1          **UNITED STATES DISTRICT COURT**
           **NORTHERN DISTRICT OF FLORIDA**
2               **PENSACOLA DIVISION**

3    UNITED STATES OF AMERICA,      )
                                    )
4               Plaintiff,          ) Case No: 3:19-CR-110/RV
        v.                          )
5                                   ) Pensacola, Florida
     SHANE PATRICK SPRAGUE, and     ) February 18, 2020
6    DEREK JEDIDIAH GOLSON, a/k/a    )
     DEREK JEDIDIAH MURRAY,         ) 9:10 a.m.
7                                   )
                Defendant.          )
8    _____)

9          **TRANSCRIPT OF JURY TRIAL - DAY 1**
            **BEFORE THE HONORABLE ROGER VINSON**
10         **SENIOR UNITED STATES DISTRICT JUDGE**
                 **(Pages 1 through 217)**

11   APPEARANCES:

12
     For the Government:        United States Attorney's Office
13                              by:  **J. RYAN LOVE**
                                21 East Garden Street, Suite 400
14                              Pensacola, Florida 32502-5675
                                (850) 444-4000
15
        and                     United States Department of Justice
16                              by:  **ETHAN EDDY**
                                150 M Street NE, Room 4.108
17                              Washington, D.C. 20002
                                (202) 305-0202
18
     For Defendant Shane        Ronald W. Johnson, PA
19   Sprague:                   by:  **RONALD W. JOHNSON**
                                114 East Gregory Street
20                              Pensacola, Florida 32502
                                (850) 438-1400
21
     For Defendant Derek        Michael J. Griffith, PA
22   Jedidiah Golson:           by:  **MICHAEL J. GRIFFITH**
                                304 E. Government Street
23                              Pensacola, Florida 32502
                                (850) 433-9922
24
25              *Julie A. Wycoff, RMR, CRR*
            *Official United States Court Reporter*
            *(850) 470-8196 * julieawycoff@gmail.com*

1          **P R O C E E D I N G S**

2          *(Call to Order of the Court.)*

09:10:34   3          THE COURT:  Good morning.  Be seated, please.  Let's

09:10:36   4   see.  We have the attorneys, we have the defendants, and we're

09:10:39   5   ready to bring in our jury.

09:10:40   6          Leonard, please.

09:11:17   7          MR. EDDY:  Your Honor, if I may, just a brief

09:11:18   8   housekeeping matter in case it's relevant to --

09:11:20   9          THE COURT:  All right, Mr. Eddy.

09:11:20   10         MR. EDDY:  -- the preliminary instructions to the

09:11:22   11  jury.

09:11:23   12         As Your Honor's aware, we have three co-defendants in

09:11:26   13  this matter who've pleaded guilty, and so the Government has a

09:11:29   14  set of proposed redactions from the original indictment.  We're

09:11:34   15  happy to present those to the Court now if it's not --

09:11:37   16         THE COURT:  I'm not going to read the indictment to

09:11:38   17  them.  I'm going to give the same summary I gave when we

09:11:42   18  selected the jury, just to remind them who they are, but we'll

09:11:45   19  have a redacted copy when we send it back to the jury for

09:11:49   20  deliberation.

09:11:50   21         MR. EDDY:  Thank you, Your Honor.

09:11:51   22         COURT SECURITY:  All rise for the Jury.

09:11:51   23     *(Jury present.)*

09:12:29   24         THE COURT:  Let me welcome all of our -- please remain

09:12:30   25  standing for just a moment.  Our last juror in has to take the

| | | |
|---|---|---|
| 09:12:34 | 1 | added seat.  So you get responsibility for the chair. |
| 09:12:39 | 2 | THE JUROR:  Very well. |
| 09:12:40 | 3 | THE COURT:  Ladies and gentlemen of the jury, let me |
| 09:12:41 | 4 | welcome you this morning.  The first thing we have to do is |
| 09:12:44 | 5 | swear you as the jury.  So please raise your right hand, and |
| 09:12:48 | 6 | I'll have the clerk administer the oath to you. |
| 09:12:52 | 7 | (Jury sworn.) |
| 09:13:03 | 8 | THE COURT:  Please be seated.  Ladies and gentlemen, |
| 09:13:06 | 9 | you also have a notepad with you, and I'll get to those |
| 09:13:10 | 10 | instructions about how and whether you want to use those, but |
| 09:13:13 | 11 | those are for you to take notes if you choose to do so and if |
| 09:13:17 | 12 | you want to do so. |
| 09:13:19 | 13 | Let me say that you've now been sworn as the jury to |
| 09:13:21 | 14 | try this case, and by your verdict you're going to decide all |
| 09:13:26 | 15 | the issues of fact in this case, what is the factual truth in |
| 09:13:29 | 16 | this case. |
| 09:13:30 | 17 | And I emphasize issues of fact because there are lots |
| 09:13:33 | 18 | of issues in a trial.  There are issues of law, of course, |
| 09:13:36 | 19 | issues of evidence, and issues of procedure, and issues of fact. |
| 09:13:40 | 20 | My job is to take care of the first three of those -- the |
| 09:13:43 | 21 | evidence, the procedure, and the law -- and your job is to |
| 09:13:46 | 22 | decide what is the factual truth in the case.  So it goes |
| 09:13:49 | 23 | without saying that you're going to have to pay very careful |
| 09:13:52 | 24 | attention to the evidence as it comes in during the trial. |
| 09:13:55 | 25 | And the evidence is only going to come from two |

09:13:58   1   sources:  It will come from the testimony of witnesses

09:14:00   2   testifying under oath from this witness box right in front of

09:14:04   3   you, and it will come from the exhibits that are properly

09:14:07   4   admitted during the course of the trial that meet the rules of

09:14:11   5   evidence and for admissibility.  That's the only source of

09:14:14   6   evidence.

09:14:16   7          I emphasize that because you're going to hear the

09:14:18   8   lawyers a lot during the trial, but what the lawyers say is not

09:14:21   9   evidence.  They're not testifying under oath.  None of them on

09:14:26   10  either side were present at the scene of the events you're going

09:14:30   11  to be hearing evidence about.  And their job is to present the

09:14:34   12  evidence to you.  This is an adversary process.  Everybody's on

09:14:38   13  one side or the other.  You and I are the disinterested, neutral

09:14:42   14  parties in this trial.

09:14:43   15         So they will be presenting evidence to you, and your

09:14:45   16  job is to simply absorb it, listen to what they present, and

09:14:49   17  understand it, if you can, as best you can.  But they will

09:14:53   18  present the evidence to you.  But what they say at any time,

09:14:55   19  even in their opening statements or their closing arguments, or

09:15:00   20  even in asking questions or objections or motions, or whatever

09:15:05   21  else will occur, that's not evidence.  So keep that in mind.

09:15:06   22  They're not witnesses; they're not testifying about the

09:15:08   23  evidence.

09:15:10   24         Let me refresh you a little bit about what this case

09:15:13   25  is about because it's been over a week since you were selected,

09:15:19  1   and I'm going to just give you a quick summary of what the case

09:15:24  2   entails.

09:15:25  3           This is a case involving alleged animal-fighting

09:15:30  4   venture.  And under the law, an animal-fighting venture is an

09:15:32  5   event -- and I'm quoting from the statute now -- any event in

09:15:35  6   which -- in or affecting interstate or foreign commerce that

09:15:39  7   involves a fight conducted or to be conducted between at least

09:15:43  8   two animals for purposes of sport, wagering, or entertainment.

09:15:49  9   That's what the law says.

09:15:50  10          The alleged animal-fighting venture in this case is

09:15:53  11  dogfighting, and the indictment charges 44 separate counts

09:15:57  12  against five defendants.  This trial only involves two

09:16:00  13  defendants.  And the defendants who are on trial here, Shane

09:16:04  14  Patrick Sprague and Derek Jedidiah Golson, have been charged.

09:16:09  15  Mr. Sprague in nine counts and Mr. Golson in 11 counts of that

09:16:15  16  indictment.

09:16:16  17          Both defendants are charged in Count One, which is

09:16:17  18  what we call a conspiracy count.  The conspiracy count charges

09:16:22  19  that from a period of time beginning about April 27 of 2011 and

09:16:29  20  continuing through about June the 4th of 2019 -- that's a period

09:16:34  21  of a little over eight years -- here in the Northern District of

09:16:38  22  Florida, and elsewhere.  Both defendants did knowingly conspire

09:16:43  23  with each other and with others, first, to sponsor and exhibit

09:16:47  24  dogs in animal-fighting ventures; and, second, to possess,

09:16:51  25  train, sell, purchase, transport, deliver, and receive dogs for

09:16:54  1    the purpose of having the dogs participate in the

09:16:56  2    animal-fighting ventures; and, third, to use an instrumentality

09:17:00  3    of interstate commerce for a commercial speech for purposes of

09:17:04  4    advertising an animal for use in that fighting venture, all in

09:17:08  5    violation of certain provisions of the Criminal Code.

09:17:12  6          The other counts are known as what we call substantive

09:17:17  7    counts.  Mr. Sprague is charged in Count Five and in Counts

09:17:20  8    Eight through Fourteen with knowingly possessing, selling, and

09:17:24  9    delivering dogs on various dates during that period of time here

09:17:26  10   in the Northern District of Florida for the purpose of having

09:17:30  11   the dogs participate in the animal-fighting venture, again in

09:17:35  12   violation of certain provisions of the Criminal Code.

09:17:39  13         Mr. Golson is charged in Counts Two and Three and in

09:17:42  14   Counts Fifteen through Twenty-One with knowingly possessing,

09:17:44  15   selling, delivering, receiving, and transporting dogs on various

09:17:51  16   dates during that period of time here in the Northern District

09:17:53  17   of Florida, and elsewhere, for the purpose of having them

09:17:56  18   participate in the animal-fighting venture, all in violation of

09:18:01  19   the U.S. Criminal Code.

09:18:04  20         Mr. Golson is also charged in Count Seven with

09:18:10  21   knowingly using an instrumentality of interstate commerce for

09:18:15  22   commercial speech, and that on or about June the 2nd of 2019, in

09:18:19  23   the Northern District of Florida, and elsewhere, for purposes of

09:18:23  24   advertising an animal for use in that fighting venture, again in

09:18:28  25   violation of certain provisions of the Criminal Code.

09:18:32  1      You do have your notepads, so let me just suggest that

09:18:38  2  you write on the front page the names of the attorneys and the

09:18:43  3  defendants so that you will know as we go through who everybody

09:18:46  4  is, and some of the other people I'll also reintroduce to you.

09:18:51  5      Again, the defendants are Shane Patrick Sprague, who's

09:19:00  6  represented by Attorney Ron Johnson, who's sitting first at the

09:19:05  7  end of the table.  And the other defendant is Derek Jedidiah

09:19:11  8  Golson, G-O-L-S-O-N.  Mr. Sprague is S-P-R-A-G-U-E.  And

09:19:16  9  Mr. Golson is represented by Michael Griffith, who's seated over

09:19:20  10  here, along with a paralegal.  So the attorneys are Mr. Johnson,

09:19:30  11  J-O-H-N-S-O-N, and Mr. Griffith.

09:19:33  12      And for the Government, the Government's case is going

09:19:38  13  to be prosecuted by Ethan Eddy, who's seated here at the end,

09:19:41  14  E-D-D-Y.  And assisting him is Ryan Love, who's seated in the

09:19:48  15  middle.  They have a paralegal, Ms. Backer -- is that right? --

09:19:53  16  there, and the case agent is seated back behind them.  I think

09:19:57  17  that's Agent Ridgeway.

09:20:02  18      Other people that you can see here in the courtroom.

09:20:04  19  Again let me introduce myself.  I'm Roger Vinson.  I'll be

09:20:08  20  presiding over the trial throughout the trial.  And by the way,

09:20:11  21  the attorneys' estimate that we'll be able to finish this trial

09:20:13  22  probably next Tuesday or Wednesday.  But that's an estimate;

09:20:18  23  there are no guarantees, but we're going to try to expedite as

09:20:22  24  much as possible.  I hope we can finish a little sooner.  But we

09:20:25  25  may not be able to, so be flexible with us, but that's our best

09:20:31  1    estimate right now.

09:20:32  2         Again, seated to my left is my law clerk, Tim Inacio;

09:20:36  3    and he'll be coming in and out of the courtroom as we work on

09:20:41  4    instructions on the law and other legal issues and procedural

09:20:44  5    issues, perhaps, and often some evidentiary issues.  So you'll

09:20:49  6    know what he's doing as we go back and forth with that.

09:20:53  7         Others here in the courtroom, right in front of me,

09:20:55  8    our courtroom deputy clerk, Mary Moloy.  She is, as I said,

09:21:00  9    acting as the secretary.  She notes when the witnesses testify,

09:21:06  10   who they are, swears the witnesses, maintains the exhibits,

09:21:06  11   marks the exhibits, does all of that stuff.  And as I mentioned

09:21:11  12   to you when we selected you, she's the one responsible for your

09:21:15  13   compensation as jurors and for your travel and mileage; and if

09:21:18  14   you need a certificate for an employer, she's the one you need

09:21:21  15   to see about that.  She will be happy to give you that.

09:21:25  16        Julie Wycoff is over here.  She's our official court

09:21:28  17   reporter taking down everything that's being said, and including

09:21:31  18   what I'm saying now, and everything else that goes on in the

09:21:34  19   trial.

09:21:35  20        We have some court security officers and U.S. marshals

09:21:41  21   around.  Let's see.  We've got Leonard Thomas, who's our court

09:21:44  22   security officer, back here.  We've got Gary Carnley back here

09:21:46  23   somewhere, and we've got Shawn Doll somewhere over here.  So

09:21:52  24   we'll have marshals and court security officers during the

09:21:56  25   trial, and they'll also be rotating in and out, and you'll

| | | |
|---|---|---|
| 09:22:00 | 1 | understand what they're doing. |
| 09:22:02 | 2 | Let me give you some just very basic instructions |
| 09:22:05 | 3 | before we start the trial. |
| 09:22:09 | 4 | I told you you're going to be called upon to decide |
| 09:22:11 | 5 | the fact.  And because of that, you need to pay very careful |
| 09:22:14 | 6 | attention to all the evidence as it comes in.  And I'm going to |
| 09:22:18 | 7 | give you some instructions on taking notes, if you want to take |
| 09:22:22 | 8 | notes; but, again, you certainly don't have to take notes.  A |
| 09:22:24 | 9 | lot of people are -- you know, they like to do that as part of |
| 09:22:27 | 10 | their daily routine.  Other people, they're not familiar with -- |
| 09:22:32 | 11 | they're not customarily doing that.  So it's up to you whether |
| 09:22:34 | 12 | you want to do it or not. |
| 09:22:36 | 13 | But I need to remind you that you need to keep an open |
| 09:22:39 | 14 | mind until the end of this trial because the trial has very |
| 09:22:44 | 15 | discrete phases.  We're going to begin by giving the attorneys |
| 09:22:47 | 16 | an opportunity to make an opening statement.  And I emphasize an |
| 09:22:51 | 17 | opening statement.  It's not an opening argument, despite what |
| 09:22:56 | 18 | you hear on the news and in television and even in impeachment |
| 09:23:00 | 19 | proceedings.  It's an opening statement. |
| 09:23:03 | 20 | The attorneys are not permitted at this time to argue |
| 09:23:04 | 21 | the case.  Their intent and their purpose is to give you a |
| 09:23:11 | 22 | preview of what they expect you to see and hear as the evidence, |
| 09:23:14 | 23 | because at this point in time you and I are still in the dark. |
| 09:23:18 | 24 | We don't know what this case is about.  And they will tell you |
| 09:23:21 | 25 | what they think the evidence is going to be and how that relates |

09:23:23  1    to the issues that you're going to be called upon to decide.

09:23:28  2         Again, what they say is not evidence.  They're just

09:23:30  3    going to tell you what they think the evidence is going to be

09:23:33  4    and what you can expect to see and hear.  You may just want to

09:23:37  5    think about it as the picture on the front of a jigsaw puzzle

09:23:42  6    box.  They'll tell you sort of where they think the corner

09:23:45  7    pieces ought to go and where certain colors might be so you'll

09:23:47  8    understand, as you get the bits and pieces of evidence, how to

09:23:50  9    fit them together.  So that's what the opening statement is

09:23:56  10   about.

09:23:56  11        When they finish, then the Government, as the

09:23:58  12   prosecution, gets to put on its evidence; and it will present

09:24:02  13   evidence in the form of witnesses and exhibits.  When it

09:24:05  14   finishes, or rests, then the defendants may, if they choose; but

09:24:09  15   they have no obligation to do so, put on evidence.  And if they

09:24:13  16   do put on evidence, the Government has an opportunity for

09:24:18  17   rebuttal.  And if the Government puts on rebuttal, the

09:24:21  18   defendants may, if they choose, put on surrebuttal.  But

09:24:23  19   eventually you will see and hear all the evidence, which is

09:24:27  20   going to take up most of the trial.

09:24:29  21        When they finish doing that, then they have an

09:24:32  22   opportunity to make their closing arguments.  And at that time

09:24:37  23   they can argue the case and argue what they think you should

09:24:40  24   conclude or infer from what you've seen and heard as evidence

09:24:44  25   and how that relates to their positions in this trial.

09:24:48  1    And after they finish doing that, then I'll instruct

09:24:51  2  you on the law that you should apply, along with some

09:24:55  3  suggestions on how to deal with certain kinds of evidence,

09:24:58  4  probably, and how to deal with certain other things that may

09:25:01  5  have taken place during the trial.

09:25:04  6    But I emphasize that all of those are important

09:25:07  7  phases.  The law may not be what you think it is, for example.

09:25:12  8  So you need to keep an open mind until you've had the benefit of

09:25:15  9  every one of those phases; and then, and only then, deliberate

09:25:18  10  and discuss it together and reach your verdict unanimously.

09:25:23  11    So that's what we're going to be doing for the next,

09:25:26  12  probably, six days or so.

09:25:33  13    Let me remind you that it is very important that you

09:25:36  14  base your decision only on the evidence that you see and hear in

09:25:41  15  this courtroom during this trial.  And that means you shouldn't

09:25:45  16  try to be independent investigators.  All you have to do is sit

09:25:50  17  there and let the attorneys present the evidence to you.

09:25:52  18    But it would be wrong for you to go out and try to do

09:25:55  19  your own independent investigation.  Don't go to a scene of any

09:25:58  20  of the events that are taking place.  Stay off the internet.

09:26:01  21  Avoid anything that may be in the news about this case or this

09:26:05  22  trial, regardless of whether it's a newspaper, radio,

09:26:07  23  television, whatever it might be.  But importantly, stay off

09:26:12  24  your electronic devices.  Don't go doing any independent Google

09:26:19  25  searches or anything like that.  Don't start telling other

09:26:21  1  people what trial is going on.  So I'll mention that a little

09:26:25  2  bit later.

09:26:28  3          It is important that you not discuss the case among

09:26:32  4  yourselves until we give it to you at the end because, as I've

09:26:38  5  suggested to you, you need to have the benefit of every part of

09:26:41  6  it.  So don't jump to any hasty conclusions.  Don't start

09:26:45  7  talking, two or three of you together, about the case.  That

09:26:49  8  wouldn't be right.

09:26:49  9          So don't talk about the case among yourselves or

09:26:51  10  certainly not with anybody else.  And that means if you see

09:26:53  11  anybody here in the courtroom that you can associate with this

09:26:56  12  trial, don't start up a conversation with them.  Try to avoid

09:27:01  13  them if you can.  And we, in turn, will not be friendly to you.

09:27:07  14  We're not going to strike up a conversation to you, and don't

09:27:11  15  think we're being rude.  It's simply to avoid the appearance of

09:27:14  16  any impropriety.  Because to someone looking on, it might appear

09:27:19  17  that we're talking about the case, and that would be improper.

09:27:22  18          During the noon hour, you're going to be allowed to

09:27:23  19  eat lunch -- and there'll be opportunities as you go up and down

09:27:27  20  the elevators or the stairs, or out on the sidewalk, or even in

09:27:31  21  a restaurant -- try to stay away from anyone you can associate

09:27:34  22  with this trial so that you don't inadvertently hear matters

09:27:37  23  that might relate to the trial that are not admissible as

09:27:43  24  evidence.

09:27:45  25          I'll also emphasize this repeatedly:  When you get

09:27:48  1   home tonight and each night, there are going to be people at

09:27:52  2   home, your family, they're going to say, Well, what's going on

09:27:54  3   in the trial?  What's it all about?  What's happening?  And I'm

09:27:58  4   going to ask you strongly, don't start talking about it, because

09:28:02  5   as soon as you do, somebody's going to say, Well, I know

09:28:06  6   something about that, or I think I do.  And we don't want to get

09:28:11  7   you involved in that kind of a conversation.  So please just

09:28:14  8   don't -- tell them you can discuss it fully when it's over, but

09:28:19  9   you don't want to talk about anything right now.

09:28:21  10          Again, it's important, don't stay up -- don't get on

09:28:25  11  your iPhones, don't get on e-mail or text messaging or Twitter

09:28:30  12  or any of the social blogs or media, Facebook, YouTube,

09:28:34  13  LinkedIn -- Twitter especially.  Don't get on any of those about

09:28:37  14  this case or this trial.

09:28:40  15          I mentioned to you when we were selecting you that

09:28:44  16  even though we have a court reporter taking down everything in

09:28:48  17  the trial, you're not going to have a transcript available to

09:28:51  18  you for review, so you shouldn't assume you're going to have

09:28:55  19  that.  You need to keep a distinct memory of what the evidence

09:29:00  20  was and what the testimony of the witnesses was.  And you may

09:29:03  21  take notes, of course, if you choose to do so, but you're not

09:29:06  22  going to have a transcript.  We can, perhaps, read a short

09:29:08  23  question and answer back for you; but other than that, you will

09:29:11  24  have to depend on your memory and perhaps your notes.

09:29:14  25          You will have all of the exhibits back in the jury

09:29:17    1    room when you deliberate, so we will send all the exhibits back

09:29:21    2    for you to look at and review at your leisure and in as much

09:29:25    3    detail as you want.

09:29:27    4         I mentioned to you that you have notepads there, and

09:29:30    5    some of you have already started taking some notes.  The

09:29:36    6    decision of whether to take notes is entirely up to you.  I do

09:29:40    7    caution you, though, that if you're taking notes, do not become

09:29:44    8    so engrossed in your note-taking that you don't observe what's

09:29:47    9    going on here in the courtroom.

09:29:48   10         It's important that you look at the witness.  You're

09:29:51   11    going to have to determine the credibility of each witness.  And

09:29:54   12    that, of course, depends on all the things you would use in

09:29:57   13    determining whether you believe or do not believe a witness in

09:30:00   14    your day-to-day lives, and part of that is just simple

09:30:07   15    observation.  So pay attention to what's going on.  Don't become

09:30:09   16    so engrossed in your note-taking that you fail to do that.

09:30:12   17         And I remind you that your notes are only an aid to

09:30:15   18    your personal memory.  They don't deserve any greater weight

09:30:19   19    than your own memory; and if they disagree with what other

09:30:23   20    people believe, then you need to, of course, take all of that

09:30:26   21    into account.  You should rely on your memory and not your notes

09:30:30   22    if there's any discrepancy.  Notes are not entitled to any

09:30:35   23    greater weight during your deliberations than the recollection

09:30:38   24    and impression of each juror concerning what that testimony was.

09:30:43   25         During this trial, I'm sure there are going to be

09:30:47   1   objections.  I'm sure there are going to be some motions made

09:30:50   2   and other things like that that I'm going to have to rule on.

09:30:53   3   And you should not in any way infer from how I rule that I favor

09:30:58   4   one side or the other in this case because I do not.  You and I,

09:31:01   5   as I said, are the disinterested, impartial parties in this

09:31:04   6   case.

09:31:05   7           So if I sustain an objection, that means it's an

09:31:09   8   improper question for some reason, and you shouldn't in any way

09:31:11   9   draw any conclusion from it.  On the other hand, if I overrule

09:31:16   10  the objection, the same thing applies:  It's a proper question,

09:31:20   11  and we'll proceed.  So don't draw any inferences from how I

09:31:25   12  rule.

09:31:25   13          Occasionally, we have a witness who's faster on the

09:31:28   14  draw than I am in ruling on the objection.  So we may have a

09:31:33   15  question and an answer from a witness, and then an objection and

09:31:36   16  I'll rule on it.  And sometimes if I sustain that objection,

09:31:40   17  that means that was an improper question and an improper answer.

09:31:46   18  And in that case I'll usually just instruct you to disregard

09:31:49   19  that answer and that question.

09:31:51   20          And that may seem a little odd to you to disregard

09:31:53   21  something you've already seen and heard, but that's exactly what

09:31:56   22  I want you to do.  Just mentally set it aside and say, That's

09:32:01   23  not part of the evidence in the case and I'm not going to give

09:32:03   24  it any consideration.  May not happen, but it may.

09:32:08   25          Sometimes the attorneys and I are going to have to get

09:32:10  1   together, either out of your presence or out of your hearing.

09:32:13  2   Sometimes we may do it by conference here at the bench.  Other

09:32:17  3   times we may actually have to preview the evidence or get into

09:32:20  4   it, and we'll ask you to step back in the jury room.  It may

09:32:23  5   seem to you that we're going awfully slow and dragging the case

09:32:28  6   out, but I can assure you we're going to move as rapidly as we

09:32:32  7   can, consistent with your time and our own.  But sometimes

09:32:35  8   matters are very important, and we have to really hash it out

09:32:37  9   and make sure we're right before we go on.  So you'll understand

09:32:40  10  if we have to do that.

09:32:43  11       Now I'm going to give the attorneys an opportunity to

09:32:46  12  make their opening statements.  And I remind you again that what

09:32:50  13  they say is not evidence.  If you're taking notes, do not

09:32:53  14  consider this as a part of your note-taking evidence.  Perhaps

09:32:57  15  you probably even shouldn't take notes at all so you don't get

09:33:01  16  confused about that.  But they're going to tell you what they

09:33:04  17  think the evidence is and how that relates to what they think

09:33:06  18  their issues are in the case and their positions on those

09:33:09  19  issues.

09:33:10  20       There are no time limits on them.  I give them time

09:33:12  21  limits when we get to the closing arguments, but they're going

09:33:15  22  to give you their separate opening statements.  The Government

09:33:20  23  gets to go first because it has the burden of persuasion.  The

09:33:25  24  defendants may, if they choose, make opening statements now; but

09:33:28  25  they can reserve them sometimes.  But then, after they finish,

09:33:32    1    we'll move right on into the trial of the case.

09:33:37    2            So at this time, I'm going to recognize the attorneys

09:33:39    3    in turn for purposes of opening statement.  I begin with

09:33:42    4    Mr. Eddy or Mr. Love.

09:33:45    5            Who's going to do it?  Mr. Love.  All right.

09:33:47    6            MR. LOVE:  Thank you, Your Honor.  May it please the

09:33:49    7    Court, counsel for each defendant --

09:33:50    8            THE COURT:  Oh, one other thing.  There are some

09:33:51    9    witnesses that we didn't ask about -- Mr. Love, pardon me.  I

09:33:54   10    didn't ask about some of these witnesses.  Let me make sure

09:33:57   11    we've got no one on the witness list now that someone perhaps

09:34:05   12    knows.  These are names that were not mentioned to you during

09:34:10   13    our jury selection.

09:34:11   14            Kirt Allen, K-I-R-T Allen.  Myron Cason.  Justin

09:34:18   15    Johnson.  Victoria Wyndham.  Jessica Wyndham.  Fred Wright,

09:34:25   16    W-R-I-G-H-T.  Christina Browne, B-R-O-W-N-E.  Jim Knotts,

09:34:34   17    K-N-O-T-T-S.  Or Anthony Wilburn, W-I-L-B-U-R-N.

09:34:41   18            Anyone in the jury think you might know any of those?

09:34:48   19            MR. JOHNSON:  Judge, could I ask you to add two more

09:34:49   20    names on this?  One is Anna Hackney.

09:34:52   21            THE COURT:  How do you spell that name?

09:34:54   22            MR. JOHNSON:  A-N-N-A.  Last name is H-A-C-K-N-E-Y.

09:34:58   23            THE COURT:  Okay.

09:34:58   24            MR. JOHNSON:  And the other person is J. P. Juarez,

09:35:01   25    J-U-A-R-E-Z.

| | |
|---|---|
| 09:35:04 | 1 |
| 09:35:09 | 2 |
| 09:35:12 | 3 |
| 09:35:14 | 4 |

THE COURT:  All right.  Anybody know either of those?

THE JURY:  (No response.)

THE COURT:  All right.  With that, Mr. Love, I recognize you for opening statement.

MR. LOVE:  Thank you, Your Honor.

Again, may it please the Court, counsel for each defendant.

Good morning, ladies and gentlemen.  First of all, thank you for your time.  I know each of you can think of a hundred different things that you'd rather be doing, probably, than sitting here and serving on a jury.  I'm sure the defense will tell you this is an important day for them.  It's also an important day for the Government.  The important thing is you-all get to determine -- listen to the facts and applying the law that the judge will give you later, and determine what's the right decision in this case.

This case is about dogfighting, about pitting two dogs, one with the other, and fighting, maybe till the death, maybe till injuries, but it's about dogfighting.

But it's more sophisticated than just dogfighting.  What you will hear and see from the evidence is this was a network of individuals that bred dogs, that trained dogs, that trafficked in dogs -- whether it be buying, selling, or trading dogs -- and trained dogs for the purpose of fighting.  All of it for the purpose of dogfighting.

09:36:18  1          You'll hear that a network of individuals spanned

09:36:21  2    across multiple states, and it included individuals of Shane

09:36:25  3    Sprague, Derek Golson, and their business of C Wood Kennels.

09:36:35  4    You'll hear that the purpose of this case and the purpose of the

09:36:37  5    conspiracy for which they conspired together and with others

09:36:41  6    were to do just that:  to breed dogs, train dogs, trade dogs,

09:36:48  7    and possess dogs, all for the purpose of dogfighting.

09:36:52  8          This was not just dogfighting, as I said before.  It

09:36:55  9    was a sophisticated business.  A business that relied on

09:36:59  10   records, a business that relied on information, and a business

09:37:02  11   that relied on techniques and skills for dogfighting.

09:37:08  12         When it relates to breeding dogs, you're going to hear

09:37:12  13   that the focus of this was on the bloodlines of each dog.  The

09:37:16  14   bloodlines of known dogfighters, the known dogfighting dogs.

09:37:21  15   When they bred dogs, you'll see that the focus was to make sure

09:37:24  16   that they bred dogs to other dogs that had a lineage of

09:37:28  17   dogfighting.

09:37:29  18         They wanted to make sure they bred their dog with

09:37:32  19   another known dogfighting dog.  When they traded dogs or sold

09:37:36  20   dogs or bought dogs, you'll see the focus was on whether or not

09:37:39  21   this dog that they were buying, selling, or trading had a

09:37:43  22   lineage or bloodline of fighting, of dogfighting.

09:37:49  23         And when it relates to fighting, you'll see that they

09:37:51  24   trained their dogs using various techniques, that they traded

09:37:56  25   information with each other through Facebook, text messages, and

09:37:58   1   other avenues.  They trained these dogs in such a way that they
09:38:02   2   conditioned them so they could sustain the fight and have the
09:38:06   3   stamina.  But you'll see they also trained them to have the
09:38:10   4   strength in their jaws and in their legs and other areas so that
09:38:14   5   they'd be ready for a fight.
09:38:17   6       You'll see that like any other business, there was
09:38:20   7   tools of the business.  There was tools such as weight collars
09:38:23   8   to build muscles, treadmills again to build stamina, flirt poles
09:38:29   9   and spring poles, things that you-all probably, like me, had
09:38:33  10   never heard of before this case.  But you're going to hear
09:38:36  11   testimony about how these devices, each one, are used.
09:38:38  12       You may think, Well, I have a treadmill.  I've got one
09:38:41  13   in my house.  That's not the way you'll hear these treadmills
09:38:45  14   were used.  You'll hear they were used for the dog to have
09:38:48  15   stamina, to be able to withstand a fight.
09:38:51  16       Spring poles.  Flirt poles.  Again, I anticipate
09:38:54  17   you'll have evidence of what they are and what they're used for.
09:38:59  18   Break sticks to probe a clenched jaw from a dog in a dogfight.
09:39:05  19       A breeding stand used for breeding.  Again, probably
09:39:08  20   never heard of this.  I anticipate you'll see a picture, maybe
09:39:10  21   even get to see it itself, a breeding stand that would cause the
09:39:15  22   female dog to be trapped in a device so that she could be bred
09:39:19  23   by a male dog.
09:39:21  24       Again, when you listen to this evidence, you realize,
09:39:23  25   Why would this be needed?  I anticipate you'll hear that these

09:39:27  1    dogs are fighting dogs.  They can't just be allowed loose in a

09:39:31  2    cage like a normal breeding, to breed whenever they get ready.

09:39:36  3    They would lock one in, and that -- so that the other dog could

09:39:40  4    breed the female.  You're going to get to hear evidence about

09:39:42  5    that.

09:39:42  6         And you'll also hear that part of the tools was live

09:39:46  7    animals such as raccoons.  And they would use raccoons to

09:39:51  8    evaluate a dog and also enhance their fighting temperament.  I

09:39:58  9    anticipate you'll see videos of that, where they sought their

09:40:01  10   dogs on a raccoon to test them.

09:40:05  11        Finally, as I said before, any good business is going

09:40:07  12   to have records and they're going to generate records.  In this

09:40:10  13   case you'll see that there are dog shipment records where they

09:40:14  14   were trading dogs, payment records, records that they tracked a

09:40:17  15   dog's fighting history, records of a fighting dog bloodline,

09:40:23  16   some of which you'll see was maintained on this underground

09:40:27  17   website called Peds Online.

09:40:30  18        And on Peds Online you'll see that they identify the

09:40:32  19   dogs by their dog name, but oftentimes it will be followed up

09:40:36  20   with a symbol or symbols:  4XW or CH or GR-CH.  Again, you may

09:40:44  21   think, I've never heard of that.  I anticipate you'll hear that

09:40:48  22   4XW on the Peds Online meant four-time winner.  CH would mean a

09:40:54  23   Champion.  GR-CH, Grand champion.

09:41:01  24        Ladies and gentlemen, I think you'll hear that these

09:41:03  25   symbols were not indicative of some dog show or some winner at

09:41:09  1    some Westminster-like contests or some treadmill pull [sic].

09:41:12  2    What you'll hear are these were symbols to symbolize that they

09:41:18  3    were dogfighters, and they were fighting dogs.  And these dogs

09:41:21  4    on these Peds Online were being traded and symbolized so that

09:41:27  5    others that were trade and breeding with them knew their

09:41:30  6    lineage:  They were a four-time winner.  They were a Grand

09:41:32  7    Champion.  You want to breed with this dog because he was a

09:41:34  8    Grand Champion or in the lineage of Grand Champion dogs.

09:41:40  9         The indictment in this case charges the defendants

09:41:42  10   with conspiring to sponsor and exhibit dogs in dogfights, with

09:41:47  11   engaging in specific unlawful activities for the purpose of

09:41:50  12   dogfighting.  But this case is not just a case only about one

09:41:54  13   specific dogfight at a specific date or a specific place or

09:41:59  14   specific time.

09:42:02  15        You will hear evidence at trial about dogfights.

09:42:04  16   Indeed, you'll hear evidence about them.  But I anticipate the

09:42:08  17   judge will instruct you that federal law prohibits not just

09:42:12  18   dogfighting but the things that happen in preparation.  The

09:42:14  19   things that happen before the fight.  The things that happen

09:42:17  20   surrounding the fights:  The selling, the buying, training,

09:42:22  21   transporting, receiving dogs, and even the mere possession if it

09:42:27  22   was done for the purpose of dogfighting.

09:42:30  23        The indictment charges all those, and it charges these

09:42:33  24   defendants with conspiring to engage in those acts, either with

09:42:37  25   one another or with others, and others that you'll hear about

09:42:42  1  besides just Mr. Golson and Mr. Sprague.

09:42:45  2      The evidence will show beyond a reasonable doubt that

09:42:46  3  these co-conspirators worked together to further the objectives

09:42:49  4  of the conspiracy.  They supplied each other with fighting dogs.

09:42:53  5  They bred fighting dogs.  They advertised their fighting dogs.

09:42:58  6  They advertised dogs for stud services.  They shipped dogs to

09:43:03  7  others.  And they made arrangements to test their dogs, again

09:43:07  8  using live animals, and they made arrangements to fight dogs.

09:43:12  9      Members of the conspiracy sought out dogs for, again,

09:43:14  10  particular bloodlines to purchase and breed their own dogs.

09:43:18  11  They share information.  They share the history of their dogs.

09:43:22  12  They share tips and techniques.

09:43:25  13      And you'll find that at the end of the fights, if dogs

09:43:28  14  were injured, they didn't take them to the customary

09:43:31  15  veterinarian because they didn't want that type of scrutiny.

09:43:34  16  And at the end of the day, they didn't want law enforcement to

09:43:37  17  know about it.  You'll see that they treated them themselves,

09:43:39  18  using makeshift devices to treat these dogs that were injured.

09:43:44  19      Now, if you'll allow me, I want to talk to you about

09:43:47  20  the specific roles that these defendants played.  You're going

09:43:51  21  to hear evidence that Mr. Golson and Mr. Sprague, again, bred

09:43:56  22  dogs, advertised dogs, sold dogs, received dogs, and possessed

09:44:00  23  dogs, all based on this bloodline lineage of dogfighting, and

09:44:05  24  possessed them for the purpose of dogfighting.

09:44:09  25      You're going to hear that Mr. Golson solicited

09:44:11   1   individuals for these stud services, for dogs that he advertised

09:44:17   2   as fighting dogs and from lineage of fighting dogs, and would

09:44:21   3   charge individuals to breed with his dogs with this known

09:44:25   4   bloodline.  You'll hear that Mr. Golson also arranged to have a

09:44:28   5   dog attack and kill a live raccoon for the purpose of evaluating

09:44:35   6   and enhancing the dog's fighting temperament.

09:44:38   7          You'll also see and hear about evidence that we

09:44:41   8   recovered at each of their houses.  At Mr. Sprague's house, I

09:44:43   9   anticipate you'll hear that they maintained a number of pit

09:44:46  10   bulls or pit bull-type dogs in conditions consistent for use in

09:44:51  11   dogfighting.  You'll hear that they had dogfighting pedigrees,

09:44:56  12   dogfighting magazines, used break sticks, dog treadmills, and

09:45:02  13   other tools for the dogfighting -- for training dogfighting and

09:45:05  14   using dogs for the purpose of dogfighting.

09:45:07  15          Mr. Golson similarly had pit bull-type dogs that were

09:45:11  16   maintained, again, you'll hear, in conditions consistent for use

09:45:14  17   in dogfighting.  He had books about dogfighting.  Instructional

09:45:18  18   material about how to prepare a dog for fight, not only in his

09:45:21  19   house, but you'll hear he had it on his own cell phone as well:

09:45:25  20   How to prepare a dog for a fight.  What conditions do you do?

09:45:28  21   What type of exercises do you put them through to get this

09:45:32  22   dog -- even weeks in advance.  This is what you're going to

09:45:34  23   hear.  You'll hear about six weeks in advance, five weeks, four

09:45:38  24   weeks, exactly what you need to do for your dog to have them

09:45:41  25   prepared for a dogfight.  I believe you will hear that that was

09:45:45  1   on his phone and in his house.

09:45:48  2        I anticipate you'll learn about another co-conspirator

09:45:54  3   named Tommy Peek, a Milton resident who you'll learn was a known

09:45:58  4   dogfighter.  A known dogfighter such that he was -- he had a

09:46:01  5   chapter dedicated to him in a dogfighting book, a resident from

09:46:06  6   right here in Milton, Florida.  And you'll hear that this

09:46:09  7   dogfighting book was one that he treasured.  He had a lot of

09:46:12  8   them, and he would sign the books for people.  You'll hear that

09:46:15  9   unbeknownst to him, he signed and gave one of the books to an

09:46:18  10  undercover agent, our own case agent, Andrew Ridgeway.  He'll

09:46:23  11  tell you that he received a book from Tommy Peek, one he signed.

09:46:27  12       But not only did he receive a book.  You'll hear that

09:46:28  13  Mr. Golson also had one of those signed books in his house.  And

09:46:32  14  you'll hear that the reason he had a signed book is because

09:46:35  15  Mr. Golson was aware of the bloodline, dogfighting dogs that

09:46:40  16  Mr. Peek had.  Mr. Peek had a long history of having trained

09:46:46  17  blood -- a trained lineage of dogfighters.  Mr. Golson wanted to

09:46:52  18  tap into that bloodline, and you're going to hear that he took

09:46:55  19  one of his female dogs over to Mr. Peek's house.  Again using

09:46:58  20  this breeding stand, he locked his female in, and he allowed

09:47:02  21  Mr. Peek to have one of his male dogs breed one of Mr. Golson's

09:47:06  22  female dogs.

09:47:08  23       Mr. Golson's dog had puppies.  Mr. Golson kept one of

09:47:13  24  the puppies, and you'll hear Mr. Sprague kept one of the puppies

09:47:17  25  from the breeding.  And then they sold or traded the other dogs.

09:47:19  1   But you're going to hear after that, when these two puppies got

09:47:22  2   older and were able to breed, Mr. Sprague and Mr. Golson bred

09:47:26  3   them together.  Didn't matter that they were siblings.  Again,

09:47:28  4   they wanted to extend this known fighting bloodline that they

09:47:33  5   had tapped into from Mr. Peek, the known dogfighter.

09:47:42  6        You're going to hear from an expert witness as well, a

09:47:47  7   witness who has extensive law enforcement experience regarding

09:47:49  8   dogfighting.  And she'll testify about her understanding of the

09:47:52  9   meaning of a number of these tools.  I anticipate when the

09:47:55  10  evidence comes in, some of it the agents will talk about; but

09:47:59  11  some of it you're going to see is just introduced.  And we ask

09:48:02  12  that you be patient as we introduce that evidence because we can

09:48:04  13  assure you that at some point you're going to hear what those

09:48:07  14  devices are used for and what those devices are made for.

09:48:12  15       Some of the evidence is going to come in, and it may

09:48:14  16  be a little bit slow in your mind.  You may think this is like

09:48:16  17  watching paint dry.  I can assure you we've gone through it and

09:48:21  18  we've tried to condense it down, but a lot of this is going to

09:48:23  19  be Facebook messages back and forth.  Some of this will be text

09:48:27  20  messages.  Some of it will be recordings.  We're going to walk

09:48:31  21  you through this conspiracy and walk you through the

09:48:34  22  communication between these defendants and others, again, in

09:48:37  23  their breeding, training, trading, possessing of dogs for

09:48:42  24  dogfighting.

09:48:46  25       Ladies and gentlemen, what I've told you is just a

09:48:48  1    summary of what I expect you'll hear.  And I anticipate at the
09:48:51  2    conclusion of the trial, we'll ask that you return a verdict.
09:48:55  3    And again, it's not what I say, it's not what Mr. Eddy says,
09:48:58  4    it's not what the defense attorneys say.  I ask that you give
09:49:02  5    your attention to what happens on the evidence stand in the form
09:49:05  6    of evidence, in the form of testimony, and in the form of
09:49:08  7    objects that are placed on the screen for you-all to see.
09:49:12  8    That's what's important to determine the facts of this case.
09:49:15  9    And I anticipate when you hear all the facts and when you apply
09:49:18  10   the law as instructed by Judge Vinson, that you'll return a
09:49:21  11   verdict of guilty for these two defendants for each and every
09:49:26  12   count.
09:49:27  13            Thank you.
09:49:29  14            THE COURT:  Very well.  Let's see.  Mr. Johnson.
09:49:33  15            MR. JOHNSON:  Thank you, Your Honor.  May it please
09:49:34  16   the Court, the Government.
09:49:41  17            Ladies and gentlemen of the jury, good morning.  It's
09:49:45  18   an honor to address you, the jury.  You'll probably remember
09:49:51  19   Judge Vinson told you during jury selection that serving as a
09:49:54  20   juror is probably the most important responsibility of a citizen
09:49:59  21   in a peacetime society.  You are a bedrock in our democracy.
09:50:13  22   You are part of the criminal justice system.  You stand between
09:50:17  23   the government and the accused citizen.  You follow the rules of
09:50:24  24   the Court that the judge instructs you to use.  He's given you
09:50:31  25   an overview of that this morning.

| | |
|---|---|
| 09:50:35 | 1 |
| 09:50:39 | 2 |
| 09:50:46 | 3 |
| 09:50:51 | 4 |
| 09:50:56 | 5 |
| 09:51:03 | 6 |
| 09:51:07 | 7 |
| 09:51:11 | 8 |
| 09:51:16 | 9 |
| 09:51:21 | 10 |
| 09:51:26 | 11 |
| 09:51:35 | 12 |
| 09:51:40 | 13 |
| 09:51:47 | 14 |
| 09:51:55 | 15 |
| 09:52:02 | 16 |
| 09:52:14 | 17 |
| 09:52:19 | 18 |
| 09:52:25 | 19 |
| 09:52:29 | 20 |
| 09:52:33 | 21 |
| 09:52:38 | 22 |
| 09:52:50 | 23 |
| 09:52:55 | 24 |
| 09:52:59 | 25 |

But every citizen walks into a courtroom in the United States of America presumed to be innocent, and that presumption affords and abides by the accused until you retire to deliberate your verdict.  It's the Government's responsibility to prove the case beyond and to the exclusion of every reasonable doubt. Judge Vinson will tell you that's proof so convincing that you would not hesitate to rely upon it in the most important of your own daily affairs.

Judge Vinson's asked you to keep an open mind throughout the trial till you've heard all of the evidence.  We ask you to do the same thing.  It's your oath.

The evidence is going to show that Shane Sprague has never fought a dog in his life.  The evidence is going to show that none of his dogs had any injuries.  This vet will probably say one of them had scratches on one of his legs.  These dogs were Shane Sprague's family's pets.  Shane Sprague has five little girls, and this was their dogs that the Government came in and ripped out of their hands and out of their house.

The Government told you they recovered evidence. Yeah, they recovered evidence.  They took all the little girls' and Mr. Sprague's trophies and ribbons.  Not from dogfighting. From going to dog shows.  Mr. Sprague and his little girls don't fight dogs.

The evidence is going to show that Shane Sprague is a dog lover.  The evidence is going to show that Shane Sprague was

09:53:04  1  born a dog lover.  He was attracted to dogs at the time he was a

09:53:13  2  little baby.  He became somewhat of a dog whisperer.  He loved

09:53:20  3  dogs; he didn't fight dogs.  They had a dog that was somewhat

09:53:23  4  aggressive.  Nobody would mess with his food, like most dogs.

09:53:29  5  Shane Sprague would eat out of the dog's bowl.  He would eat his

09:53:34  6  treats, and that was okay with the dog.  That was his first dog.

09:53:39  7  It was a mixed-bred dog.  Looked like a wolf.

09:53:46  8        Then he and his family got a pedigree.  You've heard

09:53:50  9  all about pedigrees.  I don't know how much any of you people

09:53:53  10  know about dogs, but a pedigree is a purebred dog.  And you can

09:53:59  11  get their bloodlines and their lineage from the place where

09:54:06  12  they're registered.

09:54:08  13        The dogs at the Westminster Dog Show are pedigrees.

09:54:13  14  The dogs at the Westminster Dog Show walk and train and run on

09:54:19  15  treadmills.  It's conditioning, just like some of you may

09:54:24  16  condition.  That is a way that you condition a dog.  It's not

09:54:27  17  the only way to condition a dog, but it is a way to condition a

09:54:31  18  dog.

09:54:33  19        But then Mr. Sprague and his family got a rottweiler,

09:54:38  20  a pedigree.  They were going to show the dog.  Somebody stole

09:54:43  21  the dog, broke the dog's leg, and they weren't able to show the

09:54:48  22  dog.  But it was back then that he started learning about

09:54:57  23  pedigrees and bloodlines.  That's what breeders do.  It's not

09:55:02  24  that -- dogfighters.  That's what dogs are.  Every one of those

09:55:12  25  champions in all the dog shows, they have a pedigree.

09:55:23   1          Shane Sprague was born into a Navy family that lived

09:55:26   2   in Virginia and California, and then they moved to Pensacola

09:55:31   3   when he was a little boy.  He lived next door to a man who

09:55:39   4   raised and trained greyhounds.  He had about a hundred dogs, and

09:55:44   5   he trained them, and he had a racetrack, and he fed them.  And

09:55:50   6   Mr. Sprague learned a lot from him about training dogs and

09:55:56   7   nutrition and feeding dogs raw food and conditioning.

09:56:11   8          And he started reading books.  He doesn't like to

09:56:15   9   read.  He's severe ADD.  He learns better by somebody showing

09:56:17  10   him.  But that's the books that he would read.

09:56:27  11          When he was about 17 or 18 years old, he moved to

09:56:30  12   Denver, Colorado, to be with his mother.  He wanted a dog, so he

09:56:37  13   went to the shelter.  He rescued two pit bull dogs.  It's the

09:56:47  14   first pit bull dog he ever owned.

09:56:52  15          He walked in the shelter, looking at the dogs, and

09:56:58  16   he'll tell you this one little pit bull spoke to him.  The dog

09:57:03  17   whisperer.  They immediately bonded.  He adopted that dog and

09:57:11  18   another dog.  It turns out that pit bull had been a bait dog in

09:57:19  19   a dogfighting operation.  It didn't even have teeth.  They had

09:57:24  20   shaved his teeth down to the gum so he couldn't fight back.  But

09:57:32  21   he adopted that dog.

09:57:40  22          While he's still in Denver, while his dogs were still

09:57:42  23   young, a man's walking down the road.  And he just had a litter

09:57:46  24   of pit bull puppies, he tells him.  So Mr. Sprague bought one of

09:57:54  25   those dogs.  They came back to Pensacola.  And while he was

09:58:09  1   there, he met a girlfriend and had a daughter.  A daughter named
09:58:15  2   Hayleigh.  Hayleigh would eventually get a dog named Maggie that
09:58:23  3   the government took.  But he came back to Pensacola, and the one
09:58:28  4   dog that he had bought was a little aggressive.  Someone
09:58:32  5   complained.  He had to put it down.  It made him cry like a
09:58:40  6   baby.  But he still loved his pit bulls.

09:58:49  7          His wife now introduced Shane Sprague and his
09:58:59  8   girlfriend then, the mother of Hayleigh, to a litter of pit
09:59:04  9   bulls.  Somebody had too many dogs and had to get rid of them.
09:59:11  10  Shane Sprague gave away all of those dogs and helped the person
09:59:15  11  get rid of them.

09:59:20  12         He eventually got into wanting to breed and train pit
09:59:27  13  bull dogs.  His first dog was Cain, that the government also
09:59:38  14  seized.  But he would train Shane.  He would show Cain.  He won
09:59:51  15  ribbons.  He won trophies.  He would do weight pulls.  He would
09:59:56  16  do wall climbs.  And he would do conformation.  The show.  The
10:00:06  17  pretty part of the dogs.

10:00:12  18         As his girls were born, they also loved it.  Wherever
10:00:18  19  Mr. Sprague goes, his girls always go with him.  He wouldn't
10:00:23  20  have time to fight dogs.

10:00:31  21         But everyone who knows Shane Sprague knows that he's a
10:00:34  22  dog lover.  His mother will testify.  His father will testify.
10:00:43  23  Numerous friends, neighbors, and acquaintances will testify.

10:00:53  24         There's a man named Charles he used to work with.
10:00:58  25  Tell you he never liked dogs, but he's never seen dogs so

10:01:03  1  obedient as Mr. Sprague's dogs.  He knows how to handle them.

10:01:18  2          He had seven dogs, he and his girls.  Dogs can be

10:01:24  3  aggressive.  I don't know if any of you ever had an aggressive

10:01:30  4  dog; but if you've got a dominant dog, you can't just leave them

10:01:33  5  together.  His dogs lived outside.  They lived on chains so they

10:01:41  6  could each be separated.  They all -- each had their own

10:01:46  7  doghouse and their own food and their own water, and they were

10:01:59  8  fed twice a day.

10:02:07  9          The Government may tell you something of a chain

10:02:13  10 accident, and I want to tell you about it.  Mr. Sprague had a

10:02:25  11 dog named Batman, and he was keeping his friend's dog named

10:02:30  12 Lugnut.  Batman was always very excited for his family to come

10:02:43  13 home.  He would bark and he would go crazy.

10:02:49  14         One night in December 2017, they came home and there

10:02:56  15 was a noise.  What's going on?  Mr. Sprague got his 5-gallon

10:03:06  16 bucket of food, and his little girl Alyse goes out there and is

10:03:12  17 feeding her dog Biscuit.

10:03:16  18         And all of a sudden they notice Batman's not doing

10:03:20  19 anything.  And they see him come out of his doghouse, and he's

10:03:25  20 all bloody and mangled.  And then Lugnut comes out, and he's

10:03:33  21 bloody and mangled.  Their chains are all wrapped together.

10:03:42  22 Someone had taken Lugnut off his anchor.  They use car axles to

10:03:52  23 anchor the dogs, and then the chain goes around the axle.

10:03:59  24 Someone had pulled the axle out of the ground, put it back in

10:04:03  25 the ground.

10:04:15  1        There are some suspects, but they're not really sure

10:04:20  2   who did this.  But the Government on occasion has tried to

10:04:29  3   contend that he fought his dogs.  He didn't fight his dogs.  He

10:04:34  4   came home one night about 7:00 o'clock with his wife and four of

10:04:41  5   his girls, and this is what they found.  And that's undisputed.

10:04:57  6        He had a friend that helped him treat his dogs, and

10:05:00  7   they took them over there.  Batman died the next day, and Lugnut

10:05:06  8   died about a week later.  But it was no organized dogfighting.

10:05:15  9   It was a backyard incident.  They call it yard accident when

10:05:20  10  your dogs get into a fight.

10:05:27  11       The Government tells you that they found evidence and

10:05:30  12  tools at the house.  One thing you do to break a dog's bite --

10:05:36  13  because a pit bull has a very tight, strong bite.  It's a very

10:05:42  14  athletic, strong, muscular dog.

10:05:48  15       They talk about fighting dogs.  A pit bull was

10:05:54  16  initially bred back in the 1800s in England to be a fighting

10:05:59  17  dog.  So every pit bull has fighting lineage that's in their

10:06:09  18  blood, but that doesn't mean you're going to fight your dog.

10:06:19  19       But one tool you use to break their bite is called a

10:06:24  20  break tool, and it's not a dogfighting tool.  One day

10:06:28  21  Mr. Sprague came home and his neighbor dog got into it.  She's

10:06:34  22  frantically wanting help.  So he went over there with his break

10:06:39  23  tool to break the bite to separate the dog.  It's not a

10:06:44  24  dogfighting tool.  I guess it could be a dogfighting tool, but

10:06:49  25  it also has a non-dogfighting use.

|            |    |
|------------|----|
| 10:06:58   | 1  | One night Mr. Sprague's wife came home.  Two of their
| 10:07:01   | 2  | dogs got into it.  She tried to find a break stick to break the
| 10:07:06   | 3  | bite.

4   I also anticipate the Government's going to play some
5   tape recordings for you.  They sent an informant in to make a
6   phone call to Mr. Sprague.  As far as I know, that first one's
7   not recorded.  At least it hasn't been provided to us.  But this
8   informant tells Mr. Sprague, Hey, man, I've heard about your
9   dogs.  There are all over the country.  They are some bad dudes.

10   Well, he knows -- Mr. Sprague knows that's BS.  That's
11   smack.  He doesn't have dogs all over the country, and he's not
12   fighting dogs.  So he starts playing this guy's game.  This guy
13   wants to buy a dog, and Shane Sprague says a bunch of stupid
14   stuff, really.  But he pretends he's going to sell him a
15   fighting dog, and he embellishes all the stories.  He talks
16   about how this one puppy broke off his chain.  It went and
17   jumped on this 65-pound dog, slammed it to the ground so hard it
18   broke his back.  His legs were paralyzed, and so they had to put
19   him down.

20   He talks about litters that he never even had.  He
21   talks about doing an autopsy on Batman after the yard accident
22   and talks about how the liver was all disintegrated and what it
23   was like.  You'll hear the recordings of the phone call.  Well,
24   that's BS.  The dog didn't have any autopsy.  He's just talking
25   trash, trying to reel this guy in.  He says he's talking trash

| | | |
|---|---|---|
| 10:09:21 | 1 | to the guy because he wants him to come so he can punch his |
| 10:09:27 | 2 | lights out.  Anyway, the guy never bought any dogs and quit |
| 10:09:32 | 3 | calling. |
| 10:09:44 | 4 | There'll be a lot of witnesses that testify on |
| 10:09:48 | 5 | Mr. Sprague's behalf that he doesn't have the disposition to be |
| 10:09:51 | 6 | a dogfighter, and that's not the relationship that he has with |
| 10:09:55 | 7 | his dogs.  His daughters will testify that that's not what they |
| 10:10:01 | 8 | do with their dogs.  His wife.  His ex-girlfriend. |
| 10:10:10 | 9 | I understand you've heard a lot of hype from the |
| 10:10:13 | 10 | Government.  But our side of the story is much different.  Just |
| 10:10:25 | 11 | like Judge Vinson asked you, I ask you to keep an open mind. |
| 10:10:30 | 12 | Listen to all the evidence.  Apply the law that Judge Vinson |
| 10:10:35 | 13 | asks you to use.  And I'll ask you to return a verdict of not |
| 10:10:42 | 14 | guilty to each of the counts against Shane Sprague. |
| 10:10:47 | 15 | Thank you for your attention. |
| 10:10:51 | 16 | THE COURT:  All right.  Mr. Griffith. |
| 10:11:01 | 17 | MR. GRIFFITH:  May it please the Court, Mr. Johnson, |
| 10:11:04 | 18 | counsel for the Government. |
| 10:11:09 | 19 | Ladies and gentlemen, as you know, I represent Derek |
| 10:11:13 | 20 | Golson.  And you are the jury who is going to determine his fate |
| 10:11:19 | 21 | as far as whether or not the Government is able to sustain the |
| 10:11:24 | 22 | charges in the indictment that was brought against him. |
| 10:11:28 | 23 | Mr. Johnson is absolutely correct.  You are the |
| 10:11:31 | 24 | bedrock of our society, for without a jury to hear evidence, |
| 10:11:38 | 25 | judge the evidence, apply the law to the evidence, we would be |

10:11:43   1   no more than Iraq.  We are depending upon you, each one of you,

10:11:50   2   to individually listen to the evidence, listen to the argument

10:11:55   3   of the lawyers at the end of the case, apply the evidence that

10:12:00   4   you hear to the law that Judge Vinson reads to you, and at the

10:12:06   5   end of the case return a verdict that would be not guilty as far

10:12:11   6   as Mr. Golson's concerned.

10:12:17   7           Mr. Love made a very compelling argument when -- or

10:12:21   8   statement when he came up here earlier.  If what he had told you

10:12:26   9   is the way the facts were to be, then I might as well close my

10:12:31   10   briefcase, pack up my computers, and walk out of here.  But what

10:12:35   11   you hear is what the Government is suggesting the facts were in

10:12:39   12   this case.

10:12:43   13           Using the words "dogfighting" and "pit bull" together

10:12:46   14   conjures up horrid images.  Horrid images.  But that is not what

10:12:53   15   we have here today.  There is no one that can in any way, shape,

10:12:59   16   form, or manner ever place Derek Golson at a dogfight.

10:13:07   17           Derek Golson is 38 years old.  He is married with

10:13:11   18   three children.  He worked as a chef for a while, he worked at

10:13:22   19   Navy Federal, and is now before you.

10:13:29   20           Derek joined the service at 17 and moved away from

10:13:32   21   home.  Prior to that time, he, for much of his life, lived in

10:13:39   22   Japan.  He moved back here with his family from Japan when he

10:13:46   23   was 12 years old.  His family moved to Canterbury Woods.  And

10:13:50   24   you'll hear that when he moved to Canterbury Woods, he developed

10:13:51   25   what's become a lifelong friendship with Shane Sprague, his

1  co-defendant.  They were friends from approximately the age of

2  12 until 17, when Derek joined the service and left.

3       Mr. Sprague had moved to Colorado to be with his

4  mother.  They did not see each other for several years.  Derek,

5  after his discharge, went to culinary school in California.  He

6  was discharged in North Carolina, went to culinary school in

7  California, moved back to North Carolina, was a chef there, and

8  went back and forth until he eventually moved back to Pensacola.

9       While working as a chef up in North Carolina and

10  moving back to Pensacola, he got a dog that was a pit bull dog,

11  Angel.  Prior to that he had had a Japanese breed of a dog when

12  he was a young child growing up.  When he got Angel he thought

13  Angel was the greatest dog he had ever owned.  He gushes over

14  Angel to this day.  He'll talk about Angel, drive you crazy with

15  it.  His mother is not a lover of dogs at all, but she loved

16  Angel because Angel was such a good dog.

17       Derek is a bit obsessive-compulsive in things he does.

18  He loved that dog so much, as she got older, he wanted another

19  dog just like Angel.  So he started researching Angel's

20  bloodlines.  And I believe the testimony will show you that

21  while researching Angel's bloodlines, he determined that he

22  could trace her back into the early 1900s, late 1800s and

23  further.  He was just obsessive on the internet finding out

24  about this dog's bloodlines.

25       He found two people that had a dog with similar

| | |
|---|---|
| 10:16:01 | 1 |
| 10:16:06 | 2 |
| 10:16:12 | 3 |
| 10:16:15 | 4 |
| 10:16:19 | 5 |

bloodlines.  One was a gentleman up in North Carolina, and the other was in Milton, a fellow by the name of Jimmy Peek.  Derek had never known Jimmy Peek, had no knowledge of him, but called him up and asked about his dog and the dog's bloodlines.  The dog's name was Lucky.

Derek arranged to make a breeding so he could essentially clone this dog Angel.  So he took Angel -- he and his wife, Derek and his wife took Angel to Jimmy Peek's house and they bred Angel.  And did they use a breeding stand?  Yes.  That's how Jimmy Peek bred his dogs.

Derek had never been into dog breeding, and they went to Mr. Peek's house, and he had a barn where they went to.  He bred his dog, Little Angel with Lucky.  He didn't know anything about Jimmy Peek.

Jimmy Peek said -- after the breeding they -- Little -- or Angel, rather, got put in the car, and Mr. Peek said, I want to show you my dogs.  Derek looks at where he has his dogs, and he was appalled.  The dogs were on heavy chains, in barrels that were half buried in the ground, and appeared to be fighting dogs.

Derek left.  Jimmy Peek had these books involving him.  Derek got one, being polite.  You know, let me have your book.  He leaves.  Never breeds with Jimmy Peek again.  There is no evidence that can be adduced that he ever had any further dealings with Jimmy Peek except one time.

10:17:55  1          In the pit bull dogs, there are dogs called Red

10:17:59  2   Nose -- because their nose has red around -- there are Blue

10:18:03  3   Nose, and then there are Bullies.  Derek likes Red Nose dogs.

10:18:09  4   That's what Angel was.  And he got a call from Jimmy Peek one

10:18:14  5   day that said, Hey, I've got a dog that I want to get rid of.

10:18:19  6   It's a puppy and it's a Red Nose, and I don't particularly want

10:18:24  7   it.

10:18:24  8          Derek takes that dog.  The dog's name was Gambit,

10:18:30  9   named Gambit.  Derek kept the dog for a while, but the dog was

10:18:36  10  shy and didn't really get along with his own dogs because of its

10:18:40  11  shyness.  And Derek found a fellow, Myron Cason.  Myron works at

10:18:47  12  Joe Patti's.  And Myron wanted a pit bull.  So Derek said, I've

10:18:52  13  got a dog that doesn't really fit in with the house.  She's shy

10:18:57  14  with all the other dogs.  And Myron bought Gambit from Derek.

10:19:03  15         Those are Derek's -- well, that's his involvement with

10:19:04  16  this Jimmy Peek that the Government is going to make so much of

10:19:08  17  a deal about, the dogfighter.  If Mr. Golson, I suggest to you,

10:19:13  18  were to be wanting to have fighting dogs, he'd have kept that

10:19:17  19  dog from Mr. Peek, who was apparently a known dogfighter.  He

10:19:21  20  didn't.

10:19:22  21         Mr. Golson had numerous other dogs.  And I believe the

10:19:28  22  evidence is going to show that of the dogs that Mr. Golson had,

10:19:33  23  at the time the Government came to his home and seized the dogs,

10:19:38  24  Mr. Golson had Porter, Kali, Captain, General, Georgia, Amaya,

10:19:51  25  and Rascal.  When the Government came to seize those dogs from

10:19:55　1　Mr. Golson, the Government had a vet with them to check out the

10:20:01　2　dogs and see what condition they were in, to see if they had

10:20:06　3　scars on them or anything from dogfighting, any evidence, any

10:20:10　4　evidence of malnutrition or mistreatment.

10:20:14　5　　　　　Some of the dogs were in the yard.  One was on a run.

10:20:17　6　There were kennels for the other.  They were in doghouses that

10:20:21　7　were built by Mr. Golson like mini houses.  They were insulated.

10:20:26　8　They were off the ground so that they wouldn't be sitting on the

10:20:30　9　cold ground.  Some of the dogs were in kennels in the house

10:20:33　10　because I believe the evidence will show you that Mr. Golson

10:20:33　11　rotated the dogs in and out of the house so no dog was excluded

10:20:40　12　or left outside.

10:20:45　13　　　　　Of the dogs, Kali was a 12-year-old dog.  Captain,

10:20:49　14　General, Georgia.  Then Amaya, the youngest dog, was 6 months

10:20:53　15　old.  There was a dog, Rascal, that had been given to Mr. Golson

10:20:57　16　by a gentleman by the name of Fred Wright.  Fred is older and

10:21:01　17　couldn't take care of his dog, and he knew Derek and knew that

10:21:05　18　he was someone that would love that dog and take care of him

10:21:10　19　with his family.  Then they had Porter.  Porter is a show

10:21:14　20　competition dog.  He was the Number 2 dog in the country for

10:21:18　21　show.

10:21:20　22　　　　　None of these dogs were found to be anything but

10:21:24　23　sweet.  The only, if you would, negative about Porter was he

10:21:30　24　barked when the agents came and the vet came.  All these strange

10:21:34　25　people are going through the house, and Porter barked like a

10:21:37 1  normal dog would do.  But you will never hear any testimony that
10:21:42 2  any of Mr. Golson's dogs were in any way abused, scarred, marked
10:21:49 3  up, aggressive, or any of the traits that you would think a
10:21:54 4  fighting dog would be.  In fact, they were house pets.  They
10:21:58 5  were dogs that the family loved.  You will hear how the family
10:22:05 6  loved those dogs, that the dogs would lay together.  They would
10:22:09 7  all pile up on the couch with the family to watch TV and be
10:22:12 8  petted.  These are not fighting dogs.
10:22:21 9        Now, once Mr. Golson came back from North Carolina
10:22:27 10 after culinary school and before he went to work at Navy
10:22:30 11 Federal, he resumed his friendship with Shane because Shane had
10:22:38 12 come back here as well.  And at that point Mr. Golson had Angel
10:22:42 13 and Mr. Sprague had his pit bull.  Just a coincidence that both
10:22:48 14 these childhood friends fell into the love of pit bull dogs.
10:22:54 15       Mr. Golson went to a couple dog shows.  He didn't know
10:22:57 16 anything about them but just thought he'd go, and he took his
10:23:01 17 dog with him.  And lo and behold, they said, Do you want to
10:23:05 18 enter your dog in this dog show?  Sure, I'll do it.  He won.  He
10:23:11 19 started going back to the dog shows and got Mr. Sprague to go
10:23:14 20 with him.
10:23:16 21       And at dog shows, a lot of the big kennels will come
10:23:21 22 with Jim's Kennels or The Best Dogs in the World, and they'll
10:23:28 23 have their shirts with the little patches on, and they'll have
10:23:33 24 trailers with the kennel name all over them.  Derek just had his
10:23:36 25 dogs and Mr. Sprague had his dogs.

10:23:39   1          And Derek come up with the idea, Why don't we just --

10:23:43   2    as a spoof, if nothing else -- we'll have a kennel and we'll

10:23:49   3    call it C Woods Kennel.  C being for Canterbury Woods, where

10:23:54   4    they grew up.  It was not official.  It was just a spoof.  But

10:23:58   5    they started winning dog shows, each of them individually.

10:24:02   6          And I suggest to you you'll see pictures of both

10:24:06   7    Mr. Sprague and Mr. Golson with trophies and ribbons and dogs,

10:24:11   8    and they were just having fun.  It was two guys who had kids

10:24:16   9    that loved their dogs, and they would go to these dog shows and

10:24:19   10   show them off, and they started winning.  And the more they won,

10:24:23   11   the more they went to the dog shows.

10:24:29   12         Eventually the wives of Mr. Sprague and Mr. Golson

10:24:35   13   didn't get along that well, so their friendship drifted apart.

10:24:40   14   Mr. Sprague stayed at C Wood Kennels, and Mr. Golson had Golson

10:24:47   15   Family Kennels.  But it wasn't a real kennel.  It was just what

10:24:51   16   he called themselves.  They continued to show their dogs.  And

10:24:57   17   as I told you, I believe the evidence is going to show that

10:25:02   18   Porter was Number 2 in the country.

10:25:05   19         Now, what do these shows consist of?  Well, I'm sure

10:25:09   20   many of you have seen either the Westminster dog show or the

10:25:12   21   Eukanuba dog show that they always have on Thanksgiving where

10:25:17   22   all the different breads, the sporting class, the nonsporting

10:25:21   23   class, terrier class, et cetera, they walk around the ring.

10:25:23   24   They're all in good shape.  Their coats are immaculate.  And the

10:25:29   25   judges determine who's the dog that meets the standards, and

10:25:33   1   they go on to determine the grand champion of that particular

10:25:37   2   show.

10:25:38   3          Well, for the pit bull dogs, they have that as well.

10:25:41   4   But in addition to that, they have competitions for the dogs,

10:25:46   5   much like you have when you have Labrador retrievers, golden

10:25:52   6   retrievers for the agility tests.  Pit bull dogs also have

10:25:56   7   agility tests.  One of them is a wall climb, where they see how

10:26:01   8   high they can jump or climb up a wall to get an object.

10:26:07   9          They have treadmills, where the dogs get on -- I

10:26:10   10  believe it's called a scratch mill where it's not powered by

10:26:14   11  electricity.  The dog powers it.  And they'll hit a stopwatch,

10:26:19   12  and the dog will start running on the treadmill; and at the end

10:26:24   13  of a specific time, they'll see how far the dog ran.  That's

10:26:28   14  another competition.

10:26:30   15         These are sanctioned events.  They are not American

10:26:37   16  Kennel Club events.  They're called the UKC.  And there's a pit

10:26:41   17  bull association for these events.

10:26:43   18         Mr. Golson won and won and won.  And he bred his dogs

10:26:54   19  and was always seeking a better dog.

10:27:02   20         In this case, how do you find a good dog?  How does

10:27:06   21  one find a good dog?  The bloodlines of the dog, much like

10:27:14   22  racehorses.  You want the best racehorse, you go and you find

10:27:18   23  the best bloodlines of a racehorse, and you breed into those

10:27:22   24  bloodlines.

10:27:23   25         That's very similar to what you do with dogs.  They do

10:27:27  1   it with all kinds of dogs:  rottweilers, shepherds, Labradors,

10:27:36  2   poodles, et cetera.  In this case there's a website Peds Online.

10:27:42  3   I don't know why the Government thinks it's an underground

10:27:42  4   website.  Anybody can get on it.  All you do is type it into

10:27:46  5   your computer.  And it has different dogs, and it has different

10:27:49  6   bloodlines on the dogs.

10:27:50  7        And in the old days -- yes, the Government's

10:27:55  8   absolutely correct.  You can see on some of the old bloodlines

10:27:59  9   where it will have "1X," one time, meaning the dog -- and a W.

10:28:04  10  Dog won a fight.  This is old stuff, but it's there.  Nothing

10:28:08  11  you can do about it.  You can't change a dog's bloodlines, or go

10:28:13  12  in and change them.  But you look to see what kind of dog you

10:28:17  13  would like to breed to get the best dog you can possibly get.

10:28:22  14        There's a group of dogs out in California, the

10:28:25  15  Castillo dogs.  They don't have -- unless you go way back -- any

10:28:31  16  of the numbers behind their names, but they're a very famous dog

10:28:36  17  that are bred.  And you'll see in some of the exhibits I believe

10:28:39  18  the Government will show, the Castillo dogs are there.  They're

10:28:44  19  known nationwide.

10:28:48  20        Now, the history of pit bull dogs.  They were a

10:28:50  21  fighting breed from way back.  All of the bulldog-type dogs are

10:28:57  22  fighting dogs.  The big ole fat English bulldogs that we all

10:29:00  23  know that are in commercials, at one point they were involved in

10:29:04  24  bull baiting.  Spuds MacKenzie, a bull terrier.  They're

10:29:09  25  fighting dogs.

10:29:11  1          Then you have your American bulldog.  You have your

10:29:13  2     Staffordshire terriers that are a spring off from the pit bulls.

10:29:17  3     Then you have Doberman pinschers, rottweilers, shepherds.  Their

10:29:21  4     lineage going way back are fighting dogs.

10:29:26  5          The current pit bull dogs that my client had and

10:29:29  6     Mr. Sprague had are not fighting dogs.  They were pets and you

10:29:35  7     will see evidence of that.

10:29:46  8          Now, I've talked to you a little bit about breeding

10:29:52  9     stands.  You'll hear evidence of that.  I believe you'll also

10:29:55  10    hear evidence about spring poles.  Spring poles are long poles

10:29:57  11    that are in the ground with a treat or a toy tied on the end of

10:30:01  12    a piece of string that the dogs will jump up for.  This is for

10:30:06  13    training the dogs for this wall-climbing event.  They're all

10:30:11  14    legitimate purposes.  The treadmills is the same thing.

10:30:17  15          Now, can these training utensils or training

10:30:25  16    equipment, can it be used for improper purposes?  Absolutely.

10:30:29  17    There is no question about that.  Are there people who fight

10:30:35  18    dogs?  Absolutely.  And do they use the same equipment?  They

10:30:40  19    do.

10:30:41  20          You could make the analogy, people that hunt have

10:30:46  21    guns.  They're not the criminals that are bank robbers.  They

10:30:52  22    use the same equipment, though.  A bank robber will take his

10:30:56  23    gun, go into a store, and terrorize people.  A hunter will go

10:31:00  24    out, put food on the table or go out to a gun range and get a

10:31:05  25    prize for the longest shot or the best shots.

10:31:08    1    You can take any tool, I suggest to you, and abuse it.
10:31:13    2    And that's what you're going to hear in the evidence that will
10:31:16    3    be presented during this case.  My client had tools that were
10:31:21    4    not abused.  Other people may abuse them.
10:31:28    5            There is a sport that is legal and sanctioned -- they
10:31:33    6    do it, in fact, down at Eglin Air Force Base.  It's called
10:31:38    7    hunting with dogs.  You can hunt deer with dogs, and you can
10:31:44    8    hunt hogs with dogs.  And licenses are given out at Eglin for
10:31:47    9    that purpose.
10:31:50   10            My client wanted to become a hog hunter with his dogs.
10:31:53   11    And he did, in fact, get a raccoon to see if his dog had the
10:32:01   12    ability to chase down an animal and would be aggressive with it.
10:32:05   13    And he did have his dog attack a raccoon that was trapped for
10:32:11   14    him.  That was the end of it.  It turned his stomach.
10:32:21   15            He had bought a trailer for this sport.  He had bought
10:32:25   16    vests for his dogs, goodies for them.  And he couldn't do it.
10:32:31   17    It was not what he wanted to do after that one time.  That was
10:32:34   18    it.  But he was getting his dog ready for a legitimate sport.
10:32:37   19            And you will see that raccoon and the dog attack the
10:32:42   20    raccoon, and it is not very pleasant to watch.  But it's not
10:32:46   21    dogfighting.  He didn't fight his dogs.  And you can twist
10:32:51   22    anything.  And the Government has one view of it, and our
10:32:54   23    position is that it was never for the purpose of dogfighting.
10:32:58   24    And there's no evidence that the dog that attacked the raccoon
10:33:02   25    that my client had was anything but a house dog, and the vet

10:33:06  1   records for the Government will show that.

10:33:15  2        My client, because he is so obsessive-compulsive in

10:33:23  3   his research on the dogs, he knows more about these pit bull

10:33:31  4   dogs than just probably about anyone in the world.  He bought

10:33:37  5   more books and studied more subjects about these dogs:

10:33:42  6   genealogy, history, how far back they go.  I suggest the

10:33:47  7   evidence will show that he just immersed himself in the history

10:33:52  8   of the pit bull dogs.

10:33:56  9        And part of that was the fighting lineage of the dogs.

10:34:01 10   In fact, he sought out people -- older people, a gentleman by

10:34:05 11   the name of Randall Abernathy, another one by the name of Ronnie

10:34:09 12   Hyde that he ran into.  In fact, he bought a couple puppies from

10:34:14 13   Randall Abernathy.  They were guys known to be involved in

10:34:20 14   dogfighting, and he talked to them, and he asked them questions.

10:34:23 15   What was it like back in the '50s and the early '60s and the

10:34:29 16   early '70s about dogs, about dogfighting?  How did that come

10:34:32 17   about?

10:34:33 18        And he also learned what the word "keep" is.  A keep

10:34:38 19   is a training regime.  That is a training regime that

10:34:43 20   dogfighters did to get their dogs ready to fight.  And

10:34:47 21   Mr. Golson decided, Well, gee, to be a dogfighter, you have to

10:34:55 22   have your dog in peak condition.  So I'm going to go ahead and

10:34:59 23   I'm going to take these training regimes that they had for their

10:35:03 24   dogfights.  I'm going to modify them and I'm going to use them

10:35:07 25   to train my dogs to become champions.  Obviously if a dog would

10:35:13   1   fight for an hour or two hours on this training regime, then for

10:35:21   2   my dog to run a few minutes on the treadmill or to jump really

10:35:25   3   high, the way you feed them, the way you exercise them, that may

10:35:29   4   be good for me to become a national champion.

10:35:33   5          He was Number 2 in the country.  He wanted to be

10:35:35   6   Number 1 with his dog, and he trained his dogs using those --

10:35:39   7   what are called keeps.  You will hear evidence to that, but you

10:35:45   8   won't hear any evidence that he ever fought his dogs.  He bred

10:35:51   9   dogs.  He gave some away.  He sold some.  He never fought them

10:35:58  10   and never sold his dogs with the intent that they would be

10:36:02  11   fought.

10:36:04  12          Now, you are going to hear a great deal of evidence in

10:36:08  13   this case, both pertaining to Mr. Sprague and to my client.  It

10:36:14  14   is important that you keep them separate.  You are not trying

10:36:19  15   them together as one individual.  They are separate.  So when

10:36:23  16   you're making your notes, you're listening to the evidence,

10:36:27  17   please be sure to separate my client and Mr. Sprague because

10:36:32  18   you're going to be asked by the Court to make a determination as

10:36:37  19   to whether they are guilty or not guilty individually, not as a

10:36:42  20   group.

10:36:43  21          So I ask you to pay very close attention to all of the

10:36:46  22   evidence as it applies to each individual defendant.  At the end

10:36:53  23   of the case, I'm sure you'll find that my client is not guilty

10:36:57  24   of the charges brought against him by the Government.  Thank

10:37:00  25   you.

10:37:03   1          THE COURT:  Ladies and gentlemen, we've been here a

10:37:05   2    good while, and we're going to take a recess before we continue

10:37:09   3    with the evidence.  Our routine will basically be that we will

10:37:13   4    start about 9:00 o'clock every morning and go until about

10:37:16   5    5:00 o'clock each day.  We'll take a break for lunch about -- a

10:37:21   6    little over an hour, probably, every day; and we'll take a

10:37:24   7    15-minute recess in the morning and a 15-minute recess in the

10:37:29   8    afternoon.  So it's time for our morning recess.

10:37:31   9          So we'll be in recess for 15 minutes.  We'll come back

10:37:35   10   at seven till 11:00; not 11:07, seven minutes till 11:00.  So

10:37:44   11   we'll be in recess until that time.

10:37:46   12         Let me remind you:  Don't talk about the case in the

10:37:49   13   jury room.  There should be some coffee and soft drinks and

10:37:54   14   things for you back there.  And I don't know if the coffee's

10:37:59   15   made or not.

10:37:59   16         Is it, Leonard?  Is the coffee ready?

10:38:01   17         All right.  So we'll have refreshments for you.

10:38:05   18         You have pads with numbers on them.  Remember the

10:38:08   19   number on your pad because that's the one you'll have to pick up

10:38:11   20   when you come back in.  We'll have to leave those pads in the

10:38:15   21   courtroom.  You cannot take them back to the jury room until we

10:38:18   22   end the case, and you'll have them for your deliberations.  So

10:38:20   23   just leave them on the seat, and you'll pick up the same number

10:38:23   24   when you come back.

10:38:25   25         All right, ladies and gentlemen.  We'll be in recess

10:38:27  1   for 15 minutes.

10:38:30  2        *(Recess taken from 10:38 a.m. to 10:55 a.m.)*

10:55:05  3             THE COURT:  Please be seated.

10:55:06  4        All right.  Let me count heads of our jurors.  We've

10:55:10  5   got all of our jurors back.  We have the attorneys and the

10:55:13  6   defendants.  And we are now ready to proceed to take the

10:55:19  7   evidence.  So, Government, you may call your first witness.

10:55:23  8             Let me ask, Counsel:  I have not invoked the rule, but

10:55:29  9   I presume you have already instructed your witnesses and

10:55:34  10  everyone to observe the rule; is that right?

10:55:36  11            MR. EDDY:  Yes, Your Honor, we'd like to invoke the

10:55:37  12  rule.

10:55:38  13            MR. GRIFFITH:  That's fine, Judge.

10:55:40  14            THE COURT:  All right.  Well, my rule is a little bit

10:55:42  15  broader than Rule 615 of the Rules of Evidence.  It means that

10:55:44  16  anyone who's in the courtroom now and expects to be called as a

10:55:47  17  witness, they must leave and not discuss this case with anyone

10:55:50  18  except the attorney who has them here or in that attorney's

10:55:54  19  presence or, for the Government, in the presence of the

10:55:57  20  Government's case agent, or until they're excused and the trial

10:56:00  21  is completed.

10:56:01  22            And, Counsel, you need to instruct all your witnesses

10:56:03  23  to observe the rule if they show up late.

10:56:05  24            MR. EDDY:  Yes, Your Honor.

10:56:06  25            MR. GRIFFITH:  Your Honor, Mr. Golson's wife was in

| | | |
|---|---|---|
| 10:56:08 | 1 | here initially, and we asked her to leave. |
| 10:56:11 | 2 | THE COURT:  All right.  Good. |
| 10:56:13 | 3 | All right.  Call your witness. |
| 10:56:14 | 4 | MR. EDDY:  Thank you, Your Honor, and good morning. |
| 10:56:17 | 5 | The Government calls Andrew Ridgeway. |
| 10:56:27 | 6 | And, Your Honor, with the Court's indulgence, in an |
| 10:56:29 | 7 | effort to streamline the proceedings, we'd like to place in |
| 10:56:33 | 8 | advance a binder of the evidence to which they'll be testifying, |
| 10:56:35 | 9 | just to spare the time going back and forth. |
| 10:56:38 | 10 | THE COURT:  Sure.  It has them marked already so they |
| 10:56:40 | 11 | can refer to it? |
| 10:56:41 | 12 | MR. EDDY:  Yes, Your Honor. |
| 10:56:43 | 13 | THE COURT:  That will be fine. |
| 10:56:45 | 14 | **ANDREW RIDGEWAY, GOVERNMENT WITNESS, DULY SWORN** |
| 10:56:45 | 15 | DEPUTY CLERK:  Be seated.  State your full name and |
| 10:56:45 | 16 | spell your last name. |
| 10:56:59 | 17 | THE WITNESS:  Christopher Andrew Ridgeway. |
| 10:57:02 | 18 | THE COURT:  We can't hear you very well, Mr. Ridgeway. |
| 10:57:03 | 19 | Is that -- turn that volume up, Mary.  We don't have volume on |
| 10:57:07 | 20 | that mic. |
| 10:57:10 | 21 | All right.  Pull the chair up close to the microphone |
| 10:57:13 | 22 | in front of you.  All right.  Tell us your name again. |
| 10:57:15 | 23 | THE WITNESS:  Christopher Andrew -- |
| 10:57:17 | 24 | THE COURT:  It's not working. |
| 10:57:18 | 25 | THE WITNESS:  -- Ridgeway. |

| | | |
|---|---|---|
| 10:57:36 | 1 | THE COURT:  Is the system volume up? |
| 10:57:38 | 2 | DEPUTY CLERK:  Yes, sir. |
| 10:57:38 | 3 | THE COURT:  Try it again. |
| 10:57:40 | 4 | THE WITNESS:  Christopher Andrew Ridgeway. |
| 10:57:43 | 5 | THE COURT:  All right.  We're getting it now.  Okay. |
| 10:57:47 | 6 | All right, Mr. Eddy. |
| 10:57:49 | 7 | **DIRECT EXAMINATION** |
| 10:57:49 | 8 | BY MR. EDDY: |
| 10:57:49 | 9 | Q.   Good morning.  Mr. Ridgeway, are you currently employed? |
| 10:57:52 | 10 | A.   Yes, I am. |
| 10:57:53 | 11 | Q.   What is your job? |
| 10:57:54 | 12 | A.   I'm a special agent. |
| 10:57:55 | 13 | Q.   With what agency? |
| 10:57:56 | 14 | A.   With the United States Department of Agriculture, Office of |
| 10:57:58 | 15 | Inspector General. |
| 10:58:00 | 16 | Q.   Where do you work out of, sir? |
| 10:58:02 | 17 | A.   Birmingham, Alabama. |
| 10:58:03 | 18 | Q.   Tell us a little bit about your job duties. |
| 10:58:06 | 19 | A.   My job duties include conducting criminal/civil |
| 10:58:10 | 20 | investigations into the programs and agencies of the U.S. |
| 10:58:12 | 21 | Department of Agriculture. |
| 10:58:14 | 22 | Q.   Does your work include investigating violations of federal |
| 10:58:18 | 23 | criminal laws falling within the jurisdiction of the Secretary |
| 10:58:20 | 24 | of Agriculture? |
| 10:58:23 | 25 | A.   Yes. |

10:58:23   1   Q.   Does that include the federal Animal Welfare Act?

10:58:27   2   A.   Yes, it does.

10:58:29   3   Q.   Agent Ridgeway, how long have you been in your current

10:58:31   4   position?

10:58:32   5   A.   Approximately nine years.

10:58:34   6   Q.   And what did you do before that?

10:58:36   7   A.   I was an intern for one year prior to that.

10:58:40   8   Q.   An intern where?

10:58:41   9   A.   With the U.S. Department of Agriculture, Office of

10:58:43   10  Inspector General.

10:58:43   11  Q.   And prior to your internship --

10:58:45   12          THE COURT:  Wait just a minute.  You shouldn't have to

10:58:47   13  lean over into the microphone.  We need to make sure the

10:58:50   14  microphone picks up his voice.

10:59:06   15          All right.  Just tell us your name again.  Don't lean

10:59:09   16  over close to it.  I just want to see if we can get it.

10:59:13   17          THE WITNESS:  Andrew Ridgeway.

10:59:20   18          THE COURT:  No, it's not working.

10:59:20   19          THE WITNESS:  I can try to scoot a little closer.

10:59:20   20          THE COURT:  No, we don't want that.  We want the

10:59:22   21  system to work.

11:00:18   22          All right.  Bear with us, ladies and gentlemen.

11:00:27   23          DEPUTY CLERK:  I have Systems coming because it's

11:00:29   24  turned up all the way, Judge.

11:00:30   25          THE COURT:  Well, just speak as loudly as you can,

11:00:37  1   Agent Ridgeway, and we'll proceed.  We're going to have somebody

11:00:42  2   adjust the mic when we get a tech up here.

11:00:45  3             All right.  Go ahead, Mr. Eddy.

11:00:46  4             MR. EDDY:  Thank you, Your Honor.

11:00:47  5   BY MR. EDDY:

11:00:47  6   Q.   Before this internship that you mentioned, what did you do

11:00:49  7   prior to that?

11:00:50  8   A.   I was a full-time student in college.

11:00:52  9   Q.   Where was that?

11:00:53  10  A.   At Jacksonville State University.

11:00:56  11  Q.   What was your field of study there?

11:00:58  12  A.   Sociology.

11:01:00  13  Q.   Do you have a degree in that?

11:01:02  14  A.   Yes, sir, I do.

11:01:02  15  Q.   To become a special agent, did you have to take any sort of

11:01:07  16  specialized training?

11:01:09  17  A.   Yes, sir.  There is a 12-week basic training program that

11:01:12  18  law enforcement goes through at the Federal Law Enforcement

11:01:13  19  Training Center in -- I believe it's in Glynco, Georgia, and --

11:01:20  20  yeah.

11:01:21  21  Q.   What subjects does that cover?

11:01:22  22  A.   That covers just the basic criminal law for agents,

11:01:27  23  defensive tactics, firearms training, vehicle handling and

11:01:33  24  driving, search warrant planning and execution.

11:01:37  25  Q.   Have you had any training after that?

11:01:40  1    A.    Yes.

11:01:40  2    Q.    Tell us a little bit about that.

11:01:42  3    A.    There is an agency-specific follow-on training that I

11:01:47  4    attended that is roughly one month long.  It's the -- I believe

11:01:52  5    it's the Inspector General Training Academy, I believe, that's

11:01:56  6    also put on there at FLETC.  It's, again, agency-specific

11:01:59  7    training.

11:02:00  8    Q.    Setting aside the investigation for this case, have you

11:02:03  9    participated in any animal-fighting investigations?

11:02:06  10   A.    I have.

11:02:06  11   Q.    Tell us a little bit about your work in those.

11:02:11  12   A.    Most of my work in those previous cases were as an

11:02:15  13   assistant just during the execution of search and/or arrest

11:02:20  14   warrants.

11:02:20  15   Q.    And as part of that, were you involved in seizing physical

11:02:23  16   evidence?

11:02:24  17   A.    I was.

11:02:26  18   Q.    Agent Ridgeway, as part of your work duties, were you asked

11:02:29  19   to investigate someone named Marcus Golson in the context of

11:02:34  20   dogfighting?

11:02:35  21   A.    Yes, I was.

11:02:36  22   Q.    What were the circumstances of that?

11:02:38  23   A.    Around November of 2017, my agency was contacted by the

11:02:43  24   United States Attorney's Office and asked to participate in an

11:02:46  25   investigation in the Montgomery, Alabama, area into an

| | | |
|---|---|---|
| 11:02:50 | 1 | individual. |
| 11:02:52 | 2 | Q.   And did you, in fact, undertake an investigation into |
| 11:02:55 | 3 | Marcus Golson? |
| 11:02:56 | 4 | A.   Yes. |
| 11:02:57 | 5 | Q.   Was there evidence to suggest that Marcus Golson was |
| 11:03:01 | 6 | involved in dogfighting? |
| 11:03:02 | 7 | A.   Yes. |
| 11:03:02 | 8 | Q.   Is there any relation that you're aware of between Marcus |
| 11:03:06 | 9 | Golson and the Derek Golson who's the defendant in this case? |
| 11:03:09 | 10 | A.   None that I'm aware of. |
| 11:03:11 | 11 | Q.   Does your agency utilize confidential informants for |
| 11:03:15 | 12 | dogfighting cases? |
| 11:03:16 | 13 | A.   Yes. |
| 11:03:17 | 14 | Q.   And how would you define a confidential informant? |
| 11:03:21 | 15 | A.   It's an individual that law enforcement may interact with |
| 11:03:25 | 16 | who has knowledge of ongoing criminal activity, or criminal |
| 11:03:31 | 17 | activity in general, that can provide reliable information |
| 11:03:34 | 18 | regarding that. |
| 11:03:34 | 19 | Q.   As part of your investigation into Marcus Golson, did you |
| 11:03:38 | 20 | inquire into any of your agency's informants whether they knew |
| 11:03:42 | 21 | that person? |
| 11:03:43 | 22 | A.   Yes. |
| 11:03:43 | 23 | Q.   And did any claim to know him? |
| 11:03:45 | 24 | A.   Yes. |
| 11:03:46 | 25 | Q.   Did that particular informant claim to have any information |

11:03:49   1   about dogfighting partners of this Marcus Golson?

11:03:53   2   A.   Yes.

11:03:53   3   Q.   Can you describe that a little bit for us, please.

11:03:57   4   A.   Yes.  The informant told us that Marcus Golson --

11:04:03   5            MR. JOHNSON:  Objection to hearsay, Your Honor.

11:04:05   6            THE COURT:  Sustained.

11:04:05   7            But ladies and gentlemen, hearsay is an out-of-court

11:04:11   8   statement that's offered in court for the truth of the matter

11:04:15   9   asserted.  There may be times when the statement is offered for

11:04:20  10   other purposes and not for the truth of the matter.  And in that

11:04:23  11   event, it's to explain why certain actions were taken, in this

11:04:26  12   case why the witness probably did what he did.

11:04:30  13            I think that's why you're offering it.  Right,

11:04:32  14   Mr. Eddy?

11:04:32  15            MR. EDDY:  In this instance, Your Honor, more for

11:04:35  16   background information.

11:04:35  17            THE COURT:  Is that why you're -- why are you offering

11:04:37  18   it?

11:04:38  19            MR. EDDY:  As background information.

11:04:40  20            THE COURT:  All right.  So the statement itself may be

11:04:42  21   true or false.  It doesn't matter.  It's just the fact that he's

11:04:47  22   going to testify that he was told certain things and certain

11:04:50  23   things then took place.  For that limited purpose, you may

11:04:54  24   accept it, but it's not -- the statement itself may be true or

11:04:58  25   false.

11:04:58    1              Go ahead.

11:04:59    2              MR. EDDY:   Thank you, Your Honor.

11:05:00    3    BY MR. EDDY:

11:05:00    4    Q.   And, Agent Ridgeway, based on intelligence provided by the

11:05:04    5    informant, did you develop any leads into potential dogfighting

11:05:10    6    partners of Marcus Golson?

11:05:13    7    A.   I did.

11:05:13    8    Q.   Can you describe that for us a little bit, please?

11:05:16    9    A.   Yes.   There were other individuals who were involved at the

11:05:20   10    time, we believed, with Marcus Golson in the Florida area.

11:05:24   11    Q.   What sort of investigative findings or activities did you

11:05:28   12    undertake with respect to investigating those links?

11:05:33   13    A.   Well, I worked with the informant to set up making contact

11:05:40   14    with those individuals to further determine the links.

11:05:45   15    Q.   And what, if any, links did there turn out to be -- well,

11:05:48   16    let me ask you this, Agent Ridgeway:   Through your

11:05:53   17    investigation, did you identify internet activity that you

11:05:58   18    believed to link this Marcus Golson to someone named Shane

11:06:01   19    Sprague?

11:06:02   20    A.   Yes.

11:06:04   21    Q.   And what, if any, links did there actually turn out to be

11:06:09   22    between Marcus Golson and Shane Sprague?

11:06:12   23    A.   None.

11:06:12   24    Q.   Did you next turn your investigation to Shane Sprague?

11:06:16   25    A.   I'm sorry.   Can you repeat that, please?

11:06:17  1   Q.   I'm sorry.  Did you next turn your investigation to Shane

11:06:22  2   Sprague?

11:06:22  3   A.   Yes.

11:06:23  4   Q.   So independent of Marcus Golson, did the same informant

11:06:26  5   claim to know someone named Shane Sprague?

11:06:29  6   A.   Yes.

11:06:29  7   Q.   And from what activity did he claim to know Mr. Sprague

11:06:34  8   from?

11:06:34  9   A.   Dogfighting.

11:06:36  10  Q.   Did he have access to the phone number of someone he knew

11:06:40  11  to be Shane Sprague?

11:06:42  12  A.   Yes.

11:06:42  13  Q.   At your direction, did that informant place any calls

11:06:46  14  during this investigation?

11:06:47  15  A.   Yes.

11:06:48  16  Q.   Were those calls recorded?

11:06:50  17  A.   Yes.

11:06:51  18  Q.   Can you explain to us generally the system for recording

11:06:54  19  those calls?

11:06:56  20  A.   Yes.  My agency has contracted with a group that assists

11:07:01  21  law enforcement in conducting investigations.  One of the ways

11:07:05  22  that they assist law enforcement in conducting their

11:07:07  23  investigations is providing a call recording system where, as a

11:07:12  24  law enforcement officer, I can obtain a general area code for a

11:07:16  25  phone number, and I can assign that phone number to the

11:07:21   1   informant who's going to be making undercover calls so that it

11:07:24   2   matches up with the general area that we are investigating as to

11:07:28   3   not give any indication that something may be up.  So I used

11:07:34   4   that system to record those phone calls.

11:07:37   5   Q.   What sort of information does this system provide with

11:07:41   6   respect to the calls that are coming and going off of that line?

11:07:44   7   A.   The date, the time, and the phone numbers associated.

11:07:50   8   Q.   Is this -- does this occur through an electronic system or

11:07:53   9   is it done manually?

11:07:55   10  A.   Through an electronic system.

11:07:56   11  Q.   Along with the -- well, let me ask this:  The system

11:08:00   12  captures the audio recordings of these calls?

11:08:03   13  A.   Yes, that's correct.

11:08:04   14  Q.   Does it also capture text messages?

11:08:07   15  A.   Yes.

11:08:08   16  Q.   And is there a visual interface at your end of the system

11:08:11   17  by which you can see all of that?

11:08:12   18  A.   Yes, there is.

11:08:13   19  Q.   Are you, as the agent, notified when calls to or from that

11:08:18   20  informant's line on that system are placed?

11:08:21   21  A.   Yes.

11:08:22   22  Q.   And when that happens, are you able to listen in real time?

11:08:26   23  A.   Yes.

11:08:27   24  Q.   Did you do that as part of your work in this case?

11:08:30   25  A.   Yes.

11:08:30   1   Q.   Does this electronic system, does it generate an electronic

11:08:34   2   audio file for each one of these calls as it comes in?

11:08:38   3   A.   It does, yes.

11:08:39   4   Q.   And can the system be made to generate a report or a

11:08:43   5   printout of the calls and the information associated with those?

11:08:47   6   A.   Yes.

11:08:48   7   Q.   Did you use that system in this case?

11:08:50   8   A.   I did.

11:08:51   9   Q.   Do you have a binder in front of you, Agent Ridgeway?

11:08:53  10   A.   Yes, I do.

11:08:54  11   Q.   If you would be so kind, if you could turn to what's been

11:08:57  12   marked for identification in that binder as Government's

11:09:00  13   Exhibit 1.

11:09:01  14           MR. EDDY:  And, Your Honor, just for the record, the

11:09:05  15   exhibits that we'll be referring to have previously been

11:09:08  16   provided to defense counsel.

11:09:09  17           THE COURT:  All right.  So we're going to have an

11:09:10  18   audio.  And I presume there will be a series of them, right?

11:09:15  19   Are they lettered, or how are they numbered?

11:09:18  20           MR. EDDY:  This first one is not an audio file, Your

11:09:21  21   Honor.  This is just a text document that Agent Ridgeway will

11:09:24  22   testify about, and we'll ask for Your Honor's permission to

11:09:26  23   publish.

11:09:28  24           THE COURT:  Government Exhibit 1?

11:09:29  25           MR. EDDY:  Correct.

RIDGEWAY - DIRECT

| | | |
|---|---|---|
| 11:09:30 | 1 | THE COURT:  All right. |
| 11:09:30 | 2 | MR. EDDY:  There will be forthcoming audio recordings |
| 11:09:33 | 3 | that we've got as numbered exhibits, and each has a |
| 11:09:36 | 4 | corresponding transcript with the letter A subsequent to the |
| 11:09:39 | 5 | exhibit number. |
| 11:09:40 | 6 | THE COURT:  Very well. |
| 11:09:41 | 7 | BY MR. EDDY: |
| 11:09:41 | 8 | Q.   Have you got Number 1 in your binder, Government's |
| 11:09:45 | 9 | Exhibit 1 for identification? |
| 11:09:46 | 10 | A.   Yes, sir, I do. |
| 11:09:48 | 11 | Q.   Do you recognize this? |
| 11:09:49 | 12 | A.   I do. |
| 11:09:50 | 13 | Q.   What is it? |
| 11:09:52 | 14 | A.   A report from that system. |
| 11:09:56 | 15 | Q.   Is this a fair and accurate copy of automated information |
| 11:10:02 | 16 | pertaining to the recorded calls that you just mentioned that |
| 11:10:03 | 17 | were made during this investigation? |
| 11:10:05 | 18 | A.   It is. |
| 11:10:09 | 19 | MR. EDDY:  Your Honor, we move admission of |
| 11:10:11 | 20 | Government's Exhibit 1.  This is also one of the business |
| 11:10:14 | 21 | records that was previously mentioned. |
| 11:10:16 | 22 | THE COURT:  Any objection? |
| 11:10:17 | 23 | MR. JOHNSON:  None, Your Honor. |
| 11:10:18 | 24 | MR. GRIFFITH:  No, sir. |
| 11:10:18 | 25 | THE COURT:  It's admitted. |

11:10:21    1         (GOVERNMENT EXHIBIT 1:  Received in evidence.)

11:10:23    2              THE COURT:  And you may publish it if you want.

11:10:25    3              MR. EDDY:  Thank you, Your Honor.  We'd like to

11:10:26    4    publish page 3 to start, please.

11:10:28    5    BY MR. EDDY:

11:10:29    6    Q.   And, Agent Ridgeway, I'd have you turn in your binder to

11:10:30    7    page 3, please.

11:11:09    8              MR. EDDY:  Let's move to page 3, if you would.

11:11:12    9              THE COURT:  We need to focus it somehow.

11:11:15   10              MR. EDDY:  We're going to zoom in, Your Honor, if we

11:11:17   11    may, and hopefully that will help.  I'm hoping that will help.

11:11:18   12    I'm going to ask Ms. Backer to zoom in on that header row and

11:11:25   13    then the row just under that, please.

11:11:30   14    BY MR. EDDY:

11:11:30   15    Q.   Agent Ridgeway, could you walk us through the columns that

11:11:32   16    are listed here, those headers, and explain just briefly your

11:11:36   17    understanding of what each of the headers means.

11:11:38   18              THE COURT:  I don't think the jury -- it needs to be

11:11:39   19    made a little bit larger.  Can you enlarge it?

11:11:42   20              MR. EDDY:  Maybe just leave off that last column so we

11:11:45   21    can zoom in a little bit better.

11:11:54   22              THE COURT:  That's better.

11:12:00   23    A.   The first column is the date column, which captures the

11:12:04   24    date.  Beside that is the time, captures the time.  The phone

11:12:09   25    number.  The type of contact, if it's a call or a message.  The

11:12:16   1   direction of that, if it is an outgoing call being placed or if

11:12:21   2   it is an incoming call coming in.  And the content, I believe,

11:12:26   3   applies to messages.  And then the minute or the duration of the

11:12:31   4   call.  The filename, which would be the date, and some other

11:12:37   5   data, and then the hash column.

11:12:43   6   Q.   Agent Ridgeway, besides the informant's number on that

11:12:43   7   special line you were telling us about, what's the other number

11:12:48   8   for this particular set of calls and text messages?

11:12:50   9   A.   850-501-7171.

11:12:56   10  Q.   Did law enforcement personnel serve a subpoena to a phone

11:13:00   11  company for subscriber records pertaining to that number?

11:13:06   12  A.   Yes.

11:13:06   13  Q.   And did the phone company respond to the subpoena?

11:13:08   14  A.   Yes.

11:13:09   15  Q.   Can you please find what's marked for identification in

11:13:11   16  your binder as Government's Exhibit 11, please.

11:13:23   17         Do you recognize this?

11:13:24   18  A.   Yes.

11:13:24   19  Q.   What is it?

11:13:25   20  A.   A response from a phone provider.

11:13:28   21  Q.   Is this a fair and accurate copy of records that law

11:13:30   22  enforcement received from AT&T in response to the subpoena you

11:13:35   23  just mentioned?

11:13:36   24  A.   Yes.

11:13:37   25         MR. EDDY:  Your Honor, we move admission of

| | | |
|---|---|---|
| 11:13:40 | 1 | Government's Exhibit 11. |
| 11:13:41 | 2 | THE COURT:  Objection? |
| 11:13:42 | 3 | MR. JOHNSON:  No, Your Honor. |
| 11:13:43 | 4 | MR. GRIFFITH:  No, sir. |
| 11:13:44 | 5 | THE COURT:  It's admitted. |
| 11:13:45 | 6 | *(GOVERNMENT EXHIBIT 11:  Received in evidence.)* |
| 11:13:47 | 7 | MR. EDDY:  All right.  And I'm going to ask Ms. Backer |
| 11:13:50 | 8 | to zoom in on the third box from the top where it says User |
| 11:13:54 | 9 | Information, please. |
| 11:13:54 | 10 | BY MR. EDDY: |
| 11:13:57 | 11 | Q.   Agent Ridgeway, who's identified as the subscriber to this |
| 11:14:02 | 12 | phone number? |
| 11:14:04 | 13 | A.   Laurie R. Sprague. |
| 11:14:07 | 14 | Q.   And how would you compare the spelling of that last to the |
| 11:14:10 | 15 | spelling of the last name Sprague of the person you were |
| 11:14:12 | 16 | investigating? |
| 11:14:13 | 17 | A.   It is the same. |
| 11:14:14 | 18 | Q.   Do you see -- |
| 11:14:15 | 19 | MR. EDDY:  Let's back out just a moment. |
| 11:14:20 | 20 | BY MR. EDDY: |
| 11:14:20 | 21 | Q.   And, Agent Ridgeway, I'm going to direct your attention to |
| 11:14:22 | 22 | the bottom, very bottom.  Do you see a field for Contract |
| 11:14:28 | 23 | Accepted?  It's the third row in that very bottom box. |
| 11:14:33 | 24 | A.   Yes. |
| 11:14:34 | 25 | Q.   Is there a date listed there? |

11:14:37   1    A.   Yes.  12-3-2017.

11:14:41   2    Q.   Okay.  And do you see a date at the very top left of that

11:14:44   3    document, way up in the corner?

11:14:48   4    A.   Yes.

11:14:49   5    Q.   What's that?

11:14:50   6    A.   The date that we received the response.

11:14:53   7    Q.   And what date would that be?

11:14:56   8    A.   February 11th, 2019.

11:14:59   9    Q.   And now, Agent Ridgeway, if we could flip back to

11:15:03   10   Government's Exhibit 1, page 3, line 1.  I'm going to ask

11:15:08   11   Ms. Backer to do the same.

11:15:24   12          And what, if anything, do you notice when you compare

11:15:27   13   the phone number to the one we were just looking at in

11:15:29   14   Government's Exhibit 11?

11:15:31   15   A.   It's the same.

11:15:34   16   Q.   Agent Ridgeway, regarding line 1, I'm going to direct your

11:15:36   17   attention to the field filename.

11:15:39   18   A.   Yes, sir.

11:15:39   19   Q.   You'll see it there on the right side.  Was there a

11:15:41   20   matching filename on this recording system that you referenced

11:15:45   21   earlier?

11:15:47   22   A.   Yes.

11:15:48   23   Q.   Did you listen to it?

11:15:49   24   A.   I did.

11:15:50   25   Q.   And now let me direct your attention to -- I'm going to ask

11:15:55  1    Ms. Backer to zoom in on the line that's marked under the column

11:15:58  2    Date for 2018-03-05, a little further down on the page.  I think

11:16:06  3    it's the fourth from the bottom.

11:16:08  4            Same questions for you, Agent Ridgeway.  Was there a

11:16:10  5    matching filename on the recording system that you referenced

11:16:13  6    earlier for this row?

11:16:15  7    A.   Yes.

11:16:15  8    Q.   Did you listen to it?

11:16:16  9    A.   I did.

11:16:18  10   Q.   And I'm going to ask you the same question two rows down

11:16:21  11   for the line marked 2018-03-28.

11:16:28  12           MR. EDDY:  And let's just go ahead and grab the line

11:16:29  13   under that too, please.  Right there is good.

11:16:30  14   BY MR. EDDY:

11:16:30  15   Q.   Was there a matching filename for both of these rows here,

11:16:34  16   each one, on the recording system that you mentioned earlier?

11:16:37  17   A.   Yes.

11:16:37  18   Q.   And did you listen to those?

11:16:39  19   A.   Yes.

11:16:42  20   Q.   If you could, next in your binder, please, Agent Ridgeway,

11:16:45  21   turn to what's been marked for identification as Government's

11:16:48  22   Exhibit 4, and you should see an item there.  Is there a disk

11:16:59  23   behind that tab?

11:17:00  24   A.   Yes.

11:17:01  25           MR. EDDY:  And, Your Honor, again, these exhibits were

11:17:04  1    previously provided in digital format to defense counsel.

11:17:09  2    BY MR. EDDY:

11:17:09  3    Q.   I'm going to ask you to pull out what's behind Tab 4 and

11:17:12  4    also Tab 6, 8, and 10, please.

11:17:18  5              THE COURT:  You're calling them tabs.  What exhibit

11:17:20  6    are they a part of?

11:17:22  7              MR. EDDY:  I'm sorry, Your Honor.  I'm referring to

11:17:24  8    what's been marked for identification as Government's

11:17:26  9    Exhibits 4, 6, 8, and 10.

11:17:31  10             THE COURT:  Okay.

11:17:54  11   BY MR. EDDY:

11:17:54  12   Q.   Have you got all four, Agent Ridgeway?

11:17:57  13   A.   Yes, sir.

11:17:57  14   Q.   Have you seen these items before?

11:17:59  15   A.   I have.

11:17:59  16   Q.   What are they?

11:18:00  17   A.   CDs of recordings.

11:18:02  18   Q.   What type of recordings?

11:18:04  19   A.   Audio.

11:18:05  20   Q.   Have you listened to the audio on each disk?

11:18:08  21   A.   I have.

11:18:09  22   Q.   And how do you know that these disks that you're holding in

11:18:11  23   front of us today in court are the same ones that you've

11:18:14  24   previously listened to?

11:18:15  25   A.   I initialed on them and wrote my badge number on there.

11:18:23   1   Q.   Agent Ridgeway, did you compare the content of the audio

11:18:27   2   files that are on these disks here with us today to audio files

11:18:30   3   containing the filenames that we just walked through on page 3

11:18:33   4   of Government's Exhibit 1?

11:18:35   5   A.   Yes.

11:18:35   6   Q.   What did you find when you did that?

11:18:37   7   A.   They were the same.

11:18:43   8   Q.   And does each audio file have the voices of people talking

11:18:47   9   on it?

11:18:48   10   A.   Yes.

11:18:48   11   Q.   Did you recognize each of the voices?

11:18:51   12   A.   Yes.

11:18:51   13   Q.   From what?

11:18:53   14   A.   From previous interactions with those individuals.

11:18:59   15        MR. EDDY:   Your Honor, we move admission of

11:19:01   16   Government's Exhibits 4, 6, 8, and 10.

11:19:04   17        THE COURT:   All right.   Let me just inquire:   I notice

11:19:07   18   the time date on the first line was December the 6th of 2017.

11:19:13   19   But the ones you're talking about are in 2018, right?

11:19:18   20        MR. EDDY:   There's four altogether, Your Honor, and

11:19:22   21   some are from 2018.

11:19:24   22        THE COURT:   But you don't have them all.   The ones

11:19:26   23   you've identified are 4, 6, 8, and 10.

11:19:30   24        MR. EDDY:   They correspond, Your Honor, with Rows 1 --

11:19:36   25        THE COURT:   Well, I'm interested in the dates.   There

| | | |
|---|---|---|
| 11:19:37 | 1 | seems to be a gap of about four months between the first line |
| 11:19:41 | 2 | and maybe the second line; is that right? |
| 11:19:44 | 3 | MR. EDDY:  Yes, Your Honor. |
| 11:19:45 | 4 | THE COURT:  Okay.  But the ones we're talking about |
| 11:19:46 | 5 | are 2018 and not the 2017? |
| 11:19:51 | 6 | MR. EDDY:  We've got one from 2017, December, two from |
| 11:19:54 | 7 | March 2018, and one from May of 2018. |
| 11:19:58 | 8 | THE COURT:  All right.  So we've got all of those. |
| 11:19:59 | 9 | That's all I want to know. |
| 11:20:02 | 10 | MR. EDDY:  Yes, Your Honor. |
| 11:20:03 | 11 | THE COURT:  Any objection? |
| 11:20:04 | 12 | MR. JOHNSON:  Yes, Your Honor.  Rule 106.  If they're |
| 11:20:06 | 13 | going to introduce it, I want them to introduce the entirety. |
| 11:20:12 | 14 | These are excerpts. |
| 11:20:14 | 15 | MR. EDDY:  We have additional exhibits, Your Honor, |
| 11:20:16 | 16 | containing the entirety of the calls.  We don't plan ourselves |
| 11:20:20 | 17 | to publish those, but we do have them available. |
| 11:20:24 | 18 | THE COURT:  How long are these calls? |
| 11:20:28 | 19 | MR. EDDY:  As shown on the screen here, the first |
| 11:20:30 | 20 | is -- the totality of the first call is 13 minutes, and of that |
| 11:20:33 | 21 | I think we're going to play less than half.  The second is a |
| 11:20:36 | 22 | total of 19 minutes, 17 seconds; and we have just, I think, |
| 11:20:40 | 23 | about a quarter of that.  And the bottom two are just a little |
| 11:20:44 | 24 | bit over ten minutes, of which we have, I think, about half of |
| 11:20:47 | 25 | that one.  And then the bottommost call is about 8 minutes, and |

11:20:52  1  again, I think we've narrowed it down to about half of that.

11:20:55  2          THE COURT:  Well, Mr. Johnson, your objection is

11:20:57  3  sustained to the extent that you -- on cross-examination you may

11:20:59  4  ask him to play the whole thing if you want, but -- under the

11:21:03  5  rule of completeness.  But for purposes of the Government's

11:21:06  6  presentation, we'll hear the excerpts that they've selected to

11:21:11  7  be introduced.

11:21:13  8          MR. JOHNSON:  Judge, we can do that, but I'm going to

11:21:15  9  ask him to play them in their entirety if we can do that at this

11:21:19 10  time.  Otherwise, it's going to be redundant.

11:21:25 11          THE COURT:  I don't know how the -- how the excerpt

11:21:29 12  starts out.  What does it start out with?

11:21:32 13          MR. EDDY:  Each one is a recorded call, Your Honor.

11:21:33 14  And we certainly have no objection to playing the entirety.  We

11:21:38 15  just -- we had tried to kind of truncate it just to make our

11:21:43 16  presentation a little bit more efficient, but I agree that it

11:21:46 17  would be more efficient to hear the entirety of each call now.

11:21:50 18          THE COURT:  All right.  Well, let's play them so that

11:21:51 19  the full context can be understood by the jury, so --

11:21:54 20          MR. EDDY:  Well, actually, Your Honor, one potential

11:21:57 21  logistical hang-up that occurs to me now for that one is that we

11:22:01 22  have transcripts ready to go for our excerpts.  We do not

11:22:04 23  have -- we've provided to the defense counsel but we haven't

11:22:08 24  physically printed exhibits with the transcripts for the

11:22:12 25  longer --

11:22:13   1           THE COURT:  Well, we will go with the transcripts you

11:22:14   2   have; and when we get to that point, we'll tell the jury where

11:22:18   3   we are.

11:22:18   4           MR. EDDY:  Okay.  Your Honor.  We'll attempt to do

11:22:20   5   that.  It might be difficult at times.

11:22:23   6           THE COURT:  All right.  You may play them and identify

11:22:28   7   what we have as we do it.  Do you have transcripts?  I'll let

11:22:35   8   the jury have those when you get to where you want to use them.

11:22:38   9           MR. EDDY:  Okay.  I'm happy to have Agent Ridgeway

11:22:42   10  authenticate the transcript unless there's any objection.

11:22:45   11          THE COURT:  Well, I'm going to instruct the jury

11:22:46   12  they're simply for aids.  You're not going to offer them into

11:22:49   13  evidence, are you?

11:22:50   14          MR. EDDY:  No.  We would just like to have them

11:22:51   15  available to the jurors --

11:22:53   16          THE COURT:  Well, that's what I'm --

11:22:55   17          Ladies and gentlemen, these transcripts may be

11:22:56   18  accurate and they may not.  What's in evidence is what you hear.

11:23:01   19  But the transcripts are there to aid you in understanding what

11:23:04   20  the audio is so it'll help you understand.

11:23:07   21          The transcripts may or may not be completely accurate.

11:23:10   22  So do not rely on the transcript.  If there's a conflict between

11:23:15   23  what you see and what's on the transcript, it's what you hear

11:23:19   24  that's in evidence.  And rely on that and not the transcript.

11:23:22   25  Transcript is just an aid, and we're going to collect it back

| | | |
|---|---|---|
| 11:23:24 | 1 | from you after we play these. |
| 11:23:26 | 2 | Go ahead.  Pass them out. |
| 11:23:33 | 3 | MS. BACKER:  All four, Your Honor? |
| 11:23:34 | 4 | MR. EDDY:  Let's just do one at a time. |
| 11:23:36 | 5 | THE COURT:  Let's do them one at a time so we can |
| 11:23:43 | 6 | collect them back and forth. |
| 11:23:50 | 7 | MR. EDDY:  And, Your Honor, just for the record, the |
| 11:23:52 | 8 | entire call has been marked for identification as |
| 11:23:54 | 9 | Government's Exhibit 3.  The corresponding excerpt is our |
| 11:24:02 | 10 | Exhibit 4, which we would like to -- which I believe the |
| 11:24:05 | 11 | Court -- |
| 11:24:06 | 12 | THE COURT:  All right.  Without objection, 3 and 4 are |
| 11:24:09 | 13 | admitted, and I presume there's 5 and 6, 7 and 8, 9 and 10?  Is |
| 11:24:14 | 14 | that the sequence? |
| 11:24:16 | 15 | MR. EDDY:  I believe so, Your Honor. |
| 11:24:17 | 16 | THE COURT:  All right.  So without objection, those |
| 11:24:19 | 17 | will all be admitted.  And you're going to play them in their |
| 11:24:23 | 18 | entirety.  And you may do so. |
| | 19 | (GOVERNMENT EXHIBITS 3 through 10:  Received in evidence.) |
| 11:24:30 | 20 | THE COURT:  All of our jurors have a transcript?  All |
| 11:24:33 | 21 | right. |
| 11:24:34 | 22 | Tell us what we're listening to, Agent Ridgeway. |
| 11:24:37 | 23 | BY MR. EDDY: |
| 11:24:37 | 24 | Q.   And let me ask you briefly, Agent Ridgeway, in line with |
| 11:24:41 | 25 | the Court's question:  Do you see a date on the -- let me have |

| | | |
|---|---|---|
| 11:24:44 | 1 | you turn to Exhibit 4A in your binder, the transcript.  Do you |
| 11:24:56 | 2 | see a date there? |
| 11:24:57 | 3 | A.   Yes. |
| 11:24:57 | 4 | Q.   Did you check that against the call recording system? |
| 11:24:59 | 5 | A.   Yes. |
| 11:24:59 | 6 | Q.   What did you find when you did that? |
| 11:25:01 | 7 | A.   They were the same. |
| 11:25:02 | 8 | MR. EDDY:  All right.  And if we may, Your Honor, |
| 11:25:03 | 9 | we'll publish -- |
| 11:25:05 | 10 | THE COURT:  All right.  For the record, just so the |
| 11:25:06 | 11 | jury will maybe note, what is the date of this call? |
| 11:25:10 | 12 | MR. EDDY:  Oh, thank you. |
| 11:25:11 | 13 | THE WITNESS:  12-6-2017. |
| 11:25:13 | 14 | THE COURT:  And that's Exhibits 3 and 4. |
| 11:25:19 | 15 | All right.  You may play it. |
| 11:25:22 | 16 | MR. EDDY:  All right. |
| 11:25:28 | 17 | *(Audio recording played in open court.)* |
| 11:25:34 | 18 | BY MR. EDDY: |
| 11:38:22 | 19 | Q.   Agent Ridgeway, can you turn in your binder to what's |
| 11:38:25 | 20 | marked for identification as Government's Exhibit 6A? |
| 11:38:27 | 21 | THE COURT:  All right.  Let me collect the transcripts |
| 11:38:29 | 22 | from our jurors, please. |
| 11:38:32 | 23 | MR. EDDY:  Thank you, Your Honor. |
| 11:38:51 | 24 | THE COURT:  All right. |
| 11:38:51 | 25 | BY MR. EDDY: |

11:38:52  1   Q.   Is Government's Exhibit 6A another one of the transcripts

11:38:54  2   for these audio files that we've been discussing?

11:38:57  3   A.   Yes.

11:38:58  4   Q.   Is the transcript an accurate reflection of the recording

11:39:00  5   on Government's Exhibit 6?

11:39:03  6   A.   Yes.

11:39:04  7   Q.   Do you see a date on the cover of Government's Exhibit 6A?

11:39:08  8   A.   Yes, I do.

11:39:08  9   Q.   Did you check that against the recording system?

11:39:10  10  A.   Yes.

11:39:11  11  Q.   What did you find when you did that?

11:39:13  12  A.   They're the same date.

11:39:14  13  Q.   And what's that date?

11:39:15  14  A.   3-5-18.

11:39:18  15       MR. EDDY:  Your Honor, we move admission of

11:39:20  16  Government's Exhibit 6, which is our selective excerpts from

11:39:24  17  that recorded call with the corresponding transcript labeled for

11:39:28  18  identification as Government's Exhibit 6A.

11:39:31  19       The corresponding entire file is Government's

11:39:33  20  Exhibit 5.  We're not affirmatively moving that into evidence;

11:39:37  21  but if the defense would like to play it, we don't have an

11:39:40  22  objection to that.

11:39:41  23       THE COURT:  All right.  Well, I'm admitting 3, 5, 7,

11:39:46  24  and 9 as the complete recording; and 4, 6, 8, and 10 are the

11:39:52  25  excerpts that you're selecting.  And the transcript, as of right

11:39:56  1   now, I'm not admitting.

11:40:03  2          MR. EDDY:  Thank you, Your Honor.

11:40:03  3          THE COURT:  All right.  And the date of this one,

11:40:04  4   Number 5 and 6, is what?

11:40:07  5          MR. EDDY:  March 5th, 2018, Your Honor.

11:40:15  6          THE COURT:  3-28 of 2018?

11:40:19  7          MR. EDDY:  March 5th, Your Honor, of 2018.

11:40:21  8          THE COURT:  March 5th.  Okay.  March 5th of 2018.

11:40:24  9          You may pass out the transcript.

11:40:26  10          MR. EDDY:  All right.  So I assume, Your Honor, as

11:40:28  11   with the last one, we should just go ahead and play the entire

11:40:31  12   call?

11:40:32  13          THE COURT:  Sure.

11:40:33  14          MR. EDDY:  We'll do that.

11:41:07  15          THE COURT:  Everyone has it.  You may play.

11:41:10  16      (Audio recording played in open court.)

11:59:30  17          THE COURT:  How much more do we have?

11:59:35  18          MR. EDDY:  Less than a minute.  Less than one minute,

11:59:36  19   Your Honor.

11:59:37  20          THE COURT:  I can't hear you.  One more minute?

11:59:38  21          MS. BACKER:  Less than one minute.

12:00:00  22      (Audio recording continued playing in open court.)

12:00:28  23          THE COURT:  All right.  We're going to break for lunch

12:00:30  24   now, ladies and gentlemen.  Pass your transcripts down.  We'll

12:00:32  25   collect those.

12:00:33  1          There are places to eat, restaurants, good

12:00:38  2   restaurants, up the street, down the street, all within easy

12:00:41  3   walking distance.

12:00:42  4          We're going to be in recess until 1:15.  Stay away

12:00:45  5   from anyone you can associate with this trial, either in the

12:00:48  6   courthouse or on the sidewalk or in a restaurant or wherever you

12:00:52  7   may be.  Avoid anything that may be in the news about this case.

12:00:55  8   Stay off your electronic devices.  Don't try to do any

12:00:59  9   independent research or communication about the trial.

12:01:01  10          And we'll be in recess until 1:15.

12:38:17  11          *(Luncheon recess taken from 12:01 a.m. to 1:20 p.m.)*

12:38:17  12          **A F T E R N O O N   S E S S I O N**

01:20:05  13          THE COURT:  All of our jurors are here, our attorneys

01:20:10  14   are here, the defendants are here, and we're ready to proceed.

01:20:11  15          Mr. Griffith.

01:20:13  16          MR. GRIFFITH:  Just keeping my knees flexible, Judge.

01:20:16  17          THE COURT:  All right.  That's good.

01:20:16  18          Let's see.  Everybody have their notepads?  We're

01:20:20  19   ready to go.  We're ready for the Government's next witness, or

01:20:22  20   what are we doing?

01:20:24  21          MR. EDDY:  Thank you, Your Honor.  Good afternoon.

01:20:25  22   The Government recalls to the stand Andrew Ridgeway.

01:20:31  23          THE COURT:  Very well.

01:20:41  24          Agent Ridgeway, you are still testifying under oath.

01:20:43  25   Have a seat.  State your name.

01:20:49  1          THE WITNESS:  Andrew Ridgeway.

01:20:50  2          THE COURT:  All right.  Mr. Eddy.

01:20:54  3   BY MR. EDDY:

01:20:56  4   Q.   Agent Ridgeway, could you please turn in your binder to

01:20:58  5   what's been marked for identification as Government's Exhibit

01:21:00  6   8A.  Is this a transcript of one of the audio files that we were

01:21:07  7   discussing prior to the lunch break?

01:21:10  8   A.   Yes.

01:21:10  9   Q.   Is this transcript an accurate reflection of one of those

01:21:13  10  recordings?

01:21:14  11  A.   It is.

01:21:14  12  Q.   Do you see a date on the front page of that?

01:21:16  13  A.   Yes.  3-28-2018.

01:21:19  14  Q.   Did you check that against the call recording system that

01:21:21  15  you previously described?

01:21:22  16  A.   I did.

01:21:23  17  Q.   What did you find when you did that?

01:21:25  18  A.   It was the same.

01:21:28  19          MR. EDDY:  Your Honor, at this time we'd like to

01:21:30  20  provide copies of Government's Exhibit 8A to the jury.  This is

01:21:34  21  the transcript accompanying Government's Exhibit 8, the complete

01:21:38  22  audio file for which is Government's Exhibit 7; and again, if

01:21:42  23  the defense would like to play the entirety, we don't object to

01:21:45  24  that.  We'll make that happen.

01:21:46  25          THE COURT:  All right.  The transcript is the entire

01:21:48   1    call or just a selected portion?

01:21:50   2        MR. EDDY:  No, Your Honor, just the excerpts that we

01:21:52   3    had designated --

01:21:53   4        THE COURT:  Very well.

01:21:53   5        MR. EDDY:  -- for Government's Exhibit 8.

01:21:55   6        THE COURT:  Well, ladies and gentlemen, again, the

01:21:56   7    transcript is provided only for your assistance in understanding

01:22:00   8    what you're hearing.  The evidence is the audio itself, and

01:22:04   9    we'll collect the transcript from you at the end.  But you may

01:22:06  10    pass them out.

01:22:07  11        MR. EDDY:  Thank you, Your Honor.

01:22:40  12        THE COURT:  All right.  I think everyone has it.

01:22:41  13    So -- let's see, everybody got it?  All right.  You may proceed.

01:23:09  14        (Audio played in open court.)

01:32:56  15        MR. EDDY:  We'll go ahead and retrieve those

01:32:59  16    transcripts from the jury.

01:33:01  17        THE COURT:  All right.  Pass them down to the end,

01:33:05  18    please.

01:33:11  19    BY MR. EDDY:

01:33:11  20    Q.   Agent Ridgeway, while they're doing that, could you please

01:33:14  21    turn in your binder to what's been marked for identification as

01:33:16  22    Government's Exhibit 10A.  Is this another one of the

01:33:25  23    transcripts for the audio files that you briefly mentioned a

01:33:28  24    little while back?

01:33:29  25    A.   Yes.

RIDGEWAY - DIRECT

01:33:29   1   Q.   Is this transcript an accurate reflection of the recording
01:33:32   2   to which it pertains?
01:33:35   3   A.   It is.
01:33:35   4   Q.   Do you see a date on the cover?
01:33:36   5   A.   Yes.
01:33:37   6   Q.   Did you check that against the call recording system?
01:33:39   7   A.   Yes, I did.
01:33:40   8   Q.   What did you find when you did that?
01:33:42   9   A.   They matched.
01:33:43   10   Q.   What's the date?
01:33:44   11   A.   5-17-18.
01:33:47   12       MR. EDDY:  And at this time, Your Honor, with your
01:33:48   13   permission we'd like to hand out copies of Government's Exhibit
01:33:51   14   10A.
01:33:51   15       THE COURT:  Yes, you may.  And again, ladies and
01:33:54   16   gentlemen, these are aids only, not evidence.
01:33:57   17       MR. EDDY:  And we're happy to play the entirety of
01:34:02   18   this call as well if that's --
01:34:04   19       THE COURT:  All right.  You may do that.
01:34:05   20       MR. EDDY:  -- if that's the defendant's request.  And
01:34:08   21   that's going to be Government's Exhibit 9.
01:34:33   22       (Audio recording played in open court.)
01:42:37   23       THE COURT:  We'll go ahead and collect the transcripts
01:42:40   24   from the jury.
01:42:42   25       All right.  Pass them down, ladies and gentlemen.

RIDGEWAY - DIRECT

01:42:48  1   BY MR. EDDY:

01:42:50  2   Q.   Agent Ridgeway, did you find public postings for a Facebook

01:42:52  3   account that you believe to be the same person, Shane, on those

01:42:58  4   calls?

01:42:59  5   A.   Yes, I did.

01:43:00  6   Q.   And how did that person or that account user identify

01:43:03  7   themselves on that account?

01:43:06  8   A.   As Shane Sprague.

01:43:08  9   Q.   Did that person identify the geographic location of their

01:43:12  10  residence in their Facebook account?

01:43:14  11  A.   Yes.

01:43:14  12  Q.   Where was that?

01:43:15  13  A.   Pensacola, Florida.

01:43:17  14  Q.   Were there photos on the public part of the Facebook page

01:43:21  15  purporting to be the owner or user of the account?

01:43:24  16  A.   Yes.

01:43:25  17  Q.   About how many will you estimate?

01:43:31  18  A.   Hundreds, at least.

01:43:33  19  Q.   Did those photographs match the appearance of anyone you

01:43:37  20  see in the courtroom here today?

01:43:39  21  A.   Yes.

01:43:39  22  Q.   Could you please identify that person by what they're

01:43:43  23  wearing and where they're sitting?

01:43:44  24  A.   Yes.  Sitting at the defense table in a black suit, I

01:43:48  25  believe, between -- or beside his attorney, direct -- off behind

01:43:54  1    you over there.

01:43:55  2    Q.   To what side of the table as you can see it?

01:44:02  3    A.   To the left side.

01:44:06  4         THE COURT:  There are a whole bunch of people at this

01:44:07  5    table over there.  Starting on the right-hand side, count them.

01:44:10  6    Which one you're talking about?

01:44:12  7         THE WITNESS:  I'm talking about the gentleman sitting

01:44:15  8    second to the left on the table sort of right behind you at

01:44:18  9    about 5:00 o'clock.

01:44:20  10        THE COURT:  Second from the right?

01:44:21  11        THE WITNESS:  Yes, sir, I'm sorry.  Second from the

01:44:23  12   right.

01:44:23  13        MR. EDDY:  Your Honor, may we let the record reflect

01:44:25  14   that the witness has identified the defendant, Shane Sprague?

01:44:29  15        THE COURT:  It will.

01:44:29  16   BY MR. EDDY:

01:44:31  17   Q.   What, if anything, caught your attention, Agent Ridgeway,

01:44:34  18   about the contents of this Facebook account on the public

01:44:37  19   postings?

01:44:39  20   A.   Just the amount of dogfighting-related information on

01:44:43  21   there.

01:44:44  22   Q.   Did you apply to a federal judge for a warrant to search

01:44:47  23   the rest of the contents of that account?

01:44:51  24   A.   I did.

01:44:52  25   Q.   Was that application granted?

01:44:53    1    A.    Yes, it was.

01:44:54    2    Q.    And did you provide a copy of that search warrant to

01:44:57    3    Facebook, the company?

01:44:58    4    A.    Yes, I did.

01:44:59    5    Q.    What, if anything, happened in response to that?

01:45:01    6    A.    Facebook provided a response.

01:45:05    7    Q.    Can you describe the format of what they gave back to you?

01:45:08    8    A.    Yes.  Facebook provided a response to that search warrant

01:45:13    9    that was in a PDF version and then an HTML of the information

01:45:18   10    associated with that account.

01:45:19   11    Q.    And those acronyms that you just said, can you explain a

01:45:22   12    little bit more about what you mean by each of those?

01:45:24   13    A.    To the best of my understanding, PDF is just almost like an

01:45:28   14    electronic printed version of it, and then the HTML version is

01:45:33   15    more of a -- almost a web-based-type version of the information.

01:45:37   16    Q.    Did the PDF version that you mentioned, did that have page

01:45:40   17    numbers on it?

01:45:41   18    A.    Yes, it did.

01:45:41   19    Q.    Did those appear to be in sequential order?

01:45:44   20    A.    Yes.

01:45:44   21    Q.    Did you save an electronic copy of those materials?

01:45:48   22    A.    Yes, I did.

01:45:49   23    Q.    Where or how did you do that?

01:45:50   24    A.    I saved those items to a thumb drive and then secured that

01:45:54   25    thumb drive as evidence.

RIDGEWAY - DIRECT

01:45:55   1   Q.   Is that kept in a secure location?

01:45:57   2   A.   Yes.

01:45:59   3   Q.   In preparation for your testimony today, did you review

01:46:01   4   some of that original material that Facebook had provided to

01:46:05   5   you?

01:46:05   6   A.   Yes, I did.

01:46:08   7   Q.   Agent Ridgeway, could you please now turn to what's been

01:46:11   8   marked for identification in your binder as Government's Exhibit

01:46:13   9   13?  Have you seen this before?

01:46:21   10   A.   Yes, I have.

01:46:22   11   Q.   Did you compare it to the records that you received from

01:46:24   12   Facebook in response to the search warrant for the account of

01:46:27   13   the user Shane Sprague?

01:46:30   14   A.   Yes, I did.

01:46:30   15   Q.   And what did you find when you compared this to those

01:46:33   16   original records?

01:46:34   17   A.   It was the same.

01:46:36   18        MR. EDDY:  Your Honor, we move admission of

01:46:38   19   Government's Exhibit 13.

01:46:39   20        MR. JOHNSON:  No objection, Your Honor.

01:46:40   21        THE COURT:  Any objection?

01:46:41   22        MR. GRIFFITH:  No, sir.

01:46:43   23        THE COURT:  Admitted.

01:46:43   24        *(GOVERNMENT EXHIBIT 13:  Received in evidence.)*

01:46:43   25        MR. EDDY:  Thank you, Your Honor.  And may we publish

01:46:47   1   that?

01:46:47   2           THE COURT:  You may.

01:46:47   3           MR. EDDY:  And once we've got it up, I'm going to ask

01:46:47   4   Ms. Backer to zoom in for us on the fields for Name, which is

01:46:47   5   going to be in the second block from the top, once it's on the

01:46:47   6   screen.

01:47:10   7   BY MR. EDDY:

01:47:11   8   Q.   And, Agent Ridgeway, let me direct your attention to that

01:47:14   9   and see if you can locate that for us.  Do you see a field for

01:47:19   10   Name?

01:47:20   11   A.   In the binder, yes, I do.

01:47:21   12   Q.   Okay.

01:47:23   13           THE COURT:  Wait.  We haven't gotten it on the screen

01:47:25   14   yet.  It's admitted.  You may show it.

01:47:28   15           MR. EDDY:  Thank you.

01:47:28   16           All right.  If we could grab that second block from

01:47:53   17   the top where it says Name on that left column.

01:47:57   18   BY MR. EDDY:

01:47:57   19   Q.   And, Agent Ridgeway, what does it say there?

01:47:59   20   A.   Shane Sprague.

01:48:02   21           MR. EDDY:  And if we could move down a little bit to

01:48:04   22   Address, which is about halfway down on the page, and grab that.

01:48:09   23   Zoom in on that, please.

01:48:11   24   BY MR. EDDY:

01:48:11   25   Q.   And what do you see there?

RIDGEWAY - DIRECT

01:48:16  1   A.    Pensacola, Florida.

01:48:18  2   Q.    And just down from there two entries, do you see a field

01:48:23  3   for phone numbers?

01:48:23  4   A.    Yes.

01:48:24  5   Q.    What does that say?

01:48:27  6   A.    850-501-7171.

01:48:32  7   Q.    Do you recognize that phone number, Agent Ridgeway?

01:48:35  8   A.    Yes.

01:48:36  9   Q.    From what?

01:48:37  10   A.    Subpoenaed records.

01:48:39  11   Q.    And if we could direct your attention, Agent Ridgeway, in

01:48:42  12   your binder -- and we'll just leave this one up here on the

01:48:46  13   screen for now -- to Government's Exhibit 1, page 3, already in

01:48:49  14   evidence.  This was the call log report that you previously

01:48:55  15   referred to.  If you could turn to that in your binder and do a

01:48:58  16   comparison for us of the number that you see there with the

01:49:01  17   number on the screen.

01:49:03  18   A.    I'm sorry, now.  What --

01:49:04  19   Q.    Government's Exhibit 1, page 3.

01:49:06  20   A.    Okay.

01:49:15  21         The numbers are the same.

01:49:17  22   Q.    And now if you would, Agent Ridgeway, could you please turn

01:49:20  23   in your binder to what's been marked for identification as

01:49:23  24   Government's Exhibit 16.  Have you seen this before?

01:49:29  25   A.    Yes.

| | | |
|---|---|---|
| 01:49:30 | 1 | Q.   Did you compare it to records that you received from |
| 01:49:32 | 2 | Facebook in response to the search warrant? |
| 01:49:35 | 3 | A.   Yes. |
| 01:49:36 | 4 | Q.   What did you find when you did that? |
| 01:49:41 | 5 | A.   They're the same. |
| 01:49:42 | 6 | MR. EDDY:  Your Honor, I'd move admission of |
| 01:49:44 | 7 | Government's Exhibit 16. |
| 01:49:45 | 8 | THE COURT:  Any objection? |
| 01:49:46 | 9 | MR. JOHNSON:  No, Your Honor. |
| 01:49:47 | 10 | THE COURT:  It's admitted. |
| 01:49:53 | 11 | *(GOVERNMENT EXHIBIT 16:  Received in evidence.)* |
| 01:49:55 | 12 | MR. EDDY:  May we publish, Your Honor? |
| 01:49:56 | 13 | THE COURT:  Yes. |
| 01:49:56 | 14 | BY MR. EDDY: |
| 01:49:57 | 15 | Q.   Agent Ridgeway, did the account holder post this image? |
| 01:50:01 | 16 | A.   Yes. |
| 01:50:01 | 17 | Q.   And let's zoom out to the whole card, if you would.  Do you |
| 01:50:06 | 18 | recognize that person as the same person that you previously |
| 01:50:08 | 19 | identified in the courtroom? |
| 01:50:10 | 20 | A.   Yes, I do. |
| 01:50:11 | 21 | Q.   Do you see an address here? |
| 01:50:12 | 22 | A.   Yes. |
| 01:50:13 | 23 | Q.   Do you recognize it? |
| 01:50:14 | 24 | A.   I do. |
| 01:50:16 | 25 | Q.   Does that address match the address known to you to be the |

01:50:20  1    residence of Shane Sprague during the time of the events during

01:50:23  2    this case?

01:50:23  3    A.   It does.

01:50:24  4    Q.   And now, if you would, please, Agent Ridgeway, take a look

01:50:28  5    at what's been marked for identification in your binder as

01:50:32  6    Government's Exhibits 17 and 18.  17 has several pages.  If

01:50:34  7    you'd just very briefly skim through these to acquaint yourself

01:50:41  8    with the contents, and then look up to let me know when you've

01:50:44  9    done that.

01:51:13  10          And if you would do the same thing for Government's

01:51:16  11   exhibits marked for identification as 21 through and including

01:51:19  12   27.

01:52:40  13          Could you do the same thing, if you would, for

01:52:42  14   Government's Exhibits 38 through and including 47, briefly,

01:52:54  15   please.

01:53:00  16          THE COURT:  Did you say 38 through 47?

01:53:02  17          MR. EDDY:  Yes, Your Honor.

01:53:44  18   BY MR. EDDY:

01:53:44  19   Q.   Same thing for Government's exhibit marked for

01:53:47  20   identification 55 through and including 57, and 59 while you're

01:53:54  21   at it, please.

01:54:15  22          And lastly 61 through 63, please.

01:54:38  23          Agent Ridgeway, as you were skimming these all just

01:54:40  24   now, did you see a blue bar at the top of each page?

01:54:43  25   A.   Yes.

01:54:44  1   Q.   And what, if anything, appears in the blue bar at the top?

01:54:47  2   A.   Facebook Business Record and a page number.

01:54:49  3   Q.   In preparation for your testimony today, have you

01:54:52  4   previously reviewed each of these exhibits?

01:54:54  5   A.   Yes.

01:54:55  6   Q.   And for each of these exhibits that we've just covered

01:54:59  7   falling within the range of 17 through 63, did you compare those

01:55:03  8   to the original records that Facebook provided you in response

01:55:07  9   to the search warrant?

01:55:07  10  A.   Yes, I did.

01:55:08  11  Q.   What did you find when you made that comparison?

01:55:11  12  A.   That they were the same.

01:55:13  13          MR. EDDY:  Your Honor, we move admission of

01:55:16  14  Government's Exhibits 17 and 18, 21 through 27, 38 through 47,

01:55:21  15  50 to 57, 59, and 61 to 63.

01:55:27  16          THE COURT:  Any objection?

01:55:29  17          MR. JOHNSON:  Was that 55 to 57?

01:55:32  18          THE COURT:  55, 57, but not 58.  Then 59, not 60, but

01:55:39  19  61, 62, and 63.

01:55:42  20          MR. EDDY:  I'm sorry.  Mr. Johnson is correct.  It was

01:55:46  21  55 to 57.  Not 50.  I misspoke just now.

01:55:52  22          MR. JOHNSON:  55 to 57 and then 59.

01:55:55  23          MR. EDDY:  That's right.  Thank you.

01:55:57  24          THE COURT:  You said 55 through 57 or --

01:56:00  25          MR. EDDY:  Yes, Your Honor.

01:56:01   1           THE COURT:  That would include 56.

01:56:03   2           MR. EDDY:  That's correct.

01:56:04   3           THE COURT:  Any objection?

01:56:05   4           MR. JOHNSON:  No, Your Honor.

01:56:07   5           THE COURT:  They're admitted.

01:56:08   6           MR. EDDY:  Thank you, Your Honor.

01:56:11   7         (GOVERNMENT EXHIBITS 17, 18, 21 through 27, 38 through 47,

01:56:11   8   55 through 57, 59, and 61 through 63:  Received in evidence.)

01:56:12   9           MR. EDDY:  And I'll have Agent Ridgeway turn to what's

01:56:12  10   now been admitted; and if we may, we'd like to publish, Your

01:56:14  11   Honor, Government's Exhibit 21?

01:56:18  12           THE COURT:  You may.

01:56:22  13           MR. EDDY:  And let's start with the last page.

01:56:25  14   BY MR. EDDY:

01:56:25  15   Q.   Agent Ridgeway, do these appear to you to be messages

01:56:34  16   between the user of the account and another person?

01:56:37  17   A.   Yes.

01:56:40  18   Q.   Chronologically in general in a Facebook account with these

01:56:44  19   messages, how is each of the strings organized?

01:56:46  20   A.   From bottom to top is my understanding.

01:56:50  21   Q.   In other words, would the lowest in the page order be the

01:56:54  22   earliest of the messages?

01:56:56  23   A.   Yes, that's my understanding.

01:56:58  24   Q.   And how, if at all, would these message compare to, say,

01:57:01  25   text messages on a phone?

01:57:02    1    A.    Similarly.

01:57:04    2    Q.    Do you see a block, Agent Ridgeway, that includes the

01:57:09    3    author, Kay McKay, and the one just above that?

01:57:12    4          And I'll ask Ms. Backer to zoom in on those two near

01:57:16    5    the top of the page.  Have you got those?

01:57:21    6    A.    Yes.

01:57:22    7    Q.    For the one with Kay McKay, do you see an entry for "sent"?

01:57:28    8    A.    Yes, I do.

01:57:29    9    Q.    What information is given there?

01:57:31   10    A.    The date and the time.

01:57:33   11    Q.    What's the date?

01:57:36   12    A.    6-23-2016.

01:57:39   13    Q.    And what's in the body of that message?

01:57:43   14    A.    The body reads:  What's up, Shane?  It's been a minute.

01:57:47   15    Anyway, me and my partner are starting a ADBSI-sanctioned club

01:57:55   16    with the ADBA for our region.  We need 30 members to get the

01:57:59   17    club started.  Annual membership fee are $25 per year.

01:58:03   18          With starting this club, we can hold all kind of

01:58:07   19    sanctioned shows, parentheses, conformation, weight pull, spring

01:58:11   20    pole, high jump, et cetera, close parentheses.  We will also be

01:58:15   21    able to buy all our supplies in bulk and at a much cheaper

01:58:20   22    price, parentheses, feed, vaccines, dewormers, collars, leashes,

01:58:25   23    et cetera, close parentheses.

01:58:27   24          Getting dogs registered with the ADBA will be a lot

01:58:31   25    easier, and we also have proof that the dogs we breed and raise

01:58:34   1   are used for a greater purpose whenever dealing with animal

01:58:38   2   control or any other super dicks.

01:58:42   3   Q.   Do you see a block above that with the author, Shane

01:58:45   4   Sprague?

01:58:46   5   A.   Yes.

01:58:46   6   Q.   And do you see the entry for "sent" with that one?

01:58:50   7   A.   Yes.

01:58:50   8   Q.   Which of these two is the later message?

01:58:53   9   A.   The one on top.

01:58:54   10  Q.   What's the body of that one?

01:58:55   11  A.   Call me.  501-7171.

01:58:59   12  Q.   Do you recognize those digits at the end?

01:59:02   13  A.   Yes.

01:59:02   14  Q.   From what?

01:59:04   15  A.   From the call recording system printout and from subpoenaed

01:59:08   16  records.

01:59:09   17  Q.   Let's go to the page previous to that.  And I'm going to

01:59:14   18  ask Ms. Backer if she could find and zoom in on the top four

01:59:18   19  boxes for us.

01:59:23   20       Agent Ridgeway, starting with the fourth one from the

01:59:25   21  top, can you give us the author and the body of those in

01:59:29   22  chronological order, please.

01:59:34   23  A.   Kay McKay:  Did y'all ever look at Old Girl?

01:59:38   24       Shane Sprague:  Yeah.

01:59:40   25       Kay McKay:  How she do?

01:59:43   1          Shane Sprague:  Good, 27 min and ready for more.

01:59:50   2     Q.   And let's move to the page previous to that, please.  And

01:59:59   3     now let's go to the page previous to that, and I'll ask

02:00:02   4     Ms. Backer to zoom in on that text for us.

02:00:05   5          Agent Ridgeway, do you see a field here in what we've

02:00:08   6     zoomed in on for attachments?

02:00:09   7     A.   Yes.

02:00:11   8     Q.   What's your understanding generally regarding the type of

02:00:14   9     information in that block for attachments?

02:00:18   10    A.   That is an image or attached to an image.

02:00:21   11    Q.   What's your understanding of the relationship if any,

02:00:23   12    between what's seen on this page and the item that comes

02:00:27   13    directly after it in the page number ordering?

02:00:31   14    A.   This is just the metadata that's associated with that image

02:00:35   15    on the following page.

02:00:36   16    Q.   And now if we could move from there to the previous page,

02:00:40   17    I'm going to ask Ms. Backer to start a rolling zoom for us at

02:00:44   18    the bottom, and we'll work our way up.

02:00:49   19          The attachment text we just read, who was the sender

02:00:52   20    of that, starting at the bottom of this page?

02:00:56   21    A.   Shane Sprague.

02:00:56   22    Q.   And now, Agent Ridgeway, if you could work us upward

02:00:59   23    through these messages, starting at the bottom, and for each

02:01:01   24    just give us the author and the body in chronological order?

02:01:05   25    A.   Kay McKay:  That's good.

02:01:08   1          Kay McKay:  How many times you look at her already?

02:01:11   2          Shane Sprague:  That's four.

02:01:13   3          Shane Sprague:  And longest I stop first 3 10 mon

02:01:24   4   each.

02:01:24   5          Shane Sprague:  I'd say she graduated.

02:01:27   6          Kay McKay:  Did you put a bigger dog on her?

02:01:30   7          Kay McKay:  Try to break her?

02:01:34   8          Shane Sprague:  Older and about 6 or 7 pounds bigger,

02:01:39   9   and she had been around the block twice.

02:01:42   10         Shane Sprague:  Some guy my boy knew go by Shotgun

02:01:50   11   Willy.

02:01:51   12         Kay McKay:  Good.  Real good.

02:01:53   13         Kay McKay:  You plan on hooking her up?

02:02:00   14         MR. EDDY:  And now, Ms. Backer, if you could go up

02:02:04   15   from there to the page prior to that, number two in the slides.

02:02:07   16   And we'll start with the fourth one from the bottom, and we'll

02:02:10   17   do a rolling zoom up from there, please.

02:02:14   18   BY MR. EDDY:

02:02:14   19   Q.   And, Agent Ridgeway, if you could start with us for --

02:02:16   20   where it says, You got Peek's...

02:02:21   21   A.   Kay McKay:  You got Peek's number?

02:02:25   22         Shane Sprague:  No, I lost it when I lost the other

02:02:27   23   phone.  I can get it.

02:02:29   24         Kay McKay:  If it's not a problem, please.

02:02:33   25         Shane Sprague:  You got a rape stand?

02:02:36   1          Kay McKay:  Nope, but I can get them tied up.

02:02:44   2          Kay McKay:  Or show/tell you how.

02:02:46   3          Shane Sprague:  Man, all they want to do is fight.

02:02:50   4   Can't hold them.  I got a buddy that will AI for me.

02:02:55   5          Kay McKay:  Naw, we won't be holding them.

02:03:00   6          Kay McKay:  I've had that problem many times.

02:03:07   7          The top one is -- the author is Kay McKay, and it

02:03:10   8   reads "with the male breed stand."

02:03:15   9   Q.   And then if you could work upwards from there onto the

02:03:18   10  previous page, let's do the bottom five messages, please.

02:03:22   11  A.   Okay.  Shane Sprague:  The problem is the bitch go crazy

02:03:26   12  and when she does he don't want to fuck, he want to fight.

02:03:33   13         Kay McKay:  Trust me, I can get them hooked.

02:03:36   14         Kay McKay:  I had a bitch that was the same way.  I

02:03:39   15  got a method, that is for sure.

02:03:40   16         Shane Sprague:  Well, what's up?  I have two to do

02:03:47   17  this week.

02:03:48   18         Kay McKay:  I'm free all week.

02:03:53   19  Q.   Agent Ridgeway, can you turn from there, please, to what's

02:03:54   20  been admitted into evidence as Government's Exhibit 44.  And

02:03:56   21  again we'll start at the last page.  I'll ask Ms. Backer if she

02:04:08   22  can zoom in on the third, fourth and fifth from the bottom on

02:04:12   23  that page, please.  Up from there.  And you could start, Agent

02:04:18   24  Ridgeway, with "I'm sure but," the message, if you see that one,

02:04:21   25  and work up from there.

RIDGEWAY - DIRECT

02:04:23  1   A.   Shane Sprague:  I'm sure, but that's a good coverup.  Send

02:04:26  2   my dog to an animal control officer.  What can somebody say

02:04:30  3   after that?

02:04:31  4        Shane Sprague:  She got to be doing something.

02:04:35  5        David Moser:  When the cops came out to my house, I

02:04:40  6   dropped her name and told them who she was, and that's where I'd

02:04:43  7   gotten a few dogs for.  Once they heard that they were good.

02:04:48  8   They no more questions, and they shook my hand and left.

02:04:53  9        MR. EDDY:  And then, Ms. Backer, if you could kind of

02:04:54  10  scroll up upwards from there for us, and we'll grab those top

02:04:59  11  three at the very top.

02:05:00  12  BY MR. EDDY:

02:05:00  13  Q.   And if you could start with the one "LOL," Agent Ridgeway.

02:05:06  14  A.   Shane Sprague:  LOL, I hear you.  Not me.  AC comes out

02:05:11  15  here, they taking everything if they run my name.  So if they do

02:05:14  16  come, they all my wife's dogs.

02:05:19  17       Shane Sprague:  I owe them 10,000 for one dog I had a

02:05:23  18  long time ago.

02:05:28  19  Q.   And then let's start on that next message up that kind of

02:05:32  20  bridges the page gap there.

02:05:34  21  A.   David Moser is the author.  And the body reads:  What the

02:05:36  22  hell do you owe ten grand for?

02:05:40  23       Shane Sprague:  My dog killed three dogs and F-K-E-D

02:05:46  24  up a rott in a matter of an hour.

02:05:51  25       David Moser:  Yeah, but that's not ten grand worth of

| | | |
|---|---|---|
| 02:05:56 | 1 | damage. |
| 02:05:56 | 2 | Shane Sprague:  Running at large, barking too much, |
| 02:06:01 | 3 | F-K-E-D up a total of 15 dogs in a year.  The list goes on and |
| 02:06:08 | 4 | on.  My neighbor called on me all the time for stupid shit. |
| 02:06:14 | 5 | David Moser:  LOL, damn. |
| 02:06:16 | 6 | Shane Sprague:  Yeah, I was 18 with my first game dog. |
| 02:06:21 | 7 | David Moser:  Yeah, they got me when I was 18.  They |
| 02:06:27 | 8 | tried to put me in prison for five years. |
| 02:06:29 | 9 | David Moser:  Over a dog. |
| 02:06:31 | 10 | Shane Sprague:  Yep, that's why they are my wife's |
| 02:06:38 | 11 | dogs, LOL. |
| 02:06:40 | 12 | David Moser:  LOL, great minds think alike. |
| 02:06:44 | 13 | Q.   And I'll get Ms. Backer to kind of advance us to the bottom |
| 02:06:47 | 14 | of the previous page, and we'll start at the bottom and work |
| 02:06:55 | 15 | upwards from there, Agent Ridgeway. |
| 02:06:58 | 16 | A.   David Moser:  Is that the one that Joe gave you? |
| 02:07:01 | 17 | Shane Sprague:  Yeah. |
| 02:07:04 | 18 | David Moser:  You keeping her? |
| 02:07:06 | 19 | Shane Sprague:  Oh, yeah.  I'm going to give her a |
| 02:07:10 | 20 | five min roll in March. |
| 02:07:12 | 21 | David Moser:  I was going to see if you interested in |
| 02:07:16 | 22 | trading her to me. |
| 02:07:18 | 23 | Shane Sprague:  If I can find one around her size. |
| 02:07:21 | 24 | She's only about 25 pounds. |
| 02:07:24 | 25 | Q.   And then if we could advance from there to the bottom of |

02:07:27  1  page 3, and let's grab those bottom two, Agent Ridgeway.

02:07:42  2  A.   The bottom two or do you want -- the one that's authored

02:07:47  3  Shane Sprague and David Moser?  Are those the two you're

02:07:50  4  referring to?

02:07:51  5  Q.   Yes.  Let's start with LOL and the one above that.

02:07:54  6  A.   Okay.  Shane Sprague:  LOL.  I might do something with you

02:07:57  7  one day, see what all the hype is about.  I tell you I got a

02:08:01  8  Redboy Rascal Mountain Man Skull dog when into a Mayday dog

02:08:10  9  two-time winner, my B -- and several asterisks.  Never got

02:08:15 10  matched but we was looking at her -- with her and they picked up

02:08:18 11  in 20 minutes and said, I want nothing to do with her.

02:08:23 12  Q.   And let's go to the previous page and start at the bottom

02:08:26 13  and work our way up from there, please.

02:08:33 14  A.   David Moser:  You know the sire and dam?  They're good

02:08:37 15  dogs?

02:08:37 16       Shane Sprague:  Sire is.  Dam hasn't done much.  Sire

02:08:47 17  T-H-O-S is Batman all day.  Their attitude is identical.

02:08:53 18       David Moser:  I was thinking about seeing if I can get

02:08:57 19  them both.

02:08:58 20       Shane Sprague:  Hell, yeah.

02:09:01 21       David Moser:  I'll trade you one for Peek's dog, LOL.

02:09:08 22       Shane Sprague:  I tell you what if she don't drop some

02:09:11 23  puppies for me on the 24th she's going to get a bullet in the

02:09:16 24  head.

02:09:16 25       David Moser:  Nah, don't do that.

02:09:19   1          Shane Sprague:  I've got a brood B -- with several

02:09:24   2   asterisks to follow -- just got some of that pink stuff in.  It

02:09:29   3   pretty heavy.

02:09:30   4          Shane Sprague: this will be the third breeding I've

02:09:33   5   done with her and she hasn't taken.

02:09:35   6          David Moser:  If I not get both of those dogs we'll

02:09:40   7   work something out so you can get one too.

02:09:43   8          David Moser:  Yeah.  Might be time for a bullet then.

02:09:48   9   Q.   All right.  We'll stop with that one for now.  And if you

02:09:50   10  could next, please, Agent Ridgeway, turn in your binder to

02:09:53   11  what's has been admitted as Government's Exhibit 22.  And we'll

02:09:57   12  start on page 2, please.  And I'm going to ask Ms. Backer, once

02:10:05   13  she's got it up, to grab that first entry under the giant blue

02:10:10   14  thumb, please.  Agent Ridgeway.

02:10:17   15  A.   Steven Hamilton is the author.  The body reads:  60 acres

02:10:21   16  would be lovely, and that's all I have is one acre.  Sometimes I

02:10:24   17  wish I was somewhere else with no neighbors, but they fight

02:10:27   18  chickens, so I have no worries.

02:10:30   19  Q.   Let's go to the next page previous and grab the top two

02:10:37   20  messages under that thumb, please.  And go ahead, Agent

02:10:45   21  Ridgeway.

02:10:46   22  A.   Steven Hamilton is the author.  The body reads:  Which that

02:10:48   23  ain't good either, because if they get caught up, they can see

02:10:51   24  my dog.  But everybody knows me in town, and they all think I

02:10:55   25  hog-hunt.

RIDGEWAY - DIRECT

02:10:57   1          Shane Sprague:  That's what my brother does.

02:11:00   2   Q.   And now if you would, Agent Ridgeway, please turn in your

02:11:03   3   binder to what's been admitted as Government's Exhibit 57.  And

02:11:07   4   I'm going to draw your attention to that sort of middle cluster

02:11:16   5   of dark gold text on the left, and I'm going to ask Ms. Backer

02:11:21   6   if she can zoom in on that cluster right there.

02:11:34   7          Agent Ridgeway, do you see a field there for Link?

02:11:36   8   A.   Yes.

02:11:37   9   Q.   Do you see a field for Uploaded?

02:11:42  10   A.   Yes.

02:11:42  11   Q.   And what's there in the field for Uploaded?

02:11:46  12   A.   5-29-2016.

02:11:48  13   Q.   Do you see a field for Comments?

02:11:53  14   A.   Yes.

02:11:53  15   Q.   And are there different users listed here on your page

02:11:55  16   under -- or kind of next to and down from there, Comments?

02:11:58  17   A.   Yes.

02:12:02  18   Q.   Do you see a field just above that for ID, with kind of a

02:12:08  19   long number next to it?

02:12:11  20   A.   Yes.

02:12:13  21   Q.   Did you search the electronic files that Facebook provided

02:12:16  22   you for that -- a file with that long number in it?

02:12:21  23   A.   Yes.

02:12:21  24   Q.   Did you find a file with a matching number?

02:12:23  25   A.   Yes, I did.

RIDGEWAY - DIRECT

| | | |
|---|---|---|
| 02:12:24 | 1 | Q.   Was it of video? |
| 02:12:27 | 2 | A.   It was. |
| 02:12:27 | 3 | Q.   And did you view that? |
| 02:12:29 | 4 | A.   I did. |
| 02:12:29 | 5 | Q.   If you would now find for us Tab 58, what's been marked for |
| 02:12:34 | 6 | identification in your binder as Government's Exhibit 58. |
| 02:12:38 | 7 | A.   Okay. |
| 02:12:38 | 8 | Q.   And pull it out for us, please, what you see there.  Have |
| 02:12:47 | 9 | you seen this item before? |
| 02:12:49 | 10 | A.   Yes. |
| 02:12:49 | 11 | Q.   What is it? |
| 02:12:51 | 12 | A.   A CD. |
| 02:12:53 | 13 | Q.   What contents are on the disk? |
| 02:12:55 | 14 | A.   A video. |
| 02:12:56 | 15 | Q.   Did you play it? |
| 02:12:57 | 16 | A.   I did. |
| 02:12:57 | 17 | Q.   How do you know that the contents on this disk that you are |
| 02:12:59 | 18 | holding are the same as what you played earlier? |
| 02:13:03 | 19 | A.   I initialed this disk and put my badge number on there. |
| 02:13:06 | 20 | Q.   Did you compare the video content on this file to the video |
| 02:13:09 | 21 | file that Facebook provided with a matching file number to that |
| 02:13:14 | 22 | listed on the page that we just looked at? |
| 02:13:16 | 23 | A.   Yes. |
| 02:13:16 | 24 | Q.   What did you find when you did that? |
| 02:13:18 | 25 | A.   They were the same. |

02:13:19   1   Q.   Is government's Exhibit 58 a fair and accurate copy of the

02:13:22   2   video that was linked on page 1 of Government's Exhibit 57?

02:13:26   3   A.   Yes.

02:13:28   4        MR. EDDY:  Your Honor, we move admission of

02:13:29   5   Government's Exhibit 58.

02:13:31   6        THE COURT:  Any objection?

02:13:33   7        MR. JOHNSON:  No, Your Honor.

02:13:34   8        THE COURT:  It's admitted.

02:13:35   9      (GOVERNMENT EXHIBIT 58:   Received in evidence.)

02:13:38  10        MR. EDDY:  And may I retrieve that from the witness,

02:13:39  11   Your Honor?

02:13:43  12        THE COURT:  Yes.

02:14:33  13      (Video played in open court.)

02:14:36  14   BY MR. EDDY:

02:14:38  15   Q.   Agent Ridgeway, could you next turn to what's been admitted

02:14:43  16   into evidence and is in your binder as Government's Exhibit

02:14:48  17   Number 59.  And I'm going to draw your attention to -- and ask

02:15:01  18   Ms. Backer to zoom in on the second cluster from the bottom.

02:15:12  19        Agent Ridgeway, do you see a field here on that second

02:15:14  20   one from the bottom -- and actually, on this excerpt it's the

02:15:18  21   top one here -- for ID?

02:15:22  22   A.   Yes.

02:15:23  23   Q.   Do you see a number listed there?

02:15:24  24   A.   Yes.

02:15:26  25   Q.   Did you search the electronic files that Facebook provided

| | | |
|---|---|---|
| 02:15:28 | 1 | you for a file with that same number? |
| 02:15:30 | 2 | A.   Yes. |
| 02:15:31 | 3 | Q.   And did you find a file with the same number? |
| 02:15:33 | 4 | A.   Yes. |
| 02:15:34 | 5 | Q.   What type of file was that? |
| 02:15:36 | 6 | A.   A video. |
| 02:15:36 | 7 | Q.   Did you view that? |
| 02:15:37 | 8 | A.   I did. |
| 02:15:38 | 9 | Q.   And let me direct your attention to the row down from there |
| 02:15:41 | 10 | where it says Link.  And then -- I apologize, two down from |
| 02:15:50 | 11 | there.  Let's go with Uploaded.  Do you see some text next to |
| 02:15:53 | 12 | that? |
| 02:15:53 | 13 | A.   Yes. |
| 02:15:54 | 14 | Q.   What's that? |
| 02:15:57 | 15 | A.   4-17-2017. |
| 02:16:00 | 16 | Q.   4 what?  I'm sorry? |
| 02:16:04 | 17 | A.   Are you referring to the one at the top? |
| 02:16:06 | 18 | Q.   Yes? |
| 02:16:06 | 19 | A.   Okay. |
| 02:16:07 | 20 | Q.   Under Uploaded. |
| 02:16:09 | 21 | A.   I apologize.  4-25-2017. |
| 02:16:18 | 22 | Q.   And now if you would turn to what's been marked for |
| 02:16:22 | 23 | identification in your binder as Government's Exhibit 60 and |
| 02:16:28 | 24 | take that out as well, please.  Have you seen this item before? |
| 02:16:32 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 02:16:33 | 1 | Q.   What is it? |
| 02:16:34 | 2 | A.   A CD. |
| 02:16:35 | 3 | Q.   What's on the CD? |
| 02:16:36 | 4 | A.   A video. |
| 02:16:38 | 5 | Q.   Did you view the video? |
| 02:16:39 | 6 | A.   I did. |
| 02:16:42 | 7 | Q.   And did you compare the content on this disk with that |
| 02:16:44 | 8 | video file to the video file that Facebook provided you with the |
| 02:16:48 | 9 | matching file number to the one that we just saw in Government's |
| 02:16:50 | 10 | Exhibit 59? |
| 02:16:51 | 11 | A.   Yes. |
| 02:16:53 | 12 | Q.   What did you find when you made that comparison? |
| 02:16:55 | 13 | A.   They're the same. |
| 02:16:55 | 14 | Q.   Is Government's Exhibit 60 a fair and accurate copy of the |
| 02:16:59 | 15 | video file linked on Government's Exhibit 59, the page that we |
| 02:17:04 | 16 | just looked at? |
| 02:17:05 | 17 | A.   Yes. |
| 02:17:05 | 18 | MR. EDDY:  Your Honor, we move admission of |
| 02:17:08 | 19 | Government's Exhibit 60. |
| 02:17:10 | 20 | THE COURT:  Any objection? |
| 02:17:11 | 21 | MR. JOHNSON:  No, Your Honor. |
| 02:17:12 | 22 | THE COURT:  It's admitted. |
| 02:17:13 | 23 | *(GOVERNMENT EXHIBIT 60:  Received in evidence.)* |
| 02:17:14 | 24 | MR. EDDY:  And may I retrieve that from the witness |
| 02:17:19 | 25 | and may we publish, Your Honor? |

02:17:23  1          THE COURT:  Yes, you may.

02:17:35  2          *(Video recording played in open court.)*

02:18:13  3    BY MR. EDDY:

02:18:13  4    Q.   Agent Ridgeway, if you would next, please, turn in your

02:18:20  5    binder to what's been admitted into evidence as Government's

02:18:21  6    Exhibit 18.  And this one I'm going to ask you to start with

02:18:28  7    page 1, and I'm going to ask Ms. Backer to zoom in on the body

02:18:33  8    of text that we see there toward the middle.

02:18:37  9          What's listed here for author?

02:18:41 10    A.   Shane Sprague.

02:18:43 11    Q.   Sent?

02:18:44 12    A.   10-13-2017.

02:18:47 13    Q.   And do you see a file -- a field, rather, for Attachments?

02:18:51 14    A.   Yes.

02:18:51 15    Q.   Is there something listed there?

02:18:53 16    A.   Yes.  Image.

02:18:55 17    Q.   How about under that and to the right, under Type, what's

02:18:57 18    seen there?

02:18:58 19    A.   Image.

02:18:59 20    Q.   And before I ask Ms. Backer to publish page 2, could you

02:19:04 21    please just turn to page 2 in your binder and just verbally

02:19:08 22    describe for us what's on that page.

02:19:15 23    A.   Yes.  This is a picture of a dog with a severe gaping wound

02:19:23 24    to its eye area.

02:19:26 25          MR. EDDY:  If you'd go ahead and hit page 2 for us.

02:19:33   1          MR. JOHNSON:  What exhibit?

02:19:45   2          MR. EDDY:  This is page 2 of Government's Exhibit 18.

02:19:45   3   BY MR. EDDY:

02:19:45   4   Q.   Agent Ridgeway, if you could -- and we'll take that one

02:19:45   5   down.  Let's turn to what's been admitted into evidence and is

02:19:49   6   marked in your binder as Government's Exhibit 17.  And I'm going

02:19:53   7   to have you start with page 10 of that exhibit.  It's the

02:19:58   8   second-to-last page in your binder.

02:20:08   9          And I'm going to ask Ms. Backer to grab this one here.

02:20:15   10          Agent Ridgeway, who's the author of this?

02:20:19   11  A.   Jay Mac.

02:20:20   12  Q.   And what's the date?

02:20:22   13  A.   12-25-2016.

02:20:25   14  Q.   And can you read us the body, please.

02:20:28   15  A.   Killers homie.  Watch and see.  Machete to SM's Diamante

02:20:33   16  will be the heaviest family bred Little Gator dogs in the damn

02:20:39   17  world.  You have all the brothers and half brothers in one

02:20:43   18  pedigree.  Diamante is throwing fucking killers too and SM does

02:20:49   19  not breed outside his yard or sell pups.  I'm very fortunate to

02:20:54   20  breed to him.  Joe Black, CH Bullet, CH Black Angel, Golden

02:21:01   21  States Tattoo, Cuervo, Cuervito, Moreno, Ranchita, Xena, and

02:21:10   22  more in one shot.  Nasty as fuck.

02:21:14   23  Q.   Agent Ridgeway, if you could next please turn to page 6 of

02:21:16   24  that exhibit, which has 9903 at the top.

02:21:20   25          MR. EDDY:  And I'm going to ask Ms. Backer to start a

RIDGEWAY - DIRECT

02:21:22  1    rolling zoom for us at the bottom and grab those bottom two

02:21:25  2    messages.  Just the bottom two ones for now.

02:21:27  3    BY MR. EDDY:

02:21:27  4    Q.   And if you could, please, give us the author and the body

02:21:31  5    for those.

02:21:35  6    A.   Jay Mac:  Whatcha got bro?

02:21:37  7         Jay Mac:  You run Chinaman, X Jeep, right?

02:21:44  8    Q.   And let's go up from there to the next one and maybe zoom

02:21:48  9    out a little bit.  Agent Ridgeway, for this entry here, what

02:21:55  10   type of information is contained in the field Body?

02:22:00  11   A.   Appears to be a hyperlink to a website.

02:22:03  12   Q.   Below that and a little bit to the right, do you see a

02:22:05  13   field for Title?

02:22:07  14   A.   Yes.

02:22:08  15   Q.   What's seen there?

02:22:10  16   A.   Online Pedigrees.  Bracket, 543492, close bracket.  Jack

02:22:19  17   Town Florida Heat.

02:22:20  18   Q.   And do you see a six-digit number at the end of what you

02:22:23  19   previously referred to as the website link just above that?

02:22:27  20   A.   Yes.

02:22:28  21   Q.   How do those two compare?

02:22:30  22   A.   They're the same.

02:22:32  23   Q.   What type of information is being shared in this message?

02:22:38  24   A.   Link it a pedigree.

02:22:40  25   Q.   And who's the author?

02:22:42    1    A.   Shane Sprague.

02:22:42    2    Q.   The next message up from that, if we could scroll up to

02:22:46    3    that.  Is that also a website link?

02:22:52    4    A.   Yes.

02:22:52    5    Q.   Sent by whom?

02:22:53    6    A.   Shane Sprague.

02:22:54    7    Q.   What's the date?

02:22:55    8    A.   1-25-2017.

02:22:58    9    Q.   And what's in the title field for that entry?

02:23:02   10    A.   Online Pedigrees.  Bracket, 588636, close bracket.  C Woods

02:23:11   11    hot, money sign, HIT.

02:23:15   12    Q.   And let's scroll up one more and grab that one at the top.

02:23:20   13    Does this appear to be another page on that same website that's

02:23:24   14    linked here?

02:23:24   15    A.   Yes.

02:23:25   16    Q.   Who's the author of this posting?

02:23:28   17    A.   Shane Sprague.

02:23:29   18    Q.   And then if we could go to the previous page to that,

02:23:32   19    starting at the bottom, could you read for us the author and

02:23:42   20    body of each of those, Agent Ridgeway.

02:23:46   21    A.   The author is Jay Mac.  The body reads:  Nice bro.  I like

02:23:49   22    the Double Maverick.  I know a little something about dogs in

02:23:53   23    that pedigree.  I used to have a gator dog like that years ago.

02:23:57   24    Worked good for me.  Long winded, game, head dogs is what I got

02:24:01   25    out of it.

02:24:04   1         Shane Sprague:  Definitely long wind, very game.

02:24:09   2    Q.   Let's go to page 2 next.  It's got 9897 at the top.  And if

02:24:14   3    you could, I'll ask Ms. Backer to zoom in on maybe this portion

02:24:19   4    here.  And, Agent Ridgeway, if you could find for us -- and go

02:24:24   5    down just a little bit from there, Ms. Backer.  And if you could

02:24:28   6    start us off, Agent Ridgeway, if you see it, with "I'm doing"

02:24:30   7    and work up from there?

02:24:32   8    A.   The author is Shane Sprague.  Body reads:  I'm doing this

02:24:35   9    today.

02:24:37   10   Q.   And then the entry above that, what's the -- who's the

02:24:42   11   author of that one?

02:24:43   12   A.   Shane Sprague.

02:24:43   13   Q.   Do you see a link to a website in this?

02:24:45   14   A.   Yes.

02:24:46   15   Q.   Is it the same website that we saw on the previous page?

02:24:49   16   A.   Yes, it appears to be.

02:24:51   17         MR. EDDY:  And could you please scroll up just a

02:24:54   18   little bit, Ms. Backer.

02:24:54   19   BY MR. EDDY:

02:24:54   20   Q.   And then, Agent Ridgeway, read us the author and body in

02:24:57   21   the posting above that.

02:24:59   22   A.   Author Jay Mac.  Body reads:  Rolled Hammer yesterday at

02:25:02   23   five years old for shits and giggles even though he already won

02:25:05   24   a couple years ago.  Bro, that dog is in a class of his own.  It

02:25:09   25   just reassured me and confirmed that I am doing the right thing

02:25:14  1  building a yard around him.  And he's throwing motherfucking

02:25:22  2  killers.

02:25:22  3          Shane Sprague:  Hell, yeah.  Shane Sprague:  That's

02:25:26  4  good shit, bro.  He a hell of a bulldog to build off of.

02:25:33  5  Q.   Agent Ridgeway, if you would go next, please, to what's

02:25:34  6  been admitted into evidence as Government's Exhibit 45.  And

02:25:37  7  we'll put up page 1 to start, and if you in your binder could

02:25:41  8  just take a quick skim through that and then give us a verbal

02:25:45  9  description of some of the image content that is seen in this

02:25:51  10  exhibit.

02:26:57  11          And how would you describe the content of the images

02:26:59  12  that you're seeing as you skim through these?

02:27:04  13  A.   Images of several images of dogs with multiple lacerations

02:27:10  14  to their face, chest, and leg areas.

02:27:14  15          MR. EDDY:  And could we publish -- and I'm going to

02:27:17  16  have you start at the last page of this.

02:27:28  17          THE COURT:  Before we go to this, we're still on 45.

02:27:30  18  What's the date of this?  Can we pin this down?

02:27:36  19          MR. EDDY:  Yes, Your Honor.  We can --

02:27:38  20  BY MR. EDDY:

02:27:38  21  Q.   Why don't we -- to establish the date on this, Agent

02:27:41  22  Ridgeway, why don't we move to page 29 in your binder, which has

02:27:47  23  7902 at the top.  And I'll ask Ms. Backer if she could zoom in

02:27:56  24  on that bottommost of those.

02:28:01  25          THE COURT:  All right.  Now, this is part of

02:28:02   1    Government Exhibit 45?

02:28:03   2            MR. EDDY:  Yes, Your Honor.  And for the record, we're

02:28:05   3    on page 29 of that.

02:28:09   4    BY MR. EDDY:

02:28:09   5    Q.   And, Agent Ridgeway, what's your understanding of the

02:28:11   6    relationship, if any, between the bottommost of the postings

02:28:15   7    that we see on this page and the images that follow?

02:28:19   8    A.   The metadata associated with those images.

02:28:25   9    Q.   And do you see the -- the field for Sent, can you give us

02:28:28   10   what's listed there?

02:28:28   11   A.   12-16-2017.

02:28:31   12   Q.   Who's the author of this posting?

02:28:33   13   A.   Shane Sprague.

02:28:33   14   Q.   And below that, do you see the field for attachments?

02:28:37   15   A.   Yes.

02:28:39   16   Q.   Do the images that follow, are these the attachments to

02:28:41   17   that posting?

02:28:44   18   A.   Yes.

02:28:45   19   Q.   Okay.  And I believe we had previously seen page 32.  Now

02:28:50   20   let's go to page 30.  And, Agent Ridgeway, in your binder that's

02:28:53   21   got 7903 at the top.  And now let's go backwards to -- one more

02:29:01   22   page to the one we were just on with the date, and I'm going to

02:29:03   23   ask Ms. Backer to zoom in on the other messages on that page.

02:29:08   24            And, Agent Ridgeway, if you would, please, work us up

02:29:11   25   from the bottom with the author and body.

02:29:15    1    A.    Author is Shane Sprague.  The body reads:  Batman and

02:29:18    2    Lugnut tied up for a few hours while I was at work.

02:29:22    3              Shane Sprague:  Left pic Lug, right pic Batman.

02:29:27    4              David Moser:  Thank God it's Friday night and you

02:29:31    5    don't have to work tomorrow.

02:29:33    6    Q.    And can we go to the page previous to that, please.  And to

02:29:39    7    the page previous to that, please.  And as with the others,

02:29:45    8    what, if any, is the relationship here between the text and the

02:29:50    9    image that we just saw?

02:29:52   10    A.    Just the metadata associated with the image.

02:29:55   11    Q.    And let's move to the page prior to that.  And from there

02:30:01   12    let's go to 24.  And from there 22, please.  And, Agent

02:30:19   13    Ridgeway, for each of these as we move through on the

02:30:21   14    intervening pages, the odd-numbered ones, are those the metadata

02:30:25   15    associated with each of these image files?

02:30:27   16    A.    Yes.

02:30:27   17    Q.    And let's move from there to page 20, please.  And page 18,

02:30:38   18    please.  And just one previous to that.  Let's stop for a moment

02:30:47   19    on 17, and let's zoom in on those top two.  And, Agent Ridgeway,

02:30:51   20    what do you make out for the top one there, including the date,

02:30:54   21    please?

02:30:56   22    A.    Shane Sprague is the author, and the body reads:  Lug.  The

02:31:00   23    date is 12-16-2017.

02:31:03   24    Q.    And let's go to the page previous to that.  And let's go

02:31:21   25    two prior to that, so 14, please.  And let's take a look at

02:31:38 | 1   Number 10, please.  I want to stop there for a moment.

02:31:45 | 2            Agent Ridgeway, do you recognize the background of

02:31:48 | 3   this photograph?

02:31:48 | 4   A.   Yes.

02:31:49 | 5   Q.   From what?

02:31:53 | 6   A.   From being at that location.

02:31:56 | 7   Q.   What location was that?

02:31:59 | 8   A.   Haley Cook Murph's residence.

02:32:03 | 9   Q.   Did you physically see the background of this photograph

02:32:06 | 10  yourself in person?

02:32:08 | 11  A.   Yes.

02:32:08 | 12  Q.   The area?  Did you also compare it to photographs from the

02:32:11 | 13  search warrant?

02:32:12 | 14  A.   Yes, I did.

02:32:13 | 15  Q.   Were you also investigating Haley Cook Murph?

02:32:17 | 16  A.   Yes.

02:32:17 | 17  Q.   For what?

02:32:21 | 18  A.   Participating as a quasi vet with the other individuals in

02:32:29 | 19  the case.

02:32:30 | 20  Q.   And I believe I neglected to ask you:  When you were

02:32:33 | 21  present at this location, was that pursuant to a search warrant

02:32:35 | 22  issued by this Court?

02:32:36 | 23  A.   Yes.

02:32:38 | 24  Q.   Did you find veterinary equipment there?

02:32:40 | 25  A.   Yes, I did.

| | | |
|---|---|---|
| 02:32:41 | 1 | Q.   How would you describe that for us, generally? |
| 02:32:46 | 2 | A.   A large amount, large quantity of veterinary equipment. |
| 02:32:51 | 3 | Q.   What sorts of items do you recall from that location? |
| 02:32:57 | 4 | A.   Stapler, a skin stapler, staples.  As best I can recall, |
| 02:33:09 | 5 | syringes.  A good amount of stuff. |
| 02:33:19 | 6 | Q.   Did you seize any prescription injectable veterinary |
| 02:33:21 | 7 | medications? |
| 02:33:21 | 8 | A.   Yes. |
| 02:33:22 | 9 | Q.   To the best of your knowledge, did any of the residents of |
| 02:33:27 | 10 | that house possess a license to practice veterinary medicine? |
| 02:33:29 | 11 | A.   No. |
| 02:33:30 | 12 | MR. EDDY:  And let's go to page 8 next for us, please? |
| 02:33:38 | 13 | THE COURT:  Page 8 of what? |
| 02:33:39 | 14 | MR. EDDY:  I'm sorry, Your Honor.  We're still on |
| 02:33:41 | 15 | Government's Exhibit 45. |
| 02:33:52 | 16 | And then from there could we next take a look at the |
| 02:33:55 | 17 | page previous to that, and I'm going to ask Ms. Backer to set up |
| 02:33:59 | 18 | a rolling zoom and grab the bottom two messages for us. |
| 02:34:02 | 19 | BY MR. EDDY: |
| 02:34:02 | 20 | Q.   And, Agent Ridgeway, above the posting where you see |
| 02:34:04 | 21 | Attachments, can you give us the author and the body, and we'll |
| 02:34:08 | 22 | scroll up from there to the top of the page. |
| 02:34:10 | 23 | A.   I'm sorry.  Can you say that one more time? |
| 02:34:12 | 24 | Q.   We're on the page in your binder that's got 7880 at the |
| 02:34:17 | 25 | top -- |

02:34:17   1   A.    Thank you.

02:34:17   2   Q.    -- of Government's Exhibit 45.  And we're going to start

02:34:20   3   with just above the block of fields that has Attachments, so

02:34:28   4   start from the second one from the bottom, if you will, please.

02:34:30   5   A.    Okay.  Shane Sprague is the author, and the body reads:

02:34:34   6   Batman.

02:34:35   7          Author, David Moser:  Looks like Lugnut's chewed up

02:34:41   8   his face like a motherfucker.

02:34:45   9          David Moser:  Looks like Batman went in on that chest.

02:34:50   10          Shane Sprague:  Yeah.

02:34:51   11          David Moser:  Two hours and neither one of them stop?

02:34:55   12          Shane Sprague:  They both inflicted damage big time.

02:34:59   13   Q.    Now let's keep moving upwards from there, please.

02:35:04   14   A.    Shane Sprague:  More like three, four hours.

02:35:07   15   Q.    And by the way, let me grab from you -- what's the date on

02:35:09   16   this right here?

02:35:11   17   A.    12-16-2017.

02:35:14   18   Q.    Thank you.  Go ahead.

02:35:19   19   A.    David Moser:  Yeah, I can tell bro you're going to be doing

02:35:22   20   some work for a while to get them back to 100 percent.  Well, if

02:35:26   21   you had to pick one, which one?

02:35:29   22          David Moser:  Did they both have collars on?

02:35:32   23          Shane Sprague:  Yeah.

02:35:34   24          David Moser:  That's probably what saved their lives.

02:35:38   25          Shane Sprague:  Oh, yeah.

| | | |
|---|---|---|
| 02:35:41 | 1 | David Moser:  It looks like they were both aiming for |
| 02:35:45 | 2 | that general area. |
| 02:35:46 | 3 | David Moser:  Who do you think won? |
| 02:35:50 | 4 | Shane Sprague:  That be a hard decision. |
| 02:35:55 | 5 | David Moser:  I can tell by the pictures.  You try to |
| 02:36:01 | 6 | scratch him or are you just separate them? |
| 02:36:04 | 7 | Shane Sprague:  Wish I could have seen it. |
| 02:36:09 | 8 | David Moser:  Did you know it was going on? |
| 02:36:12 | 9 | Shane Sprague:  No. |
| 02:36:17 | 10 | Q.   And let's keep flowing from there on to the previous page. |
| 02:36:21 | 11 | A.   Shane Sprague:  Nobody was here. |
| 02:36:23 | 12 | Shane Sprague:  Call me. |
| 02:36:27 | 13 | David Moser:  I'll tell you what, if they were both |
| 02:36:30 | 14 | still rocking when you got there, they deserve their spots. |
| 02:36:35 | 15 | Shane Sprague:  They both deserve their spots. |
| 02:36:39 | 16 | Q.   And let's go from there to page 4, the previous page, and |
| 02:36:42 | 17 | I'll ask Ms. Backer to pull out for us the top four postings on |
| 02:36:46 | 18 | that page, continuing up from there. |
| 02:36:55 | 19 | MR. EDDY:  And pull down just a little bit from there. |
| 02:36:55 | 20 | Thank you. |
| 02:36:55 | 21 | BY MR. EDDY: |
| 02:36:55 | 22 | Q.   Agent Ridgeway, if you could start with Batman. |
| 02:37:01 | 23 | A.   Shane Sprague:  Batman ain't doing good, bro. |
| 02:37:05 | 24 | David Moser:  He was looking pretty rough.  First 24 |
| 02:37:08 | 25 | hours are always the roughest.  Number one killer is |

RIDGEWAY - DIRECT

02:37:13  1  dehydration.

02:37:16  2          Shane Sprague:  Yeah, I'm going to get more fluid now.

02:37:19  3          David Moser:  Pedialyte or Gatorade if he's not

02:37:23  4  drinking.  If you can get your hands on an IV, that would be

02:37:29  5  ideal.  You can also give him a shot in between the shoulder

02:37:34  6  blades with water.  It will keep him hydrated.  Do it every

02:37:36  7  couple of hours, a couple of times.  I've done this to save dogs

02:37:40  8  from parvo before to keep them hydrated.

02:37:44  9  Q.   And keep going on to the next page for us, please.

02:37:46  10  A.   Shane Sprague:  I'm on my way to hook IV now.

02:37:49  11         David Moser:  I've been looking around.  I can't find

02:37:52  12  anywhere to buy them over the counter.  You can order them.

02:37:56  13  You'll have to call around to some medical places.  Tell them

02:37:59  14  you're one of those doomsday preppers if they ask why you want

02:38:02  15  it.  I know that guy, Phil Eppinette, has them for sale.

02:38:05  16         Shane Sprague:  Phil has them 29.50 a bag.

02:38:15  17         David Moser:  Yeah, something like that.  I know you

02:38:18  18  can get them cheaper through those prepper websites and shit.

02:38:19  19         Shane Sprague:  Right.

02:38:21  20         David Moser:  What's Batman doing or not doing that

02:38:27  21  you so worried?

02:38:27  22         Shane Sprague:  He's doing nothing.  Completely limp,

02:38:32  23  won't drink, won't move.  Pissed all over me.

02:38:35  24         David Moser:  How is Lugnut?

02:38:37  25         Shane Sprague:  Way better than him.

| 02:38:40 | 1 | Shane Sprague:  He moving around. |
| 02:38:41 | 2 | David Moser:  What color are Batman's gums? |
| 02:38:45 | 3 | Shane Sprague:  Drinking. |
| 02:38:51 | 4 | Shane Sprague:  Pink. |
| 02:38:55 | 5 | David Moser:  He's still got good blood flow. |
| 02:38:59 | 6 | Shane Sprague:  A little.  That's what I'm worried |
| 02:39:03 | 7 | about, him needing blood. |
| 02:39:05 | 8 | David Moser:  You consider taking him to the vet?  I |
| 02:39:10 | 9 | know that's not the and [sic] thing you want to do. |
| 02:39:14 | 10 | David Moser:  Not something you want to do. |
| 02:39:17 | 11 | Shane Sprague:  If this doesn't work, I will. |
| 02:39:20 | 12 | David Moser:  Like I said, the biggest thing is |
| 02:39:22 | 13 | dehydration, and there are a couple of things you can do besides |
| 02:39:25 | 14 | a IV.  One is you can get a turkey baster and shoot water in his |
| 02:39:30 | 15 | ass.  I've heard that helps, but could end up being messy.  I |
| 02:39:32 | 16 | don't know.  I've given puppies shots in between the shoulder |
| 02:39:33 | 17 | blades with water to keep them alive before, so I know that |
| 02:39:37 | 18 | works.  But you'll just have to do it on a bigger scale.  You |
| 02:39:40 | 19 | might be able to buy a needle from Walgreens or Rite Aid or |
| 02:39:44 | 20 | something.  Just get a big one.  I think if you can get him |
| 02:39:49 | 21 | through the first 24 hours, you'll be okay. |
| 02:39:52 | 22 | Shane Sprague:  Six more hours and 24 is up.  We will |
| 02:39:57 | 23 | see how it goes. |
| 02:39:58 | 24 | David Moser:  Hopefully he'll pull through. |
| 02:40:02 | 25 | Shane Sprague:  I hope. |

02:40:07  1    Q.   And what's the date on that one, Agent Ridgeway?

02:40:10  2    A.   12-16-2017.

02:40:15  3    Q.   Let's scroll up to the first page of this exhibit.  We'll

02:40:17  4    start at the bottom.  And if you could read for us the bottom

02:40:24  5    two messages here from that string.

02:40:27  6    A.   Shane Sprague:  We will see what the morning brings.  I

02:40:30  7    have d-o-e everything I can possibly do at this point.

02:40:36  8         David Moser:  If he's come this far, I don't think

02:40:42  9    he'll die on you.

02:40:43 10    Q.   And let's advance from there up three or four messages to

02:40:45 11    "vet, yeah."

02:40:56 12    A.   Shane Sprague:  Vet, yeah.  He on a heating pad.  He moving

02:40:59 13    around in the kennel but not standing.

02:41:01 14         MR. EDDY:  And let's go up from there, grab two more,

02:41:04 15    please.

02:41:04 16    BY MR. EDDY:

02:41:04 17    Q.   And can you go with the one just above that, starting with

02:41:20 18    "Batman"?

02:41:23 19    A.   Shane Sprague:  Batman just died.

02:41:27 20         David Moser:  I was thinking whichever son you like

02:41:30 21    the best you can take to Atlanta.  That's an option for you

02:41:33 22    also.

02:41:33 23    Q.   And what's the date on those last two messages?

02:41:38 24    A.   12-17-2017.

02:41:40 25    Q.   Agent Ridgeway, if you could next please turn in your

02:41:42  1   binder to what's been admitted as Government's Exhibit 61.  And

02:41:52  2   I'm going to ask Ms. Backer to zoom in on the bottom two of

02:41:55  3   those postings, please.  On the one that you see on the second

02:41:58  4   from the bottom, do you see a field for type?

02:42:06  5   A.   Comments.

02:42:11  6   Q.   And what's in the field for Summary?

02:42:13  7   A.   Shane Sprague commented on a post from September 18, 2016.

02:42:19  8   That's the only one I have.  His Ped Online name is C Woods

02:42:25  9   Black Maverick.  Call name is Batman.

02:42:28  10  Q.   What's the date on that?

02:42:29  11  A.   9-18-2016.

02:42:31  12  Q.   And the posting down from there, could you please give us

02:42:35  13  the summary for that.

02:42:38  14  A.   At public stud still first of the year.  $800, better get

02:42:42  15  it while you can.  And then a hyperlink to a website.

02:42:49  16  Q.   Agent Ridgeway, that website that you're seeing there, are

02:42:51  17  you generally familiar with the broader website within that --

02:42:57  18  which that page appears?

02:42:58  19  A.   Yes.

02:42:59  20  Q.   Does the public have full access to all of the contents of

02:43:02  21  that website?

02:43:03  22  A.   No.

02:43:03  23  Q.   How does one access the site, the full contents?

02:43:06  24  A.   With a username and a password.

02:43:09  25  Q.   Do you have a username and a password?

RIDGEWAY - DIRECT

02:43:12  1   A.    Yes.

02:43:12  2   Q.    Did you obtain that in your capacity as a law enforcement

02:43:14  3   agent?

02:43:15  4   A.    I did.

02:43:17  5   Q.    Based on your training and experience with animal fighting

02:43:19  6   investigations and the content of the website, what's your

02:43:25  7   general understanding of the purpose of that website?

02:43:27  8   A.    It's for dogfighting purposes.

02:43:29  9   Q.    If you could turn now in your binder to what's been marked

02:43:32  10  for identification as Government's Exhibit 75.  Have you seen

02:43:39  11  this before?

02:43:40  12  A.    Yes.

02:43:40  13  Q.    What is it?

02:43:41  14  A.    It's a pedigree.

02:43:44  15  Q.    Do you see a date at the bottom right?

02:43:46  16  A.    Yes.

02:43:47  17  Q.    What's your understanding of that date?

02:43:48  18  A.    The date that this was captured.

02:43:53  19  Q.    And what type of information is seen on this page?

02:43:57  20  A.    It's a pedigree for a dog, the lineage of the dog's

02:44:04  21  bloodline.

02:44:06  22  Q.    Was this derived from a website?

02:44:08  23  A.    Yes.

02:44:09  24  Q.    Did you visit the web page?

02:44:10  25  A.    Yes, I did.

RIDGEWAY - DIRECT

| | | |
|---|---|---|
| 02:44:10 | 1 | Q.   And when you visited that website, did you download the |
| 02:44:12 | 2 | contents of the pages you were accessing? |
| 02:44:14 | 3 | A.   Yes. |
| 02:44:14 | 4 | Q.   To the best of your memory, is this a true and correct copy |
| 02:44:17 | 5 | of the contents of that particular web page at the time that you |
| 02:44:21 | 6 | visited it? |
| 02:44:21 | 7 | A.   Yes. |
| 02:44:22 | 8 | MR. EDDY:  Your Honor, we move admission of |
| 02:44:24 | 9 | Government's Exhibit 75. |
| 02:44:26 | 10 | THE COURT:  Any objection? |
| 02:44:27 | 11 | MR. JOHNSON:  No, Your Honor. |
| 02:44:28 | 12 | THE COURT:  It's admitted. |
| 02:44:29 | 13 | *(GOVERNMENT EXHIBIT 75:  Received in evidence.)* |
| 02:44:30 | 14 | MR. EDDY:  Thank you, Your Honor.  May we publish? |
| 02:44:32 | 15 | THE COURT:  Yes. |
| 02:44:33 | 16 | BY MR. EDDY: |
| 02:44:33 | 17 | Q.   And before we zoom in, can you please walk us through -- I |
| 02:44:38 | 18 | know we can't really see the text right now, but could you |
| 02:44:41 | 19 | please just walk us through generally your understanding of kind |
| 02:44:43 | 20 | of the layout and formatting of this page. |
| 02:44:54 | 21 | A.   Yes.  So the sire would be the father of the dog on this |
| 02:45:02 | 22 | page, and the dam would be the mother.  And that falls under the |
| 02:45:07 | 23 | first column, which shows the parents of the dog that is listed |
| 02:45:09 | 24 | at the top of this pedigree.  And then from there, flowing |
| 02:45:14 | 25 | backwards, would be the grandparents.  So the second -- at the |

02:45:18   1   top of that column it says Second.  That would be the

02:45:21   2   grandparents.  And then just continuing on back from there

02:45:25   3   further in the lineage.

02:45:27   4   Q.   Can a website visitor click on some of the names here that

02:45:31   5   we see here generally on this website?

02:45:34   6   A.   Yes.

02:45:35   7   Q.   And what happens when you do that?

02:45:37   8   A.   It takes you to that -- more information regarding that

02:45:41   9   name.

02:45:41   10   Q.   Did you find other similar -- let's scroll --

02:45:44   11        THE COURT:  Before we leave this, does this posting

02:45:46   12   have a date?

02:45:48   13        MR. EDDY:  Let's move up from there, Ms. Backer, and

02:45:50   14   let's grab that top part.

02:45:51   15   BY MR. EDDY:

02:45:58   16   Q.   Agent Ridgeway, do you see a field here for "posted"?

02:46:00   17   A.   Yes.

02:46:01   18   Q.   What do you see there?

02:46:02   19   A.   1-24-2017.

02:46:05   20   Q.   And under that for Last Modified, is it the same date for

02:46:08   21   that?

02:46:09   22   A.   It is.

02:46:09   23   Q.   And what is the date -- if I could refer you to the bottom

02:46:14   24   right corner -- at which you captured this information?

02:46:17   25   A.   5-8-2018.

02:46:19  1   Q.   Did you find other similar pages on this website pertaining

02:46:22  2   to this initial letter C, as in Charlie, Wood, or C Woods?

02:46:28  3   A.   Yes.

02:46:29  4   Q.   And as you investigated those, did you see any overlaps in

02:46:32  5   the dogs that were listed or portrayed there?

02:46:36  6   A.   Yes.

02:46:38  7   Q.   Could you please next, Agent Ridgeway, find in your binder

02:46:41  8   what's been marked for identification as Government's Exhibit

02:46:45  9   64.  And I'm going to ask you to briefly flip through that one

02:46:50  10  through and including Government's Exhibit 68.

02:47:16  11          And after that could you next take a look at, please,

02:47:18  12  what's been marked for identification as Government's Exhibits

02:47:21  13  70 through 72.  And 76 while you're at it.  As well as 80 and

02:47:37  14  81, please.

02:48:14  15          Agent Ridgeway, generally speaking, what are these

02:48:16  16  exhibits?

02:48:18  17  A.   Pedigrees from Peds Online.

02:48:21  18  Q.   And when you say Peds Online, are you referring to the web

02:48:24  19  page that we just -- from which we just saw that web page?

02:48:27  20  A.   Yes.

02:48:29  21  Q.   Did you personally access each of the web pages that is

02:48:32  22  portrayed in the Government's exhibits that I just listed to you

02:48:37  23  yourself on this website?

02:48:38  24  A.   Yes.

02:48:38  25  Q.   And in preparation for your testimony today, did you

02:48:41  1   compare these exhibits to website downloads that you had

02:48:45  2   previously made of those pages at the time that you visited

02:48:50  3   them?

02:48:50  4   A.   Yes.

02:48:51  5   Q.   Are these exhibits consistent with the content that you

02:48:55  6   reviewed or downloaded from those web pages?

02:48:58  7   A.   Yes.

02:48:58  8   Q.   To the best of your memory, are these fair and accurate

02:49:02  9   copies of the contents of those web pages at the time that you

02:49:03  10  visited them?

02:49:04  11  A.   Yes.

02:49:05  12        MR. EDDY:  Your Honor, we move admission at this time

02:49:06  13  of Government's Exhibits 64 through 68, 70 through 72, 76, 80

02:49:13  14  and 81.

02:49:15  15        MR. JOHNSON:  What was the first step?

02:49:16  16        MR. EDDY:  64 through 68.

02:49:18  17        THE COURT:  Okay.  I had 64 and 63, but I didn't have

02:49:22  18  the intervening ones.  You want 64 through 68.

02:49:26  19        MR. EDDY:  Yes, please, Your Honor.

02:49:27  20        THE COURT:  And 70 through 72.

02:49:31  21        MR. EDDY:  Yes.

02:49:32  22        THE COURT:  76, 80, and 81.

02:49:35  23        MR. EDDY:  That's correct, Your Honor.

02:49:36  24        THE COURT:  Any objection?

02:49:46  25        MR. JOHNSON:  No, Your Honor.

02:49:47   1          THE COURT:  They're admitted.

02:49:49   2          (GOVERNMENT EXHIBITS 64 through 68, 70 through 72, 76, 80,

02:49:49   3   and 81:  Received in evidence.)

02:49:50   4          MR. EDDY:  Thank you, Your Honor.  And may we publish

02:49:52   5   Government's Exhibit 70.

02:49:55   6          THE COURT:  Yes.

02:49:58   7   BY MR. EDDY:

02:49:58   8   Q.   Agent Ridgeway, what's the title, if you could turn to that

02:50:01   9   in your binder, of this document here in Government's Exhibit

02:50:04  10   70?

02:50:08  11   A.   C Woods Pups.

02:50:09  12   Q.   And now I'm going to ask Ms. Backer to zoom in on the

02:50:12  13   brackets.

02:50:20  14          And what's listed as the sire of the dog seen here?

02:50:24  15   A.   C Woods Rip.

02:50:28  16   Q.   How about the dam, or you previously mentioned this would

02:50:30  17   be the mother?

02:50:31  18   A.   Golson's Ms. Kali.

02:50:34  19   Q.   What's listed in the second column from the left listed

02:50:38  20   next to C Woods Rip?

02:50:40  21   A.   Sprague's Pimpin Cain and Golson's Lil Angel.

02:50:43  22   Q.   And what's listed in the third column from the left next to

02:50:46  23   Golson's Lil Angel?

02:50:51  24   A.   I'm sorry.  Can you ask me that one more time, please?

02:50:54  25   Q.   In the third column, just to the right of Golson's Lil

| | | |
|---|---|---|
| 02:50:57 | 1 | Angel, what's seen there in the third column? |
| 02:51:00 | 2 | A.   Peek's Lucky, parentheses, 1XW, close parentheses, ROM, and |
| 02:51:11 | 3 | Murray's Angel. |
| 02:51:12 | 4 | Q.   Do you see the word Peek, P-E-E-K, elsewhere on this page? |
| 02:51:15 | 5 | A.   Yes. |
| 02:51:16 | 6 | Q.   Let's go next to what's been admitted as Government's |
| 02:51:18 | 7 | Exhibit 68, page 3, please.  And is there a dog that's purported |
| 02:51:26 | 8 | to be represented here? |
| 02:51:27 | 9 | A.   Yes. |
| 02:51:28 | 10 | Q.   What's that? |
| 02:51:30 | 11 | A.   Peek's Harley Quinn. |
| 02:51:34 | 12 | Q.   Let's go to -- I believe you're looking at page 1.  Let's |
| 02:51:37 | 13 | go to page 3. |
| 02:51:38 | 14 | A.   Oh, I'm sorry. |
| 02:51:48 | 15 | Q.   And which dog is purported to be represented here? |
| 02:51:51 | 16 | A.   Sorry about that.  Peek's Lucky, parentheses, 1XW, close |
| 02:51:51 | 17 | parentheses, ROM. |
| 02:51:54 | 18 | Q.   Does this appear to be the same dog, Lucky, that was just |
| 02:51:58 | 19 | referred to in the previous pedigree that we looked at? |
| 02:52:00 | 20 | A.   Yes. |
| 02:52:03 | 21 | Q.   Did you find other pages on this website associated with |
| 02:52:05 | 22 | the name Peek, P-E-E-K? |
| 02:52:07 | 23 | A.   Yes. |
| 02:52:11 | 24 | Q.   And now let's go to page 1 of that exhibit, 68.  And let's |
| 02:52:16 | 25 | start at the very top, if you would.  Is this one of those? |

02:52:22  1   A.   It is.

02:52:22  2   Q.   What dog is purported to be represented here?

02:52:26  3   A.   Peek's Harley Quinn.

02:52:29  4   Q.   And if we could move down now to the brackets.  What's

02:52:31  5   listed as the sire of this dog?

02:52:34  6   A.   Peek's Hoochie Man.

02:52:37  7   Q.   Did you see the word "Peek" on the pedigree pages of other

02:52:41  8   C Wood Kennels pages on this site that you investigated?

02:52:45  9   A.   Yes.

02:52:46  10  Q.   Did you begin to investigate this reference to Peek,

02:52:52  11  P-E-E-K?

02:52:52  12  A.   Yes.

02:52:53  13  Q.   The informant you mentioned earlier, was he familiar with

02:52:54  14  the person referred to in these pedigrees as Peek?

02:52:56  15  A.   Yes.

02:52:57  16  Q.   And who was that?

02:53:00  17  A.   James Tommy Peek.

02:53:01  18  Q.   Did the informant set up a transaction with James Tommy

02:53:05  19  Peek?

02:53:05  20  A.   Yes.

02:53:06  21  Q.   And by the way, did James Tommy Peek use any particular

02:53:09  22  name?

02:53:12  23  A.   Yeah, Tommy.

02:53:15  24  Q.   This transaction that you set up for -- that the informant

02:53:18  25  set up, what was the transaction for?

RIDGEWAY - DIRECT

02:53:20  1    A.    To purchase a puppy.

02:53:21  2    Q.    What type of puppy?

02:53:23  3    A.    A pit bull type puppy.

02:53:26  4    Q.    Can you explain how that got set up?

02:53:28  5    A.    Yes.  I directed the informant to contact James Tommy Peek.

02:53:34  6    The informant made phone contact with him and discussed

02:53:38  7    purchasing a puppy from him.  At that point I sent a deposit to

02:53:47  8    James Tommy Peek for that dog, and we set up a date to travel to

02:53:50  9    James Tommy Peek's home to purchase that dog from him.

02:53:56  10   Q.    In the lead-up to that transaction did Tommy Peek make any

02:54:01  11   sort of representations regarding the dog that you and the

02:54:06  12   informant were going to purchase, in general terms?

02:54:08  13   A.    That it was a fighting dog.

02:54:13  14   Q.    Agent Ridgeway, did you then go to the Tommy Peek

02:54:18  15   residence?

02:54:18  16   A.    Yes, I did.

02:54:19  17   Q.    And by the way, did money exchange hands for this dog?

02:54:22  18   A.    Yes.

02:54:23  19   Q.    Were you a part of that transaction?

02:54:25  20   A.    I was, yes.

02:54:27  21   Q.    When you went to Tommy Peek's residence, where was that

02:54:31  22   located?

02:54:32  23   A.    Milton, Florida.

02:54:33  24   Q.    Do you recall the approximate date?

02:54:36  25   A.    Around January, I believe, of 2018.

02:54:39   1   Q.   Did you meet with Mr. Peek there?

02:54:41   2   A.   I did.

02:54:47   3   Q.   And what happened after you met up with him?

02:54:49   4   A.   We arrived at his property, and Mr. Peek took us to an area

02:54:53   5   beside his home where he kept several dogs.  We went into one

02:55:00   6   initial area where there were some younger dogs and viewed

02:55:04   7   those, and Mr. Peek and the informant just talked generally

02:55:08   8   about those, and I was a little bit behind.  They were walking,

02:55:11   9   as best I can recall, side by side; and I was just sort of

02:55:15  10   behind them following them.

02:55:17  11        After we went into that initial area where there were

02:55:19  12   some younger dogs, then we went into another area where there

02:55:23  13   were what appeared to be older dogs that were chained out, and

02:55:27  14   they continued to talk at that time about those dogs and...

02:55:32  15   Q.   And if I didn't already ask you, what was the geographic

02:55:35  16   location of this, where you met Mr. Peek at his residence?

02:55:40  17   A.   Milton, Florida.

02:55:44  18   Q.   Were any of the adult dogs that you saw that day physically

02:55:47  19   able to come into contact with any of the other dogs?

02:55:50  20   A.   No.

02:55:52  21   Q.   As Mr. Peek gave you a tour, you mentioned that there was a

02:55:55  22   conversation between him and the informant.  Can you give us a

02:55:57  23   little bit more detail about that?

02:55:59  24   A.   Yeah.  At some point I can remember Mr. Peek telling the

02:56:02  25   informant that one of the dogs that we were standing there

02:56:06  1   looking at had killed another dog in a -- I don't remember the

02:56:11  2   specific time, but made reference to how short of time it took

02:56:14  3   that dog to kill the other dog.

02:56:17  4   Q.   Did you go into the house?

02:56:19  5   A.   Yes.

02:56:20  6   Q.   What happened inside the house?

02:56:22  7   A.   Once we got inside the house, I paid Mr. Peek for the

02:56:28  8   puppy.  He retrieved some paperwork for us related to the puppy,

02:56:35  9   registration paperwork.  And then he offered to sell us a book

02:56:41  10  that I also purchased.

02:56:45  11  Q.   Agent Ridgeway, if you could find for us -- I think it's in

02:56:47  12  that binder, the second binder up there -- what's been marked

02:56:51  13  for identification as Government's Exhibit 396.

02:57:02  14            THE COURT:  What's the number?

02:57:04  15            MR. EDDY:  396, Your Honor.

02:57:06  16  BY MR. EDDY:

02:57:37  17  Q.   Do you recognize Government's Exhibit 396?

02:57:40  18  A.   Yes.

02:57:41  19  Q.   What is it?

02:57:42  20  A.   It's registration paperwork.

02:57:46  21  Q.   Is Government's Exhibit 396 a fair and accurate copy of a

02:57:49  22  document that you received from James Tommy Peek at his

02:57:52  23  residence on the date we've been discussing?

02:57:55  24  A.   Yes.

02:57:56  25            MR. EDDY:  Your Honor, we move admission of

02:57:58   1   Government's Exhibit 396.

02:58:00   2            THE COURT:  Any objection?

02:58:01   3            MR. JOHNSON:  No, Your Honor.

02:58:02   4            THE COURT:  It's admitted.

02:58:03   5        (GOVERNMENT EXHIBIT 396:  Received in evidence.)

02:58:04   6            MR. EDDY:  May we publish, Your Honor?

02:58:06   7            THE COURT:  Yes, you may.

02:58:13   8   BY MR. EDDY:

02:58:13   9   Q.   Did you and the informant, in fact, complete the

02:58:16  10   transaction for the purchase of that dog that day?

02:58:17  11   A.   Yes.

02:58:17  12   Q.   What, if any, relationship is there between this document

02:58:19  13   and the dog you purchased on that date?

02:58:22  14   A.   This paperwork is attached to that dog as its registration

02:58:26  15   paperwork.

02:58:28  16   Q.   And in the bottom left, where you see for Breeder, is there

02:58:34  17   an address under that?

02:58:35  18   A.   Yes.

02:58:36  19   Q.   Is that the address where you were on that date?

02:58:38  20   A.   That is.

02:58:42  21   Q.   Agent Ridgeway, I believe behind you, you should find a box

02:58:46  22   with a few books in it.  If you could, locate that and find the

02:58:50  23   one that's been marked for identification as Government's

02:58:53  24   Exhibit 97, please.

02:59:02  25            Have you got it?

| | | |
|---|---|---|
| 02:59:03 | 1 | A.   Yes. |
| 02:59:04 | 2 | Q.   Seen this before? |
| 02:59:05 | 3 | A.   I have. |
| 02:59:06 | 4 | Q.   What is it? |
| 02:59:07 | 5 | A.   It's a book titled *My Life and Times with the American Pit* |
| 02:59:13 | 6 | *Bull Terrier* by James Crenshaw. |
| 02:59:19 | 7 | Q.   And did you obtain this item? |
| 02:59:20 | 8 | A.   Yes. |
| 02:59:21 | 9 | Q.   How? |
| 02:59:21 | 10 | A.   I purchased it at James Tommy Peek's house during the |
| 02:59:24 | 11 | undercover transaction. |
| 02:59:26 | 12 | MR. EDDY:  Your Honor, we move admission of |
| 02:59:27 | 13 | Government's Exhibit 97.  We've got the physical item here, and |
| 02:59:30 | 14 | then we've also got some slides -- |
| 02:59:32 | 15 | THE COURT:  All right.  Who -- My Life and Times by |
| 02:59:34 | 16 | James who? |
| 02:59:36 | 17 | THE WITNESS:  Crenshaw, sir. |
| 02:59:38 | 18 | THE COURT:  Crenshaw? |
| 02:59:38 | 19 | THE WITNESS:  Yes, sir. |
| 02:59:38 | 20 | THE COURT:  All right.  Any objection? |
| 02:59:47 | 21 | MR. JOHNSON:  No, Your Honor. |
| 02:59:48 | 22 | THE COURT:  Admitted. |
| 02:59:49 | 23 | *(GOVERNMENT EXHIBIT 97:  Received in evidence.)* |
| 02:59:49 | 24 | MR. EDDY:  And, Your Honor, if we may, I'd like to ask |
| 02:59:51 | 25 | the witness a few questions about it.  We've now moved the |

| | |
|---|---|
| 02:59:53 | 1 |
| 02:59:56 | 2 |
| 02:59:58 | 3 |
| 03:00:00 | 4 |
| 03:00:04 | 5 |
| 03:00:04 | 6 |
| 03:00:05 | 7 |
| 03:00:09 | 8 |
| 03:00:11 | 9 |
| 03:00:12 | 10 |
| 03:15:26 | 11 |
| 03:15:28 | 12 |
| 03:15:31 | 13 |
| 03:15:33 | 14 |
| 03:15:37 | 15 |
| 03:15:41 | 16 |
| 03:15:44 | 17 |
| 03:15:46 | 18 |
| 03:15:50 | 19 |
| 03:15:52 | 20 |
| 03:15:55 | 21 |
| 03:15:57 | 22 |
| 03:16:01 | 23 |
| 03:16:05 | 24 |
| 03:16:09 | 25 |

1  physical item itself into evidence, but we'd also like to

2  publish scanned copies of a few of the pages if we may.

3           THE COURT:  I'd like to take a break now, so maybe

4  this is a good time to do it.  We'll come back after the recess.

5           MR. EDDY:  Thank you, Your Honor.

6           THE COURT:  Ladies and gentlemen, we'll take 15

7  minutes.  We'll come back at 3:15.  Leave your notepads, and

8  don't talk about the case in the jury room.  We'll be in recess

9  until 3:15.

10      (Recess taken from 3:00 p.m. to 3:15 p.m.)

11           THE COURT:  Before I bring the jury in, let me make

12  sure we have the attorneys and the -- we're missing -- well,

13  Mr. Griffith is here.

14           All right.  We have the defendants and the attorneys

15  but no jury.  And I understand, Mr. Eddy, you have something you

16  want to take up regarding Mr. Griffith's opening statement.

17           MR. EDDY:  Oh, yes, Your Honor.  Just one point.  And

18  I didn't flag it for Your Honor right away after we had that

19  break because the jury was already here.

20           Mr. Griffith, in his opening remarks, said something

21  along the lines of evidence as to Mr. Sprague should not be

22  considered against Mr. Golson, or something along those lines.

23  And, of course, this being a conspiracy case -- and I don't

24  infer any sort of improper intent or Mr. Griffith's part; but in

25  our view, that's not a correct statement of the law as it

RIDGEWAY - DIRECT

| | |
|---|---|
| 03:16:12 | 1 |
| 03:16:15 | 2 |
| 03:16:19 | 3 |
| 03:16:20 | 4 |
| 03:16:25 | 5 |

pertains to evidence in a conspiracy case.  So we would ask if

the Court's inclined to take a look at this --

THE COURT:  Well, my recollection is -- and, of

course, we couldn't have the exact wording, and you didn't make

an objection at this time, but my recollection of what

Mr. Griffith said is consider the evidence separately against

each defendant, which is basically what I told you -- told them

at jury selection.

Mr. Griffith.

MR. GRIFFITH:  That's what I -- I intended to say and

I think I said, Judge, that they had to judge the evidence for

each individual.

THE COURT:  Yeah.  And that's part of my final

instructions.  I don't think we need to instruct them further

about that.  I think if there -- if there was a misstatement,

I'm sure it was inadvertent, but I think --

MR. EDDY:  Of course.

THE COURT:  -- to go back and emphasize it might

create more harm than anything else.

MR. EDDY:  Very good, Your Honor.  Thank you.

MR. GRIFFITH:  I try to mimic what you say as much as

I can, Judge.

THE COURT:  All right.  With that, let's bring our

jury in.

*(Jury present.)*

03:17:19  1          THE COURT:  Please be seated.  Let's see.  Does

03:18:31  2    everyone have their notepads?  Let me ask you about the

03:18:35  3    temperature.  Everybody comfortable with the temperature?

03:18:38  4    Anyone too cold?  Too hot?

03:18:43  5          Okay.  Mr. Eddy, you may continue, then.

03:18:48  6    Mr. Ridgeway, you're still testifying under oath.  State your

03:18:51  7    name again for the record.

03:18:53  8          THE WITNESS:  Andrew Ridgeway.

03:18:54  9          THE COURT:  All right.

03:18:58  10          MR. EDDY:  Thank you, Your Honor.  And I believe the

03:18:58  11    Court had just admitted Government's Exhibit 97, which is a

03:19:02  12    physical object.

03:19:03  13          THE COURT:  Yes.

03:19:05  14          MR. EDDY:  We'd also -- if the Court would permit,

03:19:07  15    we'd like to publish electronic scanned images of a few of the

03:19:11  16    pages from that exhibit, which have the same exhibit number --

03:19:12  17          THE COURT:  You may.  The whole book is in evidence.

03:19:16  18          MR. EDDY:  That's right, Your Honor.  And if we could,

03:19:18  19    we'd like to publish now the cover of that on the screen for the

03:19:23  20    jury.

03:19:23  21    BY MR. EDDY:

03:19:23  22    Q.  And, Agent Ridgeway, this is the book that you've got up

03:19:26  23    there as well?

03:19:28  24    A.  Yes, sir.

03:19:29  25    Q.  Can you turn now to the inside cover of that?  And I'll ask

RIDGEWAY - DIRECT

03:19:33   1   Ms. Backer to move us to that page.  Do you see a signature

03:19:36   2   there?

03:19:37   3   A.    Yes, sir.

03:19:38   4   Q.    Can you make it out?

03:19:39   5   A.    Appears to be James Crenshaw.

03:19:42   6   Q.    Who's that in relation to this book?

03:19:45   7   A.    The author.

03:19:46   8   Q.    And now if we could publish page 3 on the slides.  And,

03:19:49   9   Agent Ridgeway, I'm going to ask you to turn to, in your book,

03:19:52   10   page 146.  Do you see some handwritten text there?

03:20:03   11   A.    I do.

03:20:03   12   Q.    Can you make that out?

03:20:06   13   A.    Steve and Andrew, Good luck to you and yours.  Tommy Peek.

03:20:11   14   Q.    Did you witness Mr. Peek write that?

03:20:13   15   A.    Yes.

03:20:13   16   Q.    And the name Andrew, who does that refer to?

03:20:16   17   A.    Me.

03:20:17   18   Q.    Did you -- did he know -- did Mr. Peek appear to know that

03:20:21   19   you were a federal agent when he signed that for you?

03:20:24   20   A.    Not that I'm aware of.

03:20:25   21   Q.    And turning in the pages sort of before and after that, is

03:20:28   22   there additional content here pertaining to Mr. Peek?

03:20:32   23   A.    Yes.

03:20:33   24   Q.    Agent Ridgeway, going back briefly to Mr. Sprague's

03:20:38   25   Facebook account, did you observe references there to Tommy Peek

03:20:41  1   as well?

03:20:42  2   A.   Yes.

03:20:49  3   Q.   If you would turn for me next to what's been admitted into

03:20:50  4   evidence and is in your binder as Government's Exhibit 23.

03:20:53  5            MR. EDDY:   And, Your Honor, if we may publish the last

03:21:03  6   page of that.

03:21:04  7            THE COURT:   You may.

03:21:04  8   BY MR. EDDY:

03:21:05  9   Q.   And, Agent Ridgeway, if you would find your way to the last

03:21:13  10  page of Government's Exhibit 23 for us.

03:21:13  11           MR. EDDY:   And I'm going to ask Ms. Backer to zoom in

03:21:13  12  on the two rows just under that blue thumb.   And we're going to

03:21:37  13  be looking at Government's Exhibit 23, the very last page.   And

03:21:40  14  if you could zoom out a little bit for us, Ms. Backer, we'll

03:21:45  15  catch the one below that too.

03:21:45  16  BY MR. EDDY:

03:21:51  17  Q.   Agent Ridgeway, could you read us the author and the body

03:21:54  18  of the one on the bottom here, please?

03:21:57  19  A.   The author is Larry Boe.   The body reads:   Hi, Shane.   I

03:22:02  20  need your info please, thanks.

03:22:04  21  Q.   What's the date on that one?

03:22:06  22  A.   6-13-2017.

03:22:08  23  Q.   Next one, please.

03:22:09  24  A.   Author is Shane Sprague.   The body reads:   Shane Patrick

03:22:13  25  Sprague, ███████████ Road.

RIDGEWAY - DIRECT

03:22:18  1         MR. EDDY:  And could we advance from there up to the

03:22:20  2   top entry on that page.  Move up past the thumb.

03:22:23  3   BY MR. EDDY:

03:22:23  4   Q.   Please give us the author and the body of that top message,

03:22:28  5   please.

03:22:32  6   A.   Larry Boe.  The body reads:  690165976.  $850.

03:22:41  7   Q.   What's the date on this one?

03:22:42  8   A.   6-14-2017.

03:22:46  9         MR. EDDY:  Could we please move to the previous page,

03:22:48 10   and I'm going to ask Ms. Backer to zoom in on the two entries

03:22:53 11   under the top of the blue thumb.  So right here, please.

03:22:57 12   BY MR. EDDY:

03:23:02 13   Q.   And, Agent Ridgeway, find the one that has the body

03:23:06 14   beginning "the vision."  Can you work us through that one,

03:23:09 15   please.

03:23:11 16   A.   Yeah.  The author is Larry Boe, and the body reads:  The

03:23:17 17   vision.

03:23:17 18   Q.   And below that and to the right, do you see a field for

03:23:22 19   Title?

03:23:22 20   A.   Yes.

03:23:25 21   Q.   And you see a website link under that?

03:23:27 22   A.   Yes, I do.

03:23:29 23   Q.   Do you recognize those?

03:23:32 24   A.   I recognize that link, yes.

03:23:35 25   Q.   What do you recognize that website as?

*03:23:38* 1    A.   Peds Online.

*03:23:39* 2    Q.   Is that the one that we were previously discussing?

*03:23:41* 3    A.   Yes, it is.

*03:23:42* 4    Q.   And please read us the author and body of the entry above

*03:23:45* 5    that.

*03:23:46* 6    A.   The author is Shane Sprague.  The body reads:  Nice, Larry.

*03:23:51* 7    Q.   And let's move now to the previous page, and we'll have --

*03:23:55* 8    let's do a rolling zoom starting from the third from the bottom.

*03:23:58* 9    Agent Ridgeway, the one beginning "powder," if you could read

*03:24:02* 10   us -- work us upwards from those.

*03:24:07* 11   A.   Author is Larry Boe.  Body reads:  Powder is a top

*03:24:10* 12   producer.  Elvira is one of her best.  This same breed is the

*03:24:15* 13   one Tommy did to replace Hoochie Man.

*03:24:19* 14            Shane Sprague:  I like it a lot.  Need to get my hands

*03:24:23* 15   on that.

*03:24:24* 16            Larry Boe:  Check out Jericho Johnny tomorrow.  Tell

*03:24:28* 17   me what you think of him.  You're in the circle, my brother.

*03:24:31* 18   Thanks, Shane.  You're tops.

*03:24:35* 19            Shane Sprague:  Absolutely, Larry.  I'll get some pics

*03:24:38* 20   for you too.

*03:24:43* 21   Q.   You can skip those little rectangles, and what's the next

*03:24:46* 22   one up after that?

*03:24:47* 23   A.   Larry Boe:  Tommy said he will be home all day tomorrow.

*03:24:50* 24   It's on.  LOL.  Thanks, Shane.

*03:24:53* 25   Q.   What's the date for that one, please?

03:24:54    1    A.    6-15-2017.

03:24:56    2    Q.    And now let's go to the previous page to that, and I'm

03:24:59    3    going to ask Ms. Backer if she can grab the top five blocks for

03:25:02    4    us, starting with the body "Tommy's."  And, Agent Ridgeway, if

03:25:16    5    you could start us off with the one "Tommy's" and read up from

03:25:20    6    there.

03:25:20    7    A.    Author is Larry Boe.  The body reads:  Tommy's, question

03:25:26    8    mark.  And then above that, Shane Sprague:  No, Tommus,

03:25:31    9    T-O-M-M-U-S.

03:25:31   10              Shane Sprague:  Tommy's.

03:25:34   11              Larry Boe:  One second.

03:25:38   12              Larry Boe:  850-572-8538.

03:25:49   13    Q.    And then let's go to the previous page to that, and if we

03:25:53   14    can scroll up to the one at the top under the top of the thumbs

03:25:58   15    starting with "I just," Agent Ridgeway.

03:26:04   16    A.    Shane Sprague:  I just talked to him.  We are good to go.

03:26:08   17    I'll be getting up with him around 5:00.

03:26:13   18    Q.    What's the date on that one?

03:26:14   19    A.    6-15-2017.

03:26:17   20    Q.    All right.  And if we could, on the previous page to that,

03:26:19   21    let's grab the topmost of the blocks, please.  And could you

03:26:26   22    read us just that top one, Agent Ridgeway?

03:26:28   23    A.    Larry Boe:  Tommy said pictures were cool.  If you can send

03:26:32   24    some of Jericho Johnny and mom and dad, okay?  Thanks.

03:26:37   25    Q.    And let's go to the page -- two pages previous to that,

RIDGEWAY - DIRECT

03:26:41  1    page 22 of Government's Exhibit 23.  Should see a 10634 at the

03:26:47  2    top.  And let's go to the page previous to that.  And we'll have

03:26:59  3    Ms. Backer grab this text right here.  Who's the author of this?

03:27:04  4    A.   Shane Sprague.

03:27:06  5    Q.   Do you see a field for Attachments?

03:27:08  6    A.   Yes.

03:27:09  7    Q.   What, if anything, is the relationship between this text

03:27:12  8    and the image that we just saw on the page we just looked at?

03:27:16  9    A.   It's the metadata of that image.

03:27:18  10   Q.   What's the date?

03:27:19  11   A.   6-15-2017.

03:27:22  12   Q.   And now let's go to the page previous that.  Do you see

03:27:29  13   anyone that you recognize in this image?

03:27:31  14   A.   I do.

03:27:33  15   Q.   Who's that?

03:27:35  16   A.   Shane Sprague and James Tommy Peek.

03:27:38  17   Q.   And I take it Mr. Peek is the one on the left as we're

03:27:43  18   viewing the image?

03:27:46  19   A.   Yes, that's correct.

03:27:47  20   Q.   And the page previous to that?  If Ms. Backer could zoom in

03:27:50  21   on that bottom text.  Is it your understanding, Agent Ridgeway,

03:27:54  22   that this is the posting accompanying that image that we just

03:27:57  23   looked at?

03:27:58  24   A.   Yes.

03:27:58  25   Q.   And could you give us the author and the date for this one,

03:28:01  1   please?

03:28:02  2   A.   Shane Sprague.  The date is 6-15-2017.

03:28:07  3   Q.   And now let's go to the page previous that, please.  Anyone

03:28:14  4   here that we saw on the last image?

03:28:17  5   A.   Yes.

03:28:19  6   Q.   And now let's go to the page previous to that.  And let's

03:28:24  7   grab that entry at the bottom.  Same question:  Does this

03:28:27  8   accompany the image that we just saw?

03:28:29  9   A.   Yes.

03:28:30  10  Q.   What's the date on this one?

03:28:33  11  A.   6-15-2017.

03:28:35  12          MR. EDDY:  And could we scroll up from there,

03:28:37  13  Ms. Backer, to capture the two above that.

03:28:39  14  BY MR. EDDY:

03:28:39  15  Q.   And can you work us through those, please, Agent Ridgeway.

03:28:42  16  A.   Yes.  Larry Boe's the author.  The body reads:  Hey, Shane,

03:28:45  17  please have them make the health certificate out for a black lab

03:28:52  18  X, LOL.  Shane Sprague:  Will do.

03:28:55  19  Q.   And now let's move to the previous page to that, and we'll

03:28:58  20  take a look at the second full block from the top, starting with

03:09:04  21  the word "right."  And who's the author and the body for that

03:29:19  22  one?

03:29:19  23  A.   Larry Boe.  And the body reads:  Right on, brother.  She

03:29:26  24  looking good.  Thank you.  Here is the number, 600807482.  I'm

03:29:37  25  sending 300.  I lost my glasses and can't see shit.  SMH.

03:29:43  1   Q.   Let's turn two pages previous to that, which will park us

03:29:47  2   on page 14.   And can we please zoom in on the two topmost

03:29:52  3   entries there, Agent Ridgeway?

03:29:58  4   A.   The author is Larry Boe, and the body reads:   Hey, Shane, I

03:30:01  5   was just thinking that Delta might want you to have a Ziploc bag

03:30:05  6   of kibble taped to the crate.   JS, up thinking, LOL.   Thanks

03:30:11  7   brother.   Shane Sprague:  Yes, sir.

03:30:18  8   Q.   What's the date on those?

03:30:19  9   A.   6-20-2017.

03:30:21  10  Q.   Let's go to the page previous to that.   And the page

03:30:24  11  previous to that.   And I'm going to ask Ms. Backer to zoom in on

03:30:32  12  the bottom two attachments, and then we'll scroll -- bottom two

03:30:37  13  postings, and then we'll scroll from there.

03:30:39  14       Same question:   Does it appear to represent the

03:30:41  15  posting that accompanied the photograph that we just looked at?

03:30:45  16  A.   Yes.

03:30:45  17  Q.   And what's the date on that one?

03:30:48  18  A.   6-20-2017.

03:30:50  19  Q.   And can you read and work us upward from there, please.

03:30:55  20  A.   Larry Boe:   63286263.

03:31:01  21       Shane Sprague:   Total was 283.12.

03:31:09  22       Shane Sprague:   006-73256864.

03:31:18  23  Q.   And let's move to the page previous to that.   I'm going to

03:31:24  24  ask Ms. Backer if she can zoom in on the top sort of -- draw it

03:31:30  25  here for you.   Right around there.

RIDGEWAY - DIRECT

03:31:35   1          Agent Ridgeway, do you see here on the zoomed-in
03:31:40   2   version, a box with the field To, T-O?
03:31:46   3   A.   Yes.
03:31:46   4   Q.   What's listed there?
03:31:48   5   A.   ATL.
03:31:49   6   Q.   Next to that, by First Carrier.  What's there?
03:31:52   7   A.   DL.
03:31:54   8   Q.   And next to that, to the right, another box that's a little
03:31:58   9   bit blurry.  Can you make out what's at the bottom of that one?
03:32:03  10   A.   MSP.
03:32:04  11   Q.   And then over and to the left -- down and to the left of
03:32:10  12   there, where we were just looking, do you see Airport of
03:32:14  13   Destination?
03:32:16  14   A.   Yes.
03:32:16  15   Q.   What's listed there?
03:32:18  16   A.   Great Falls.
03:32:22  17   Q.   And below that, in this area here, what do we see there?
03:32:34  18   A.   It's kind of hard to read, but I think Gross Weight.
03:32:38  19          MR. EDDY:  And can Ms. Backer kind of pull up a little
03:32:41  20   bit from there so we can capture that?
03:32:44  21   BY MR. EDDY:
03:32:44  22   Q.   What's seen under that heading?
03:32:49  23   A.   25.
03:32:51  24          MR. EDDY:  All right.  And now let's go to the bottom,
03:32:54  25   zoom out, and grab the bottom kind of quarter of that image,

03:32:58    1   please.

03:32:58    2   BY MR. EDDY:

03:32:58    3   Q.   Do you see something there that appears to be consistent

03:33:03    4   with a dollar amount?

03:33:05    5   A.   Yes.

03:33:06    6   Q.   What's listed there?

03:33:07    7   A.   283.12.

03:33:11    8   Q.   And below that do you see an acronym?

03:33:16    9   A.   USD.

03:33:17   10   Q.   Are you familiar with that?

03:33:18   11   A.   Yes.  U.S. dollars.

03:33:21   12   Q.   And at the far bottom of this image, do you see a website

03:33:28   13   link?  We'll zoom out a little bit.

03:33:32   14   A.   Yes.

03:33:37   15   Q.   And is this for a particular company?

03:33:38   16   A.   Yes, Delta.

03:33:44   17   Q.   All right.  Let's go to the previous page, and we'll zoom

03:33:51   18   in on that.  Is this the accompanying posting to that image

03:33:55   19   file?

03:33:56   20   A.   Yes.

03:33:56   21   Q.   What's the date on this?

03:33:58   22   A.   6-20-2017.

03:34:02   23   Q.   Let's move to the page previous to that.  Do you see a

03:34:10   24   shipper's name and address?

03:34:12   25   A.   Yes.

RIDGEWAY - DIRECT

03:34:12  1   Q.   What's listed there?

03:34:15  2   A.   Shane P. Sprague, ███████████ Road, Pensacola, Florida,

03:34:22  3   U.S. 32526.

03:34:26  4   Q.   And how about for consignee's name and address?

03:34:32  5   A.   Larry Boe, ████████ Street, Havre, Montana, U.S. 59501.

03:34:48  6   Q.   And let's go to the page previous to that, please.  Is this

03:34:51  7   the posting that accompanies that image we just looked at?

03:34:54  8   A.   Yes.

03:34:55  9   Q.   What's the date?

03:34:56  10  A.   6-20-2017.

03:35:01  11  Q.   And let's go to the previous page to that, and I will ask

03:35:05  12  Ms. Backer to zoom in on this area here.

03:35:11  13          Agent Ridgeway, do you see a block of bolded text in

03:35:16  14  the middle appearing to be, like, a stamp?

03:35:20  15  A.   Yes.

03:35:22  16  Q.   What's it say there?

03:35:24  17  A.   Shipper guarantees payment of all transportation charges

03:35:28  18  and any additional charges for the care, feeding, and housing of

03:35:31  19  animals.

03:35:32  20  Q.   Do you see a handwritten date on the line under that?

03:35:35  21  A.   Yes.

03:35:36  22  Q.   What's listed there?

03:35:37  23  A.   6-20-17.

03:35:40  24  Q.   And then in this area that I'm going to mark with my finger

03:35:43  25  here, can you make out the text?  I know it's kind of cut off

03:35:47   1   there.

03:35:51   2   A.   Looks to read, 1EA, puppy.

03:35:57   3   Q.   Let's go to the page previous to that, and we'll start at

03:36:00   4   the bottom.

03:36:04   5            MR. EDDY:   And actually, if you would, Ms. Backer,

03:36:10   6   let's pull up page 6 of the exhibit.   And we'll start with that

03:36:18   7   bottom one.

03:36:18   8   BY MR. EDDY:

03:36:18   9   Q.   Is this the posting accompanying the image file that we

03:36:23   10   just saw?

03:36:24   11   A.   Yes.

03:36:25   12   Q.   Same date as the others?

03:36:27   13   A.   Yes.

03:36:28   14   Q.   And could we scroll upwards from there and, Agent Ridgeway,

03:36:31   15   work us through those postings.

03:36:35   16   A.   Shane Sprague:  Do you want this paper?

03:36:37   17            Larry Boe:  Hold on to it till tonight.   JS.

03:36:42   18            Shane Sprague:  10-4.

03:36:49   19   Q.   Let's move up from there to the bottom two on the previous

03:36:52   20   page.

03:36:52   21   A.   Shane Sprague:  What you think of her?  Larry Boe:  I

03:36:56   22   really like her.   Couldn't be happier.

03:37:00   23   Q.   What's the date on these two here?

03:37:02   24   A.   6-21-2017.

03:37:04   25   Q.   All right.   Moving to another part of this message string,

03:37:07  1   let's go to page 4 in your binder.  And this is going to be

03:37:13  2   10579 at the top.  Have you seen this image elsewhere?

03:37:17  3   A.   Yes.

03:37:17  4   Q.   Was it part of Government's 45 that we previously walked

03:37:28  5   through?

03:37:28  6   A.   Yes.

03:37:29  7   Q.   And let's go to the page previous to that, Number 3.  Is

03:37:33  8   this the posting accompanying that image?

03:37:35  9   A.   Yes.

03:37:35  10  Q.   What's the date on that one?

03:37:36  11  A.   12-16-2017.

03:37:38  12  Q.   And before we ask Ms. Backer to publish the next image on

03:37:46  13  the screen, could you please turn in your binder to the previous

03:37:49  14  page and then just give us a short description of what you see

03:37:51  15  there.  It should say 10577 at the top.

03:38:08  16  A.   Looks to be a gaping wound on the extremity of what looks

03:38:15  17  to be an animal.

03:38:18  18       MR. EDDY:  Can we go ahead and put that page up

03:38:22  19  briefly?

03:38:22  20  BY MR. EDDY:

03:38:22  21  Q.   And let's move from there to the previous page and zoom in

03:38:26  22  on that bottom attachment.  And who's the author of this?

03:38:32  23  A.   Larry Boe.

03:38:33  24  Q.   What's the date?

03:38:35  25  A.   12-16-2017.

03:38:38  1   Q.   Is this the posting that accompanied the image we just saw?

03:38:41  2   A.   Yes.

03:38:41  3   Q.   Can we scroll upwards from there, please.

03:38:53  4   A.   Larry Boe is the author.  The body reads:  Every single

03:38:55  5   hole went to the gums.

03:38:58  6        Shane Sprague:  Yeah.

03:38:59  7        Larry Boe:  That's just one.  There were over 20.  Too

03:39:07  8   much to make it.

03:39:08  9        Shane Sprague:  Damn.

03:39:11  10  Q.   All right.  And now let's go to what's been admitted into

03:39:14  11  in evidence and is in your binder as Government's Exhibit 27.

03:39:17  12       MR. EDDY:  And may we publish that, Your Honor?

03:39:23  13       THE COURT:  You may.

03:39:25  14       MR. EDDY:  And let's grab these here, please.

03:39:30  15  BY MR. EDDY:

03:39:30  16  Q.   Agent Ridgeway, do you see near the post -- top of this

03:39:36  17  post a field for Posted?

03:39:38  18  A.   Yes.

03:39:39  19  Q.   What's the date there?

03:39:40  20  A.   6-15-2017.

03:39:44  21  Q.   Under there, what's listed for status?

03:39:46  22  A.   Me and Tommy Peek.  Me with Hoochie Man.

03:39:51  23  Q.   And next to the word "Mobile," under that?

03:39:54  24  A.   True.

03:40:00  25  Q.   Under those entries, do you see a field for Comments?

03:40:04    1    A.    Yes.

03:40:05    2    Q.    And to the right of that, fields for User?

03:40:07    3    A.    Yes.

03:40:09    4    Q.    Can you work us downward through those top three comments,

03:40:13    5    please.

03:40:15    6    A.    User Darren Tupper.  Text reads:  Met Tommy a few times.

03:40:17    7    Him and Crenshaw were real close and old man Yabarra.  Last time

03:40:23    8    I seen him it was at old man Yabarra's, for Blackjack Grand.

03:40:28    9    User David Moser.  Text reads:  I want to get another dog from

03:40:34   10    him.

03:40:34   11          Larry Boe:  Nice looking gyp, Shane.  She looks a lot

03:40:41   12    like her daddy and her mama, LOL.  My Dee Dee dog has some

03:40:46   13    strong ass gene as well as Gator, shit.

03:40:51   14    Q.    And I want to leave this one up on the screen for the

03:40:53   15    moment and have you turn back in your binder to what's been

03:40:56   16    admitted as Government's Exhibit 23.  And if you could find for

03:40:58   17    us the page -- this is the one we just looked at -- the page

03:41:03   18    that has at the top 10631.

03:41:18   19          MR. EDDY:  And actually, could we do a side-by-side,

03:41:20   20    Ms. Backer, with 23, page 20 and this one.

03:41:30   21    BY MR. EDDY:

03:41:30   22    Q.    Have you got that one in your book, Agent Ridgeway,

03:41:35   23    Number 23?

03:41:36   24    A.    Yes.  Page 10631?  Is that what we're referring to?

03:41:41   25    Q.    Yes, on the right.  And then on the left, we're going to

03:41:44   1    superimpose that with Government's Exhibit 23, page 19.  Oh, I'm
03:42:07   2    sorry.  27, page 1, and 23, page 19.  And now let's go down to
03:42:19   3    23, page 20.
03:42:21   4            And can you compare for us here on the left for Posted
03:42:28   5    with the date of the attachment in your binder for Government's
03:42:32   6    Exhibit 23 on page 19?  And if Ms. Backer could go to page 19 on
03:42:46   7    the right side too.
03:42:54   8            THE COURT:  Mr. Eddy, you need to keep your voice up.
03:42:55   9    I'm not sure the jury can hear you clearly.
03:42:59   10           MR. EDDY:  I'm sorry, Your Honor.
03:42:59   11   BY MR. EDDY:
03:42:59   12   Q.   And can we compare those two dates, Agent Ridgeway.
03:43:04   13   A.   They're the same dates.
03:43:06   14   Q.   Agent Ridgeway, could you next turn in your binder to
03:43:09   15   what's been admitted as Government's Exhibit 24, and we'll start
03:43:13   16   with the last page.
03:43:16   17           MR. EDDY:  And may we publish that, Your Honor?
03:43:22   18           THE COURT:  Yes, you may.
03:43:23   19   BY MR. EDDY:
03:43:23   20   Q.   Agent Ridgeway, was this page also in the messages we saw
03:43:27   21   with Larry Boe?
03:43:28   22   A.   Yes.
03:43:29   23   Q.   Let's move from there to the previous page.  And what's the
03:43:34   24   date of the posting with this attachment?
03:43:38   25   A.   6-16-2017.

03:43:42  1   Q.   Who's the author?

03:43:43  2   A.   Shane Sprague.

03:43:44  3   Q.   And let's go to the page previous to that.  Was this one

03:43:50  4   also in the messages with Larry Boe?

03:43:52  5   A.   Yes.

03:43:52  6   Q.   And let's go to the page previous to that.  And can you

03:43:55  7   please give us the date of that posting?

03:43:58  8   A.   6-16-2017.

03:44:04  9   Q.   And let's go to the page previous to that.  Same question:

03:44:08  10  Was this in the messages to Larry Boe also?

03:44:12  11  A.   Yes.

03:44:14  12  Q.   Again, that's Mr. Peek on the left?

03:44:17  13  A.   That's correct.

03:44:18  14  Q.   On the page previous to that, could we zoom in on the

03:44:20  15  bottom three entries, please.  And starting with the bottom

03:44:31  16  what's the date of this lowest attachment?

03:44:33  17  A.   6-16-2017.

03:44:35  18  Q.   And is this the posting that accompanies the image that we

03:44:37  19  just saw of Mr. Peek, Mr. Sprague?

03:44:41  20  A.   Yes.

03:44:42  21  Q.   Can you work us through the two postings going upwards from

03:44:48  22  there, please?

03:44:49  23  A.   Shane Sprague:  Good day.  Carl Lavon Thomas:  Damn you

03:44:53  24  lucky.

03:44:58  25  Q.   Let's go to the page previous to that.  Do you see an entry

*03:45:01*  1   near the middle that starts, "I gotta"?  We'll zoom in on that.

*03:45:10*  2   A.   Shane Sprague:  I gotta take this pup to TJE airport at

*03:45:16*  3   6:30.

*03:45:18*  4   Q.   What's the date on that one?

*03:45:19*  5   A.   6-20-2017.

*03:45:22*  6   Q.   Let's go to page 3 of that exhibit next, please.  You

*03:45:26*  7   should see at the top, 10720.  Now, let's take a look at the

*03:45:32*  8   first full block at the top, the author and body of that,

*03:45:36*  9   please?

*03:45:39*  10  A.   Shane Sprague:  Send me the ped.

*03:45:43*  11  Q.   And let's work upwards from there to what precedes that on

*03:45:47*  12  the foregoing page?  Is this a website link?

*03:45:53*  13  A.   Yes.

*03:45:53*  14  Q.   Who's the author of this posting?

*03:45:56*  15  A.   Carl Lavon Thomas.

*03:46:01*  16  Q.   Do you recognize the website that goes along with the web

*03:46:05*  17  page that's linked here at the bottom?

*03:46:12*  18  A.   I'm sorry.  Are you -- oh.

*03:46:13*  19  Q.   Next to URL?

*03:46:15*  20  A.   Yes, I do.

*03:46:16*  21  Q.   As what?

*03:46:18*  22  A.   Peds Online.

*03:46:19*  23  Q.   And let's go to the previous page.  Let's start a rolling

*03:46:23*  24  zoom, second from bottom, please.

*03:46:29*  25  A.   Shane Sprague:  That pup bred up nice heavy Jeep, red boy

03:46:33  1   for sure.

03:46:33  2          Shane Sprague:  I need to LNOW that guy.  He has some

03:46:41  3   old blood I need.

03:46:42  4          Carl Lavon Thomas:  Damn for real.

03:46:46  5          Carl Lavon Thomas:  I will find out for you.

03:46:50  6          Carla Lavon Thomas:  So did I make a good choice?

03:46:53  7          Shane Sprague:  Yeah.  That's all that Ronnie Hyde

03:46:58  8   blood killers.

03:47:00  9          Shane Sprague:  Absolutely.

03:47:02  10         Carl Lavon Thomas:  Hell, yes.

03:47:07  11         Shane Sprague:  Killers bro.

03:47:10  12         Carl Lavon Thomas:  Damn.

03:47:14  13         Shane Sprague:  If it came from Ronnie, it's the

03:47:19  14   truth.

03:47:20  15   Q.   And what's the date on that last one?

03:47:22  16   A.   6-20-2017.

03:47:24  17   Q.   Can we move next to what's been admitted as Government's

03:47:27  18   Exhibit 25.

03:47:28  19         MR. EDDY:  And may we publish that, Your Honor?

03:47:31  20         THE COURT:  Yes.

03:47:33  21   BY MR. EDDY:

03:47:34  22   Q.   Let's start with the last page.  And we'll zoom to those

03:47:39  23   bottom three entries, please.  Is this a message string with a

03:47:45  24   different party?

03:47:46  25   A.   Yes.

03:47:46   1   Q.    From that same account?

03:47:48   2   A.    Yes.

03:47:49   3   Q.    Can you give us the author and body starting at the bottom

03:47:52   4   and work up, please.

03:47:53   5   A.    Ced Wooden:  Yo, you got pups from Peeks, right?

03:47:57   6          Ced Wooden:  I'm about to pay at least 1400 in the

03:48:03   7   next 3 to 6 months for two.  I just wanted to know more about

03:48:07   8   how his breedings turn out.

03:48:09   9          Shane Sprague:  I bred to one of his dogs.  I don't

03:48:13  10   have any pups from him.

03:48:18  11   Q.    And then let's move to the previous page and ask Ms. Backer

03:48:21  12   to zoom in on start at the bottom, please.

03:48:32  13   A.    Shane Sprague:  I hear ya.

03:48:33  14          Ced Wooden:  Which male you bred to?

03:48:38  15          Shane Sprague:  Lucky.  He dead though.

03:48:41  16          Ced Wooden:  Oh, okay.  I think Hoochie Man is his

03:48:46  17   main stud now.

03:48:47  18          Shane Sprague:  Yeah and a good one too.

03:48:51  19   Q.    And then if we could advance up from there to the top two

03:48:53  20   postings on that page, please.

03:49:06  21   A.    Ced Wooden:  Yo, how is that pup acting, the one you just

03:49:10  22   got from Tommy?  Shane Sprague:  Good so far.

03:49:13  23   Q.    And can we go there to the first page of this exhibit, and

03:49:19  24   I'm going to have Ms. Backer pull out these two here, please.

03:49:30  25   A.    Ced Wooden:  Oh, how's that pup you got from Tommy coming

03:49:33  1   along?  Shane Sprague:  I sent that pup off.  Wasn't mine.

03:49:40  2   Q.   What's the date on these last two?

03:49:40  3   A.   8-20-2017.

03:49:44  4   Q.   Agent Ridgeway, could you next turn in your binder to

03:49:47  5   what's been admitted as Government's Exhibit 26.

03:49:49  6         MR. EDDY:  And may we publish that, Your Honor?

03:49:52  7         THE COURT:  Yes, you may.

03:49:53  8   BY MR. EDDY:

03:49:53  9   Q.   Start with the last page again, please.  And again, is this

03:50:02  10  the photo that was also seen in the messages with Larry Boe?

03:50:06  11  A.   Yes.

03:50:07  12  Q.   And now let's go to the previous page to that and zoom on

03:50:12  13  the text that we see there.  Is this the posting accompanying

03:50:17  14  the image we just saw?

03:50:19  15  A.   Yes.

03:50:19  16  Q.   Who's the author of this one?

03:50:21  17  A.   Brok Hollingshead.

03:50:24  18  Q.   What's the date?

03:50:24  19  A.   2-12-2018.

03:50:28  20  Q.   And now let's go to the -- let's go up from there just a

03:50:33  21  little bit and grab the one that's sort of cut off at the top.

03:50:36  22  A.   The author is Brok Hollingshead.  The body reads:  What dog

03:50:43  23  is this?  I wanna know if someone's telling me the truth.

03:50:46  24  Q.   Can we move up there just two more on to that page, there

03:50:50  25  please?

RIDGEWAY - DIRECT

03:50:52  1    A.   Shane Sprague:  Dog I sent to Larry.  Shane Sprague:  Off

03:50:57  2    Hoochie.

03:50:59  3    Q.   Agent Ridgeway, did law enforcement issue subpoenas

03:51:05  4    regarding the transactions mentioned in some of the messages we

03:51:09  5    just worked our way through?

03:51:11  6    A.   Yes.

03:51:11  7    Q.   Will you please turn next in your binder to what's been

03:51:14  8    marked for identification as Government's Exhibit 98.  Do you

03:51:33  9    recognize this?

03:51:33  10   A.   Yes.

03:51:34  11   Q.   What is it?

03:51:37  12   A.   Response to a subpoena.

03:51:38  13   Q.   Is this a true and correct copy of records that law

03:51:41  14   enforcement received in response to a subpoena to Delta Airlines

03:51:47  15   issued in this investigation?

03:51:48  16   A.   Yes.

03:51:51  17            MR. EDDY:  Your Honor, we move admission of

03:51:52  18   Government's Exhibit 98.

03:51:54  19            THE COURT:  Any objection?

03:51:54  20            MR. JOHNSON:  No, Your Honor.

03:51:55  21            THE COURT:  It's admitted.

03:51:56  22        (GOVERNMENT EXHIBIT 98:  Received in evidence.)

03:51:58  23            MR. EDDY:  May we publish, Your Honor.

03:52:00  24            THE COURT:  Yes.

03:52:00  25            MR. EDDY:  And I'll ask Ms. Backer, once it's up, to

03:52:02  1    zoom in to -- let's get this chunk here.

03:52:04  2    BY MR. EDDY:

03:52:04  3    Q.   Agent Ridgeway, starting with the first column here, do you

03:52:15  4    see the letters AWB?

03:52:20  5    A.   Yes.

03:52:20  6    Q.   And what's listed in each of the rows under that?

03:52:29  7    A.   The Number 73256864.

03:52:34  8          MR. EDDY:   And could we do a side-by-side with that,

03:52:37  9    please, and what's been admitted into evidence and what we

03:52:41  10   recently viewed as Government's Exhibit 23, page 9.

03:52:45  11   BY MR. EDDY:

03:52:59  12   Q.   Agent Ridgeway, do you see a number at the top middle of

03:53:04  13   the image on the left which derives from Government's

03:53:09  14   Exhibit 23?

03:53:10  15   A.   Yes.

03:53:10  16   Q.   And how does it compare to what's listed under AWB in

03:53:15  17   Government's Exhibit 98?

03:53:18  18   A.   They're the same number.

03:53:20  19   Q.   And if we could go -- we'll stay with this bottom part here

03:53:24  20   on our screen Agent Ridgeway.   Two columns over there to the

03:53:27  21   right, do you see AWB underscore CRTN underscore DT?

03:53:34  22   A.   Yes.

03:53:34  23   Q.   What's listed under that heading?

03:53:36  24   A.   6-20-2017.

03:53:39  25   Q.   And if we could go three columns over there to the right on

03:53:42   1   the far side of our zoom.  What's listed in the rows over that?

03:53:47   2   A.   Shane P. Sprague.

03:53:49   3   Q.   All right.  And if we could pull up now just kind of the

03:53:51   4   middle third of Government's Exhibit 98.  And do you see on your

03:54:14   5   screen --

03:54:14   6          MR. EDDY:  I think we may need to come over just one

03:54:20   7   more column to the right, Ms. Backer.  Let's pick up this one.

03:54:32   8   BY MR. EDDY:

03:54:32   9   Q.   Agent Ridgeway, do you see a column Ntr_of_Gds_Txt?

03:54:43   10  A.   Yes.

03:54:44   11  Q.   What's listed under there?

03:54:44   12  A.   One EA puppy labra.

03:54:50   13  Q.   And the next column to the right, what's listed there?

03:54:52   14  What's that column heading?

03:54:55   15  A.   Carrier.

03:54:55   16  Q.   What do you see there?

03:54:56   17  A.   DL.

03:54:59   18  Q.   Then if we could slide just a little bit more and pick up

03:55:03   19  the last cells of that.  This second column to the left on your

03:55:04   20  screen, Brdg.  Can you read us now what's listed in the rows

03:55:19   21  there?

03:55:20   22  A.   PNS, ATL, MSP, GTF, and GTF.

03:55:28   23  Q.   And next to that, Ofld_Stn_Cd, can you work us down through

03:55:34   24  those?

03:55:35   25  A.   ATL, MSP, GTF.

RIDGEWAY - DIRECT

03:55:39  1   Q.   Do you recall seeing some of those acronyms in the

03:55:41  2   images -- some of the images that were in those messages with

03:55:44  3   Larry Boe?

03:55:45  4   A.   Yes.

03:55:45  5   Q.   And the very last column on the right, can you work us down

03:55:49  6   through those rows?

03:55:51  7   A.   The first three read, Departed.  Then Notified for

03:55:56  8   Delivery, and Delivered.

03:56:01  9   Q.   Can we move next, Agent Ridgeway, to what's been marked for

03:56:04  10  identification in your binder as Government's Exhibit 100.  And

03:56:12  11  I'm going to ask you to take just a few moments and skim briefly

03:56:16  12  through those to familiarize yourself with those and look up to

03:56:22  13  let me know once you've done it.

03:56:39  14          Do you recognize this?

03:56:40  15  A.   Yes.

03:56:40  16  Q.   What is it?

03:56:41  17  A.   Response to a subpoena.

03:56:43  18  Q.   Is this a fair and accurate copy of records that law

03:56:45  19  enforcement received in response to a subpoena issued by law

03:56:50  20  enforcement to Ria Financial in this investigation?

03:56:52  21  A.   Yes.

03:56:54  22          MR. EDDY:  Your Honor, we move admission of

03:56:56  23  Government's Exhibit 100.

03:56:57  24          THE COURT:  Any objection?

03:56:58  25          MR. JOHNSON:  No, Your Honor.

| | | |
|---|---|---|
| 03:56:59 | 1 | THE COURT:  It's admitted. |
| 03:57:00 | 2 | (GOVERNMENT EXHIBIT 100:  Received in evidence.) |
| 03:57:02 | 3 | MR. EDDY:  May we publish, Your Honor? |
| 03:57:05 | 4 | THE COURT:  What's the name of the -- responded to |
| 03:57:06 | 5 | that subpoena?  Something financial? |
| 03:57:06 | 6 | MR. EDDY:  Ria, Your Honor, R-I-A. |
| 03:57:08 | 7 | And may we publish that one as well? |
| 03:57:14 | 8 | THE COURT:  Yes, you may. |
| 03:57:15 | 9 | MR. EDDY:  Thank you.  We'll start with page 1. |
| 03:57:15 | 10 | BY MR. EDDY: |
| 03:57:15 | 11 | Q.  Agent Ridgeway, does this reflect money orders? |
| 03:57:27 | 12 | A.  I'm sorry, one more time? |
| 03:57:27 | 13 | Q.  Does this reflect money orders? |
| 03:57:28 | 14 | A.  Yes. |
| 03:57:28 | 15 | Q.  Whose money order transactions were subpoenaed? |
| 03:57:31 | 16 | A.  Shane Sprague. |
| 03:57:32 | 17 | Q.  On page 1, what does each of the rows underneath the green |
| 03:57:38 | 18 | represent? |
| 03:57:38 | 19 | A.  An individual transaction. |
| 03:57:40 | 20 | Q.  And the blank areas in between it and below, what do those |
| 03:57:44 | 21 | represent? |
| 03:57:44 | 22 | A.  Areas where information was redacted. |
| 03:57:47 | 23 | Q.  And what sort of information was redacted? |
| 03:57:53 | 24 | A.  Information that's not pertinent to what we're covering. |
| 03:57:57 | 25 | Q.  Agent Ridgeway, I'm now going to ask you about just the top |

| 03:58:01 | 1 | row that runs across the next few pages.  So let's first zoom in |
| 03:58:06 | 2 | to capture the date and the amount.  And what do you see there |
| 03:58:15 | 3 | for the top row? |
| 03:58:20 | 4 | A.   6-30-2017.   The amount is 60. |
| 03:58:27 | 5 | Q.   And now if we can move forward to page 3.  Top row, let's |
| 03:58:33 | 6 | capture Sending Agent Branch Name, City, and State? |
| 03:58:41 | 7 | A.   Walmart Stores Incorporated. |
| 03:58:46 | 8 | Q.   And what's the city and state for that top row? |
| 03:58:50 | 9 | A.   Havre, Montana. |
| 03:58:53 | 10 | Q.   And now let's move to page 7, please.  And let's zoom in to |
| 03:59:08 | 11 | capture Paying Agent Location through Paying Agent State. |
| 03:59:08 | 12 | And what do we see for those, Agent Ridgeway? |
| 03:59:12 | 13 | A.   Walmart Store 1222, Pensacola, Florida. |
| 03:59:18 | 14 | Q.   Can we move next to page 9.  And let's pick up on the |
| 03:59:26 | 15 | right, that Sender First Name. |
| 03:59:29 | 16 | A.   Larry. |
| 03:59:31 | 17 | Q.   And now let's go to page 11.  Also sticking with row 1, |
| 03:59:37 | 18 | what's the middle and last name for the sender? |
| 03:59:41 | 19 | A.   Lee Boe. |
| 03:59:43 | 20 | Q.   And slightly over to the right, how about the city and |
| 03:59:47 | 21 | state of the sender? |
| 03:59:51 | 22 | A.   Havre, Montana. |
| 03:59:54 | 23 | Q.   Page 15, sticking with that same top row.  What's the Payee |
| 04:00:03 | 24 | First, Middle, and Last? |
| 04:00:05 | 25 | A.   Shane Patrick Sprague. |

04:00:07    1    Q.    And sliding over to the right, Payee State?

04:00:10    2    A.    FL.

04:00:11    3    Q.    And let's move next to page 15 -- I'm sorry, page 17, and

04:00:21    4    we'll zoom in on Payee ID Number, please.

04:00:26    5          Did you check this number that we see here against the

04:00:30    6    driver's license of Shane Sprague?

04:00:32    7    A.    Yes.

04:00:32    8    Q.    And what did you observe when you did that?

04:00:35    9    A.    They matched.

04:00:36   10    Q.    Agent Ridgeway, let's work backwards now, and I'm going to

04:00:41   11    ask you about the third and fourth rows in these transactions

04:00:45   12    which start on page 2.

04:00:48   13          For the top row -- and this will be the Row 3 of 4 up

04:00:54   14    at the top of this page.  Could you please give us the date and

04:00:59   15    amount?

04:01:06   16    A.    6-15-17.  850.

04:01:12   17    Q.    And how about the transaction under there?

04:01:14   18    A.    6-19-17.  300.

04:01:22   19    Q.    And is this in U.S. dollars?

04:01:24   20    A.    Yes.

04:01:25   21    Q.    Let's move to page 4 next.  And if you could read us what's

04:01:37   22    seen there, we're going to zoom in for Rows 3 and 4 as the --

04:01:47   23    A.    Walmart.

04:01:49   24    Q.    -- sending agent.

04:01:51   25    A.    Sorry.  I'm sorry.

04:01:53   1    Q.   As the sending agent.  Go ahead.

04:01:55   2    A.   Walmart Store 4247, 3510 U.S. Highway 2 West, Havre,

04:02:05   3    Montana.

04:02:06   4    Q.   And now let's move to page 8.  And we'll pick up the paying

04:02:16   5    agent location through city and state, and let's work through

04:02:28   6    those you see here?

04:02:29   7    A.   Walmart Store 1605, 4600 Mobile Highway, Suite 122,

04:02:37   8    Pensacola, Florida.

04:02:38   9    Q.   And the next one down?

04:02:39   10   A.   Walmart Store 1222, 8970 Pensacola Boulevard, Pensacola,

04:02:45   11   Florida.

04:02:46   12   Q.   Let's move forward to page 10.  And we'll pick up that

04:02:50   13   sender first name on the very right.  What's that for these two

04:02:54   14   transactions?

04:02:54   15   A.   Larry.

04:02:56   16   Q.   And let's go forward to page 12.  We'll stick with these

04:03:00   17   same two rows, can we please grab the middle and last name of

04:03:03   18   the sender?

04:03:05   19   A.   Lee Boe.

04:03:07   20   Q.   What's the city and state?

04:03:09   21   A.   Havre, Montana.

04:03:11   22   Q.   And for page 16, sticking with these two rows, can we

04:03:14   23   please capture the payee first, middle, and last?

04:03:22   24   A.   Shane Patrick Sprague.

04:03:23   25   Q.   And sticking with these two rows, let's go to page 20.  And

04:03:27   1   can you please read us the -- what's listed under Payout Ben

04:03:34   2   Address, Payout Ben City, and Payout Ben State?

04:03:42   3   A.   Walmart Stores, Incorporated, ██████████ Road, Pensacola,

04:03:47   4   Florida.  Again Walmart Stores, Incorporated, ██████████ Road,

04:03:57   5   spelled differently, Pcola, FL.

04:04:01   6   Q.   And the entry to the left of Walmart Stores, does that

04:04:04   7   correspond with, on page 19, the field Entered By?

04:04:14   8   A.   Yes.

04:04:19   9   Q.   The last two entries on page 20, the addresses that you

04:04:24   10   read for us, did you recognize those?

04:04:27   11   A.   Yes.

04:04:29   12   Q.   As what?

04:04:32   13   A.   Shane Sprague's address.

04:04:36   14   Q.   All right.  If you could now flip back to page 2 for us.

04:04:43   15   And I'm going to ask Ms. Backer to zoom in on the date and

04:04:51   16   amounts of those.

04:04:57   17         And while that's up there, Agent Ridgeway, could you,

04:05:02   18   in your binder, please turn to what's already been admitted,

04:05:04   19   what we previously reviewed as Government's Exhibit 23.  These

04:05:18   20   are the messages to Larry Boe.  And if you could find page 16 of

04:05:22   21   that, it has 10628 at the top.  Second full block from the top,

04:05:38   22   do you see a reference to sending 300?

04:05:43   23   A.   Yes.

04:05:44   24   Q.   And what's the date and time of that message?

04:05:48   25   A.   6-19-2017.

RIDGEWAY - DIRECT

04:05:51  1    Q.   Who's the author?

04:05:53  2    A.   Larry Boe.

04:05:56  3    Q.   And the money order document that we've got zoomed in on

04:05:59  4    the screen, do you also see a transfer for $300?

04:06:02  5    A.   Yes.

04:06:03  6    Q.   What's the date of that transaction?

04:06:09  7    A.   6-18-2000 -- well...

04:06:16  8    Q.   I should say what's the date that the money was collected.

04:06:19  9    A.   6-19-2017.

04:06:37  10   Q.   All right.  Agent Ridgeway, if you would now turn to, in

04:06:39  11   your binder, what's already been admitted as Government's

04:06:42  12   Exhibit 23.  Let's go to the last page, page 29.  And I'll have

04:06:47  13   you refer to the top message on that page.  And if we could do a

04:07:02  14   side-by-side with that.  And the page that we just had up from

04:07:08  15   Government's Exhibit 100.  The clip we just had.

04:07:21  16          On the screen now, Agent Ridgeway, do you see a

04:07:23  17   reference to a dollar figure?

04:07:24  18   A.   Yes, I do.

04:07:26  19   Q.   What's that?

04:07:28  20   A.   $850.

04:07:29  21   Q.   And what's the date?

04:07:31  22   A.   6-14-2017.

04:07:37  23   Q.   In Government's Exhibit 100, if we could go to that same

04:07:43  24   page that we were just on.  I think it's page 2.  And scroll

04:07:57  25   down just a little bit.  Do you see a -- on page 2,

04:08:02   1   Agent Ridgeway, do you see a reference to an $850 money order at

04:08:21   2   the top?

04:08:22   3   A.   I do.

04:08:23   4   Q.   What's the date on that?

04:08:24   5   A.   6-15-2017.

04:08:27   6   Q.   And what's the date that the payment was made?

04:08:31   7   A.   6-14-2017.

04:08:34   8   Q.   And what's the date of the message below?

04:08:37   9   A.   6-14-2017.

04:08:39   10   Q.   Do you see a corresponding dollar amount there?

04:08:41   11   A.   Yes.

04:08:46   12   Q.   All right.  Then let's go -- let's clear those zooms away,

04:08:50   13   and we'll go to page 10 of Government's Exhibit 100.  And I'll

04:08:53   14   ask you to do that as well, Agent Ridgeway.  And let's go to

04:09:02   15   page 10.

04:09:11   16            All right.  And I'm going to ask Ms. Backer to zoom in

04:09:14   17   on that column there.  And if we could, Agent Ridgeway, while

04:09:24   18   this one's up on the screen, can you also turn back again to the

04:09:28   19   Larry Boe messages in Government's Exhibit 23, page 16.  This

04:09:39   20   should have at the top 10628.

04:09:48   21   A.   Okay.

04:09:49   22   Q.   Do you see a nine-digit number there?

04:09:54   23   A.   Yes.

04:09:57   24   Q.   And that's in the message from Larry Boe?

04:10:00   25   A.   That's correct.

RIDGEWAY - DIRECT

| | | |
|---|---|---|
| 04:10:01 | 1 | Q.   Do you see a corresponding nine-digit number here on the |
| 04:10:06 | 2 | screen from Government's Exhibit 100? |
| 04:10:08 | 3 | A.   Yes. |
| 04:10:13 | 4 | Q.   All right.  Now, let's keep that same zoom in up on the |
| 04:10:16 | 5 | screen.  And, Agent Ridgeway, in your binder, if you could go to |
| 04:10:19 | 6 | the very last page of -- thank you -- of Government's Exhibit 23 |
| 04:10:30 | 7 | at the top.  Do you see a reference to a nine-digit number there |
| 04:10:38 | 8 | on page 29? |
| 04:10:40 | 9 | A.   I do. |
| 04:10:43 | 10 | Q.   And could we compare that to the screen we were just |
| 04:10:47 | 11 | looking at from Government's Exhibit 100, page 10?  And I'm |
| 04:10:51 | 12 | going to ask you to compare those as well. |
| 04:11:06 | 13 | A.   They're the same. |
| 04:11:08 | 14 | Q.   Agent Ridgeway, as part of this investigation, did you |
| 04:11:14 | 15 | apply in July of 2018 -- and we can take those down for now -- |
| 04:11:21 | 16 | to a federal judge for a search warrant of any residential |
| 04:11:25 | 17 | properties? |
| 04:11:26 | 18 | A.   Yes. |
| 04:11:27 | 19 | Q.   Whose? |
| 04:11:32 | 20 | A.   Derek Golson and David Moser. |
| 04:11:38 | 21 | Q.   And were those in June of 2019? |
| 04:11:45 | 22 | A.   Yes. |
| 04:11:45 | 23 | Q.   And how about July of 2018? |
| 04:11:47 | 24 | A.   Oh, I'm sorry.  2018 was Shane Sprague, James Tommy Peek, |
| 04:11:53 | 25 | and Haley Cook. |

04:11:56   1   Q.   Were those applications granted?

04:11:58   2   A.   Yes.

04:11:58   3   Q.   Can you turn next in your binder to what's been marked for

04:12:01   4   identification as Government's Exhibit 110.  Please take a look

04:12:11   5   at that for me, as well as Government's exhibit marked for

04:12:13   6   identification 111.

04:12:40   7          Have you seen these before?

04:12:41   8   A.   Yes.

04:12:42   9   Q.   What are they?

04:12:45   10   A.   Search and seizure warrants.

04:12:46   11   Q.   Do you see signatures at the bottom?

04:12:50   12   A.   Yes.

04:12:51   13   Q.   Were you present when these were signed?

04:12:53   14   A.   I was.

04:12:54   15   Q.   Are Government's Exhibits 110 and 111 fair and accurate

04:12:58   16   copies of search warrants issued in this case?

04:13:00   17   A.   Yes.

04:13:01   18          MR. EDDY:  Your Honor, we move admission of

04:13:04   19   Government's Exhibits 110 and 111.

04:13:08   20          THE COURT:  Objection?

04:13:13   21          MR. JOHNSON:  Which one is 11?

04:13:15   22          MR. EDDY:  111?  111 is 10498 Pinewood Lane.

04:13:23   23          MR. JOHNSON:  No objection, Your Honor.

04:13:24   24          THE COURT:  They're both admitted.

04:13:25   25          *(GOVERNMENT EXHIBITS 110 and 111:  Received in evidence.)*

04:13:27   1          MR. EDDY:  Thank you, Your Honor and may we publish

04:13:29   2   Government's Exhibit 110?

04:13:31   3          THE COURT:  You may.

04:13:32   4   BY MR. EDDY:

04:13:32   5   Q.   Agent Ridgeway, we'll have Ms. Backer zoom in on maybe the

04:13:40   6   top third of that.  Whose residence was this at the time?

04:13:43   7   A.   Shane Sprague.

04:13:44   8   Q.   And let's move now and publish Government's Exhibit 111.

04:13:51   9   The same thing.  We'll zoom in on the top third.  Whose address

04:13:57   10   was this at the time?

04:14:01   11   A.   James Tommy Peek.

04:14:03   12   Q.   Did agents from your agency execute the search warrants?

04:14:07   13   A.   Yes.

04:14:08   14   Q.   Did you organize and plan all of that?

04:14:10   15   A.   I did.

04:14:11   16   Q.   Were they all executed on the same day?

04:14:13   17   A.   Yes.

04:14:15   18   Q.   On Government's Exhibit 111, what's the date next to the

04:14:19   19   signature?

04:14:21   20   A.   July 24th, 2018.

04:14:24   21   Q.   And did your teams execute the warrants on the following

04:14:27   22   day?

04:14:27   23   A.   Yes.

04:14:28   24   Q.   Were you at one of the locations?

04:14:30   25   A.   I was.

04:14:31   1   Q.   Was evidence seized at all of these locations pursuant to

04:14:35   2   those warrants?

04:14:35   3   A.   It was.

04:14:37   4   Q.   Are you familiar with the term "search warrant inventory,"

04:14:39   5   Agent Ridgeway?

04:14:40   6   A.   Yes, I am.

04:14:40   7   Q.   What does that mean?

04:14:42   8   A.   Search warrant inventory is what the evidence custodian

04:14:45   9   that is at each of these -- or that was at each of these

04:14:49  10   locations will maintain there to take inventory of the items

04:14:52  11   that are being seized by the agents there, or the evidence that

04:14:54  12   is being seized.

04:14:59  13   Q.   Can you summarize generally for us the process by which

04:15:01  14   evidence was collected and documented in this case?

04:15:04  15   A.   Yes.  Agents -- once agents find a piece of evidence, they

04:15:09  16   will notify a photographer who has been designated there at the

04:15:14  17   scene to come take a picture of that piece of evidence in its

04:15:17  18   original location.  After that is done, the agent will put it in

04:15:22  19   a bag and mark on there the -- identify the object.  It's

04:15:31  20   called -- we refer to it as bagging and tagging.  They'll write

04:15:35  21   their name on there and then take that piece of evidence to the

04:15:38  22   evidence custodian there at the location who is preparing the

04:15:41  23   inventory.

04:15:42  24   Q.   What was your role in that process for this case?

04:15:50  25   A.   Can you ask that again, please?

04:15:52   1    Q.   For the process of collecting the evidence in this case,
04:15:55   2    what was your role in all of that?
04:15:58   3    A.   Ultimately all of the evidence was transferred to me as the
04:16:01   4    evidence custodian for the evidence in this case.
04:16:04   5    Q.   For items that you did not personally seize yourself, did
04:16:07   6    you get an evidence receipt for those?
04:16:10   7    A.   I did, yes.
04:16:11   8    Q.   What's the purpose of the evidence receipt?
04:16:12   9    A.   To track the chain of custody.
04:16:16   10   Q.   Could you turn now to what's been marked for identification
04:16:19   11   in your binder as Government's Exhibit 115, and I'd like you to
04:16:23   12   look at that briefly through and including Government's Exhibit
04:16:27   13   119.  Take a moment to familiarize yourself with those pages,
04:16:31   14   and then look up to let me know when you've done that.
04:17:13   15          Do you recognize these?
04:17:14   16   A.   Yes.
04:17:14   17   Q.   What are they?
04:17:16   18   A.   Evidence receipts and inventory.
04:17:17   19   Q.   Does your name and signature appear in each one of these?
04:17:20   20   A.   Yes.
04:17:20   21   Q.   Did you generate some of these yourself?
04:17:22   22   A.   I did.
04:17:23   23   Q.   Are Government's Exhibits 115 through 119 true and correct
04:17:27   24   copies of search warrant evidence receipts and inventories that
04:17:30   25   you either generated and/or received and signed?

RIDGEWAY - DIRECT

04:17:35  1    A.    Yes.

04:17:36  2    Q.    Other than the live animals mentioned, did you either seize

04:17:41  3    yourself or otherwise receive all of the items listed in these?

04:17:45  4    A.    Yes.

04:17:45  5    Q.    Did you personally handle the seized evidence from all of

04:17:49  6    the search warrant locations in these inventories?

04:17:52  7    A.    Yes.

04:17:52  8    Q.    Did the seized items include documents?

04:17:55  9    A.    Yes.

04:17:55  10   Q.    Did you scan or supervise the scanning of all of those?

04:17:59  11   A.    I did.

04:17:59  12   Q.    Were physical items also seized?

04:18:02  13   A.    Yes.

04:18:02  14   Q.    Did you photograph or witness the photograph-taking of each

04:18:05  15   of those items?

04:18:06  16   A.    I did.

04:18:08  17   Q.    After you received the evidence, did you store it

04:18:11  18   somewhere?

04:18:12  19   A.    Yes.

04:18:12  20   Q.    Is that a secure location?

04:18:16  21   A.    It is.

04:18:17  22   Q.    Does anyone have access to that location or has anyone had

04:18:19  23   access to that location without you?

04:18:21  24   A.    No.

04:18:22  25   Q.    Did you, at some point prior to today, check the seized

04:18:26   1    items on these -- the seized items from the search warrants

04:18:30   2    against these lists or vice versa?

04:18:33   3    A.   Yes, I did.

04:18:34   4    Q.   Were you able to link everything in the storage evidence

04:18:37   5    locker location to these documents?

04:18:40   6    A.   Yes.

04:18:41   7    Q.   Were you able to link everything in the evidence receipts

04:18:43   8    and the search warrant inventories to physical items at the

04:18:48   9    evidence storage location?

04:18:49  10    A.   Yes.

04:18:50  11         MR. EDDY:  Your Honor, we move admission of

04:18:53  12    Government's Exhibits 115 to 119.

04:18:57  13         THE COURT:  Objection?

04:18:59  14         MR. JOHNSON:  Object to the ones at Peek.  I'll have

04:19:01  15    no objection to Mr. Sprague --

04:19:03  16         THE COURT:  Stand up.  I can't hear you, Mr. Johnson.

04:19:06  17         MR. JOHNSON:  I'm sorry, Your Honor.  18 and 19.

04:19:10  18         THE COURT:  Object to 18 and 19.  And they refer to

04:19:18  19    what?

04:19:20  20         MR. EDDY:  Your Honor, Government's Exhibit 118 is an

04:19:23  21    evidence receipt from the location of Defendant Derek Golson,

04:19:27  22    and evidence receipt 119 is an evidence receipt from -- Exhibit

04:19:32  23    119 rather is also from Mr. Golson's residence.

04:19:38  24         MR. JOHNSON:  117 was my objection, Your Honor.

04:19:44  25         MR. EDDY:  And that pertains to James Tommy Peek, Your

04:19:46  1  Honor.

04:19:49  2          THE COURT:  What's the basis of the objection?

04:19:52  3          MR. JOHNSON:  It's not relevant.

04:19:53  4          THE COURT:  Not what?

04:19:54  5          MR. JOHNSON:  Not relevant.

04:20:00  6          MR. EDDY:  May I be heard on that at the podium or

04:20:02  7  shall I approach, Your Honor?

04:20:03  8          THE COURT:  Well, I think you can probably tell me in

04:20:08  9  front of the jury.  Tell me what it is.

04:20:11  10          MR. EDDY:  Your Honor, the Government is -- and, in

04:20:15  11  fact, defense counsel referred to Mr. Peek in their opening

04:20:18  12  statements as well.  We've already made fairly extensive mention

04:20:21  13  of him here as the purveyor of fighting dogs to various people,

04:20:30  14  and the Government's evidence will show and has already shown so

04:20:35  15  far that he is an active co-conspirator in the conspiracy that's

04:20:41  16  been alleged here.

04:20:43  17          THE COURT:  Well, his name has already been popping up

04:20:47  18  numerous times.  Objection's overruled.

04:20:51  19          MR. EDDY:  Thank you, Your Honor.

04:20:51  20          THE COURT:  And they are admitted:  115, 116, -17, and

04:20:58  21  all the way down to 119.

04:13:25  22      (GOVERNMENT EXHIBITS 115 through 119:  Received in

04:13:25  23  evidence.)

04:21:00  24          MR. EDDY:  Thank you, Your Honor.

04:21:01  25  BY MR. EDDY:

RIDGEWAY - DIRECT

04:21:01  1    Q.   Agent Ridgeway, did the search warrant for Mr. Sprague's

04:21:06  2    residence authorize agents to seize cellular telephones and

04:21:10  3    other electronic devices?

04:21:11  4    A.   Yes.

04:21:11  5    Q.   Did law enforcement, in fact, seize such devices on that

04:21:15  6    day?

04:21:16  7    A.   Yes.

04:21:16  8    Q.   Did you receive those as the evidence custodian?

04:21:19  9    A.   I did.

04:21:20  10   Q.   What, if anything, did you do with those next?

04:21:23  11   A.   I checked those items in as evidence, and then I sent those

04:21:26  12   items to Kansas City to my agency's computer forensics division.

04:21:32  13   Q.   And would that be Kansas City, Missouri, or Kansas City,

04:21:38  14   Kansas?

04:21:39  15   A.   I believe Kansas City, Missouri.

04:21:42  16   Q.   And do you believe who at the lab received those?

04:21:46  17   A.   Yes, Vincent Castaldo.

04:21:49  18   Q.   Agent Ridgeway, during your investigation of Mr. Sprague's

04:21:53  19   Facebook account, did he make references to having a partner

04:21:56  20   with reference to some of his dog activities?

04:22:01  21   A.   Yes.

04:22:02  22   Q.   And did any documents seized from Mr. Sprague's residence

04:22:06  23   that you took as evidence custodian make reference to someone

04:22:10  24   named Derek Golson?

04:22:12  25   A.   Yes.

04:22:13  1   Q.   If we could turn in your binder to what's already been

04:22:16  2   admitted as Government's Exhibit 39.

04:22:18  3              And may we publish that, Your Honor?

04:22:23  4              THE COURT:  It's admitted as Government Exhibit 39?

04:22:30  5              MR. EDDY:  Yes, Your Honor.

04:22:32  6              THE COURT:  It's admitted.  You're right.

04:22:35  7              MR. EDDY:  Thank you.

04:22:38  8   BY MR. EDDY:

04:22:38  9   Q.   And could we zoom in on these blocks here.

04:22:43  10             Agent Ridgeway, do you see a field for Posted here at

04:22:51  11  the first page of Government's 39?

04:22:54  12  A.   Yes.

04:22:55  13  Q.   On our screen here, what's listed next to that?

04:22:58  14  A.   4-3-2017.

04:23:03  15  Q.   What's in the body for the field Status?

04:23:05  16  A.   Have four pups available, three females and one male, 500.

04:23:10  17  No tire kickers, story tellers either.  You want one or you

04:23:15  18  don't, simple as that.  PED will be posted in the comments soon.

04:23:22  19  Q.   And by the way, does this pertain to a Facebook record?

04:23:25  20  A.   Yes.

04:23:26  21  Q.   Do you see the field for User?

04:23:28  22  A.   Yes.

04:23:28  23  Q.   What's listed there?

04:23:29  24  A.   Shane Sprague.

04:23:30  25  Q.   And if we could -- actually, before we move to the next

RIDGEWAY - DIRECT

04:23:36   1   page, do you see something resembling a website next to the

04:23:40   2   field for Text?

04:23:43   3   A.   Yes.

04:23:44   4   Q.   Do you recognize the website for that page?

04:23:47   5   A.   Yes.   Peds Online.

04:23:48   6   Q.   And following that website, do you see a little bit of text

04:23:50   7   at the end?

04:23:55   8   A.   Yes.

04:23:55   9   Q.   What's that?

04:23:56   10   A.   Sire to pups.

04:23:57   11   Q.   Do you see a six-digit number at the end of that website

04:24:01   12   link?

04:24:01   13   A.   Yes.

04:24:04   14   Q.   What's that?

04:24:06   15   A.   580227.

04:24:08   16   Q.   Did you go to the website that's linked there?

04:24:11   17   A.   Yes.

04:24:11   18   Q.   And now if we could turn to what's been admitted as

04:24:15   19   Government's Exhibit 71.

04:24:16   20        MR. EDDY:   And may we publish that one as well, Your

04:24:20   21   Honor?

04:24:20   22        THE COURT:   Yes.

04:24:21   23   BY MR. EDDY:

04:24:21   24   Q.   At the top of the page, when you're there, Agent Ridgeway,

04:24:28   25   do you see a six-digit number here as well?

RIDGEWAY - DIRECT

04:24:31  1   A.   Yes.

04:24:32  2   Q.   Could you compare it to the one that we just saw?

04:24:34  3   A.   They're the same.

04:24:38  4   Q.   Does each pedigree page that you have visited on this

04:24:41  5   website have a different six-digit number that goes along with

04:24:45  6   it?

04:24:45  7   A.   Yes.

04:24:45  8   Q.   What's the title of the content on this page?

04:24:51  9   A.   C Woods Rip.

04:24:53  10  Q.   Do you see a column under there labeled First?

04:24:55  11  A.   Yes.

04:25:00  12  Q.   And let's zoom to the first two columns of the bracket

04:25:04  13  portion.  What's listed under the first column?

04:25:07  14  A.   Sire, Sprague's Pimpin Cain.

04:25:12  15  Q.   And what's listed under the -- and I'm sorry.  Let me let

04:25:16  16  you finish that.

04:25:18  17  A.   Dam, Golson's Lil Angel.

04:25:22  18  Q.   What's listed under the second column for Golson's Lil

04:25:25  19  Angel, just to the right of that name?

04:25:29  20  A.   Peek's Lucky, parentheses, 1XW, ROM, and Murray's Angel.

04:25:38  21  Q.   And now if we could return to where we were in Government's

04:25:41  22  Exhibit 39, which again is in evidence, what we were just

04:25:45  23  discussing.  And we're going to be moving down now to page 2,

04:25:45  24  continuing that same thread.  Let's start at the very top.

04:25:59  25       Is this another page from that website,

04:26:07    1    Agent Ridgeway?

04:26:08    2    A.    It is.

04:26:11    3    Q.    What's the text that appears after the website link there?

04:26:16    4    A.    Dam to pups.

04:26:19    5    Q.    And is this the same website as the previous link?

04:26:22    6    A.    Yes.

04:26:23    7    Q.    Different web page?

04:26:24    8    A.    Yes.

04:26:24    9    Q.    Can we scroll down to the next -- past the next two

04:26:28   10    postings.  Do you see a text entry beginning with "my kennel"?

04:26:34   11    Could you read that one, please?

04:26:36   12    A.    Shane Sprague:  My kennel partner's pups.  Not my decision.

04:26:40   13    I'm just posting cuz he don't have a Facebook.

04:26:45   14    Q.    And then let's back out and let's grab these two here.  Do

04:26:54   15    see the one "these," Agent Ridgeway?

04:26:56   16    A.    Yes.

04:26:56   17    Q.    Finish that one off for us.

04:26:58   18    A.    Shane Sprague:  These ain't mine, they my kennel partner's.

04:27:02   19    Q.    What's the date on that one?

04:27:03   20    A.    4-3-2017.

04:27:08   21    Q.    And let's turn in your binder next to what's been admitted

04:27:16   22    as Government's Exhibit 40, and we'll go to page 1.  We'll start

04:27:18   23    at the very bottom.

04:27:19   24         MR. EDDY:  May we publish that, Your Honor?

04:27:21   25         THE COURT:  Yes.

04:27:22   1   BY MR. EDDY:

04:27:23   2   Q.   And we'll zoom in on just that very bottom part to start us

04:27:27   3   off.   What's the date for this posting?

04:27:30   4   A.   9-17-2017.

04:27:33   5   Q.   And picking up there, that little beginning of a website

04:27:37   6   under Status, and let's flow onto the next page.   And we'll zoom

04:27:42   7   in on that one.   To right there is good.

04:27:48   8          Is this another web page from that same website?

04:27:55   9   A.   Yes.

04:27:55   10   Q.   Do you see a six-digit number at the end of that one?

04:27:59   11   A.   Yes.

04:27:59   12   Q.   What's that?

04:28:00   13   A.   312244.

04:28:05   14   Q.   Any text following that?

04:28:07   15   A.   Yes.   300.   Kennel partner selling this male five months

04:28:11   16   old.

04:28:12   17   Q.   Did you go to the website that's linked there?

04:28:14   18   A.   Yes.

04:28:14   19   Q.   If we could turn next to what's been admitted as

04:28:17   20   Government's Exhibit 70.

04:28:18   21          MR. EDDY:   May we publish, Your Honor?

04:28:23   22          THE COURT:   Yes.

04:28:23   23   BY MR. EDDY:

04:28:28   24   Q.   Do you see a six-digit number at the top of this page?

04:28:31   25   A.   Yes.

04:28:31  1    Q.   How does it compare to the one we just saw?

04:28:33  2    A.   They match.

04:28:34  3    Q.   What's the title of the content of this page?

04:28:37  4    A.   C Woods Pups.

04:28:39  5    Q.   What's listed under the first column on the left?

04:28:44  6    A.   Sire, C Woods Rip.  And dam, Golson's Ms. Kali.

04:28:51  7    Q.   Can we turn next to what's been admitted as Government's

04:28:55  8    Exhibit 38.

04:28:56  9         MR. EDDY:  And may we publish that, Your Honor?

04:29:00  10        THE COURT:  Yes.

04:29:00  11   BY MR. EDDY:

04:29:02  12   Q.   Let's start with the bottom of page 2, and we'll do a

04:29:09  13   rolling zoom starting with that one.

04:29:14  14        Does this page, Agent Ridgeway, appear to be a message

04:29:18  15   string between two parties?

04:29:19  16   A.   Yes.

04:29:21  17   Q.   And the last posting at the bottom, who's the author?

04:29:25  18   A.   Shane Sprague.

04:29:26  19   Q.   The date?

04:29:28  20   A.   1-8-2017.

04:29:31  21   Q.   And then below that in the body, is that another page from

04:29:35  22   the same website we've been talking about?

04:29:37  23   A.   Yes.

04:29:38  24   Q.   And can we do a rolling zoom up from there through the next

04:29:43  25   several?

04:29:49  1    A.    Shane Sprague:  I lost her papers but is registered.  Just

04:29:53  2    got to contact ADBA to get them.

04:29:56  3              Jederian Carter:  Bet.  Can you meet me?

04:29:59  4              Shane Sprague:  Where at?

04:30:02  5              Jederian Carter:  Maybe at that store.  I forgot name

04:30:07  6    of it.

04:30:07  7              Shane Sprague:  What RD.

04:30:11  8              Jederian Carter:  When you turn on 29 coming from

04:30:16  9    Atmore.

04:30:18  10             Shane Sprague:  Tom Thumb on 97 and 29.

04:30:25  11   Q.    And let's go after that.  Let's go up to the previous page

04:30:29  12   to that, and we'll zoom in on these.

04:30:37  13             Could you work us up from "did your partner," Agent

04:30:42  14   Ridgeway?

04:30:47  15   A.    Jederian Carter:  Did your partner sell that pup?

04:30:50  16             Shane Sprague:  No, he still got her.

04:30:52  17             Shane Sprague:  I believe.  I'll check.

04:30:55  18             Jederian Carter:  Okay.

04:30:58  19             Shane Sprague:  Yeah, he still vot [sic] her.

04:31:02  20   Number 850-485-3601.

04:31:05  21             Shane Sprague:  Got.

04:31:13  22             Jederian Carter:  Okay.  I'll give him a call.

04:31:17  23   Q.    What's the date on those?

04:31:19  24   A.    6-11-2017.

04:31:23  25   Q.    Agent Ridgeway, do you recall seeing a reference to

RIDGEWAY - DIRECT

04:31:25   1   Golson's Murray's Angel in the website printouts that we just

04:31:31   2   went through?

04:31:31   3   A.   Yes.

04:31:33   4   Q.   Did you pull up the web page for that listing?

04:31:35   5   A.   Yes.

04:31:37   6   Q.   And now I'll have you turn in your binder to what's been

04:31:40   7   admitted as Government's Exhibit 65.

04:31:42   8           MR. EDDY:   And may we publish that, Your Honor?

04:31:45   9           THE COURT:   Yes.

04:31:45   10           MR. EDDY:   Let's start with page 1.   And I'm going to

04:31:51   11   ask Ms. Backer to zoom in on about that there and maybe a little

04:31:55   12   bit more over to the right.

04:31:57   13   BY MR. EDDY:

04:31:57   14   Q.   Agent Ridgeway, what's the title for this web page?   Can

04:32:19   15   you give us the title for this web page?

04:32:21   16   A.   Peds Online.

04:32:22   17   Q.   And for this particular web page, what's the title?

04:32:25   18   A.   Golson's Murray's Angel.

04:32:28   19   Q.   Do you see fields there just to the right of that image of

04:32:32   20   a dog for breeder and owner?

04:32:36   21   A.   Yes.

04:32:37   22   Q.   What's listed there?

04:32:38   23   A.   Derek G.

04:32:41   24   Q.   And several rows down from there, do you see the field

04:32:46   25   Entered By?

04:32:47  1    A.   Yes.

04:32:47  2    Q.   What's listed there?

04:32:48  3    A.   Jedidiah.

04:32:49  4    Q.   Do you see a field for Posted just under that?

04:32:52  5    A.   Yes.

04:32:52  6    Q.   What's that?

04:32:53  7    A.   4-27-2011.

04:32:57  8    Q.   And now let's move down from there and grab the first two

04:33:00  9    columns in that bracket.

04:33:04  10        Do you see the column labeled Second here?

04:33:07  11   A.   Yes.

04:33:08  12   Q.   What's listed under that?

04:33:11  13   A.   Peek's Buford, Peek's Little Mama, Peek's Buford.  And it's

04:33:16  14   unknown.

04:33:21  15   Q.   And besides what we're seeing here on this column, do you

04:33:24  16   see other references to Peek's on this page?

04:33:26  17   A.   Yes.

04:33:35  18   Q.   Let's go to page 2 next.  What's the title, Agent Ridgeway?

04:33:38  19   And we'll zoom in on this from about right here.  The title for

04:33:48  20   this one?

04:33:48  21   A.   Murray's Planned Breeding 2012.

04:33:52  22   Q.   And same questions.  Do you see the field for Entered By?

04:33:58  23   A.   Yes.

04:33:59  24   Q.   What's listed there?

04:34:00  25   A.   Jedidiah.

04:34:01   1   Q.   How about under Posted or next to it?

04:34:05   2   A.   9-4-2011.

04:34:08   3   Q.   And now let's move down to the brackets.  Under the column

04:34:13   4   labeled First, what's listed there?

04:34:16   5   A.   Sire, Sprague's Pimpin Cain.  Dam, Golson's Ms. Kali.

04:34:23   6   Q.   Do you see any references in the larger page to the term

04:34:28   7   Peek --

04:34:28   8   A.   Yes.

04:34:28   9   Q.   -- on this page?

04:34:28   10          Let's move to page 3.  And what's the title for this

04:34:37   11   one?

04:34:39   12   A.   Golson's Ms. Kali.

04:34:42   13   Q.   Breeder and owner on this one?

04:34:44   14   A.   Derek G.

04:34:47   15   Q.   Entered by?

04:34:48   16   A.   Jedidiah.

04:34:49   17   Q.   Posted?

04:34:52   18   A.   4-28-2011.

04:34:56   19   Q.   Do you see references to the term Peek further down on this

04:35:02   20   page?

04:35:02   21   A.   Yes.

04:35:06   22   Q.   Let's go to page 4 next.  What's the title, Agent Ridgeway,

04:35:13   23   for this page?

04:35:16   24   A.   Sprague's Pimpin Cain.

04:35:19   25   Q.   Breeder?

RIDGEWAY - DIRECT

| | | |
|---|---|---|
| 04:35:19 | 1 | A.    Derek G. |
| 04:35:23 | 2 | Q.    Owner? |
| 04:35:24 | 3 | A.    Sprague. |
| 04:35:24 | 4 | Q.    Posted? |
| 04:35:27 | 5 | A.    4-27-2011. |
| 04:35:30 | 6 | Q.    Do you see references to Peek on this page as well? |
| 04:35:35 | 7 | A.    Yes. |
| 04:35:37 | 8 | Q.    Who is listed in the field for Entered By in these that we |
| 04:35:42 | 9 | just worked through? |
| 04:35:46 | 10 | A.    Jedidiah. |
| 04:35:48 | 11 | Q.    Does this Peds Online website have an online chat room |
| 04:35:53 | 12 | where users can go on and post things? |
| 04:35:55 | 13 | A.    Yes. |
| 04:35:55 | 14 | Q.    Were there entries on that posted by Jedidiah? |
| 04:35:58 | 15 | A.    Yes. |
| 04:36:00 | 16 | Q.    And if we could, let's turn next in your binder to what's |
| 04:36:04 | 17 | been admitted as Government's Exhibit 66. |
| 04:36:05 | 18 | MR. EDDY:  And may we publish that, Your Honor? |
| 04:36:08 | 19 | THE COURT:  66? |
| 04:36:09 | 20 | MR. EDDY:  Yes. |
| 04:36:10 | 21 | THE COURT:  You may. |
| 04:36:11 | 22 | MR. EDDY:  Thank you.  And I'm going to ask Ms. Backer |
| 04:36:15 | 23 | to zoom in on about right here. |
| 04:36:19 | 24 | BY MR. EDDY: |
| 04:36:19 | 25 | Q.    Agent Ridgeway, is this one of those entries in the chat |

04:36:28   1   room?

04:36:29   2   A.   Yes.

04:36:30   3   Q.   What's the title?

04:36:32   4   A.   Lucky Litter 8X CH Gator.

04:36:38   5   Q.   And let's zoom to -- or draw your attention to the topmost

04:36:49   6   posting.  And to the left of what's zoomed in, do you see a

04:36:56   7   column for Author?

04:36:57   8   A.   Yes.

04:37:00   9   Q.   Who is that?

04:37:01   10   A.   Jedidiah.

04:37:05   11   Q.   What's the date of this posting which appears to the right

04:37:08   12   of that?

04:37:12   13   A.   October 28, 2011.

04:37:18   14   Q.   And down from there what's the body of this posting?

04:37:22   15   A.   Three females left off this, and a hyperlink to Peds

04:37:27   16   Online.

04:37:29   17   Q.   And now let's go to the next post down.  What's the author

04:37:39   18   and the date on this one?

04:37:42   19   A.   Jedidiah, October 28, 2011.

04:37:46   20   Q.   And the body?

04:37:48   21   A.   They are $400 and located in northwest Florida.  Comes

04:37:54   22   with -- comes WTH first shots and ADBA reg.

04:38:03   23   Q.   All right.  Let's move to page 2 next.  I'll have you

04:38:06   24   direct your attention to and we'll zoom in on this part here.

04:38:11   25          Agent Ridgeway, do you see one posted by gboyskennel.

04:38:23   1   A.   Yes.

04:38:24   2   Q.   What's the date and the body of that?

04:38:28   3   A.   October 29, 2011.  Check PM.

04:38:35   4   Q.   And moving to the posting two down from there, starts with

04:38:39   5   "got one more."  I know this kind of is some overlapping text,

04:38:44   6   but what's the -- to the extent you can make it out, what's the

04:38:47   7   author of that posting?

04:38:49   8   A.   Jedidiah.

04:38:49   9   Q.   And the date?

04:38:52   10  A.   November 9th, 2011.

04:38:55   11  Q.   What's the substance?

04:38:57   12  A.   Got one more female left off this.  And phone number,

04:39:01   13  850-485-3601.

04:39:08   14          MR. EDDY:  And could we publish what's been admitted

04:39:11   15  as Government's Exhibit 38?  We already saw this one a few

04:39:15   16  minutes ago.  We'll go to page 1.

04:39:17   17  BY MR. EDDY:

04:39:17   18  Q.   And stay in your binder to where you just were,

04:39:21   19  Agent Ridgeway.  I'm going to ask you to compare.  And on page 1

04:39:25   20  let's zoom in right here, please.

04:39:31   21          Have you got that number pulled up on the binder as

04:39:34   22  well, that page?

04:39:35   23  A.   Yes, I do.

04:39:36   24  Q.   And what do you notice when you compare those two numbers?

04:39:41   25  A.   They're the same number.

RIDGEWAY - DIRECT

04:39:49    1    Q.   During your investigation, did you form a belief as to the

04:39:53    2    identity of the Derek G or the person referred to as Golson in

04:39:58    3    these website postings that we just saw?

04:40:01    4    A.   Yes.

04:40:01    5    Q.   What name was that?

04:40:04    6    A.   Derek Golson.

04:40:05    7    Q.   Did you locate the address of a person named Derek Golson

04:40:08    8    living in Pensacola?

04:40:10    9    A.   Yes.

04:40:11   10    Q.   Did you apply to a federal judge for a warrant to search

04:40:16   11    his residence for evidence of dogfighting?

04:40:18   12    A.   Yes.

04:40:19   13    Q.   Was that approved?

04:40:20   14    A.   Yes.

04:40:21   15    Q.   And now let's turn in your binder to what's been marked for

04:40:24   16    identification as Government's Exhibit 146.

04:41:00   17         Have you seen this before?

04:41:01   18    A.   Yes.

04:41:02   19    Q.   What is it?

04:41:03   20    A.   Search and seizure warrant.

04:41:04   21    Q.   Were you present when this one was signed?

04:41:05   22    A.   Yes.

04:41:06   23    Q.   Is this a true and correct copy of a search warrant for the

04:41:09   24    residence of Derek Golson?

04:41:11   25    A.   Yes.

04:41:12   1            MR. EDDY:  Your Honor, we move admission of

04:41:14   2   Government's Exhibit 146.

04:41:16   3            MR. GRIFFITH:  No objection.

04:41:17   4            THE COURT:  It's admitted.

04:41:19   5            MR. EDDY:  Thank you, Your Honor.  May we publish?

04:41:21   6            THE COURT:  Yes.

04:41:22   7        (GOVERNMENT EXHIBIT 146:  Received in evidence.)

04:41:23   8            MR. EDDY:  And we'll zoom in on the top third, please.

04:41:26   9   BY MR. EDDY:

04:41:26  10   Q.   What's the address listed here, Agent Ridgeway?

04:41:29  11   A.   ████████████  Road, Pensacola, Florida.

04:41:33  12   Q.   Had you previously researched public records for the

04:41:37  13   occupants of that residence?

04:41:38  14   A.   Yes.

04:41:38  15   Q.   Was Derek Golson one of those?

04:41:40  16   A.   Yes.

04:41:41  17   Q.   Did law enforcement, in fact, execute this search warrant?

04:41:44  18   A.   Yes.

04:41:45  19   Q.   And was that on June 4th of 2019?

04:41:48  20   A.   It was.

04:41:49  21   Q.   Was another search warrant for this case executed on the

04:41:50  22   same day?

04:41:51  23            THE COURT:  Before you leave that, what was the date

04:41:52  24   the warrant was actually signed?  May --

04:41:57  25            MR. JOHNSON:  30th.

04:41:59   1            THE COURT:  Okay.  30th of --

04:42:02   2            MR. JOHNSON:  '19.

04:42:03   3            THE COURT:  Is that '19?

04:42:06   4            MR. JOHNSON:  Yes, sir.

04:42:07   5            THE COURT:  Okay.

04:42:08   6            MR. EDDY:  I'm sorry, Your Honor.

04:42:09   7    BY MR. EDDY:

04:42:11   8    Q.   Was another search warrant for this case executed on this

04:42:14   9    same day?

04:42:15   10   A.   Yes.

04:42:16   11   Q.   Did you plan and organize both of those?

04:42:18   12   A.   Yes.

04:42:18   13   Q.   Were you present at the location of one of those?

04:42:21   14   A.   I was.

04:42:23   15   Q.   Was evidence, in fact, seized at Mr. Golson's residence

04:42:29   16   pursuant to the warrant we're seeing here in Government's

04:42:32   17   Exhibit 146?

04:42:33   18   A.   Yes.

04:42:33   19   Q.   Did agents complete a search warrant inventory at that

04:42:37   20   location?

04:42:37   21   A.   Yes.

04:42:37   22   Q.   And if you could go in your binder now to what is already

04:42:40   23   in evidence as Government's Exhibit 118.

04:42:42   24            MR. EDDY:  And may we publish that, Your Honor?

04:42:45   25            THE COURT:  118?  Yes.

04:42:49   1    BY MR. EDDY:

04:42:50   2    Q.    Agent Ridgeway, is this the evidence receipt for this

04:43:00   3    location?  And we've got, I guess, six pages here.  Take a look

04:43:06   4    through those.  Does this include the search warrant inventory

04:43:13   5    for that location?

04:43:14   6    A.    Yes.

04:43:14   7    Q.    Did you receive the evidence listed there as the evidence

04:43:17   8    custodian?

04:43:18   9    A.    Yes.

04:43:19   10   Q.    Other than the live animals, did you physically handle the

04:43:24   11   seized physical evidence from this location?

04:43:27   12   A.    Yes.

04:43:27   13   Q.    Did that include documents?

04:43:28   14   A.    It did.

04:43:30   15   Q.    Were physical items seized as well?

04:43:31   16   A.    Yes.

04:43:32   17   Q.    Did you photograph or witness the photograph-taking of each

04:43:35   18   of those?

04:43:36   19   A.    Yes.

04:43:37   20   Q.    Did you check the seized items against the lists here in

04:43:43   21   Government's Exhibit 118 or vice versa?

04:43:45   22   A.    Yes.

04:43:46   23   Q.    Were you able to match everything in the evidence storage

04:43:50   24   area to these lists?

04:43:52   25   A.    Yes.

04:43:52  1   Q.   Were you able to link everything in these lists to a seized

04:43:57  2   item in your physical possession?

04:43:58  3   A.   Yes.

04:44:00  4   Q.   Were the seized materials stored in a secure environment?

04:44:04  5   A.   Yes.

04:44:04  6   Q.   Anyone have access without you?

04:44:06  7   A.   No.

04:44:07  8   Q.   And were the seized materials labeled?

04:44:10  9   A.   Yes.

04:44:13  10  Q.   Could you now locate for me in your binder the tabs

04:44:18  11  beginning -- that are marked for identification as Government's

04:44:22  12  Exhibit 317.

04:44:36  13       Agent Ridgeway, Tabs 317 through 350 in this binder,

04:44:42  14  did you previously review these in preparation for your

04:44:45  15  testimony today?

04:44:46  16  A.   Yes.

04:44:47  17  Q.   Where were you when you did that?

04:44:54  18  A.   At the facility where this evidence was stored.

04:44:56  19  Q.   While you were there, did you cross-check these exhibits

04:44:57  20  with original materials that were contained in boxes labeled as

04:45:01  21  having been seized from Mr. Golson's residence?

04:45:03  22  A.   Yes.

04:45:05  23  Q.   What did you find when you did that?

04:45:07  24  A.   They matched.

04:45:08  25       MR. EDDY:  Your Honor, I move admission of

| | | |
|---|---|---|
| 04:45:09 | 1 | Government's Exhibits 317 to 350. |
| 04:45:15 | 2 | THE COURT:  All the way to 350. |
| 04:45:17 | 3 | MR. EDDY:  Yes, Your Honor. |
| 04:45:18 | 4 | THE COURT:  Okay.  Any objection. |
| 04:45:24 | 5 | MR. GRIFFITH:  All the way through 350 did he say. |
| 04:45:27 | 6 | MR. JOHNSON:  Yes. |
| 04:45:28 | 7 | MR. GRIFFITH:  No objection. |
| 04:45:29 | 8 | THE COURT:  They are all admitted. |
| 04:45:33 | 9 | MR. EDDY:  Thank you, Your Honor. |
| 04:45:33 | 10 | (GOVERNMENT EXHIBIT 317 through 350:  Received in |
| 04:45:33 | 11 | evidence.) |
| 04:45:36 | 12 | BY MR. EDDY: |
| 04:45:44 | 13 | Q.  In the search warrant materials for this location, were |
| 04:45:46 | 14 | there any books? |
| 04:45:47 | 15 | A.  Yes. |
| 04:45:47 | 16 | Q.  Did you bring those with you to court in their original |
| 04:45:51 | 17 | hard copy? |
| 04:45:51 | 18 | A.  Yes. |
| 04:45:52 | 19 | Q.  In the box behind you, could you please locate the books |
| 04:45:58 | 20 | labeled for identification as Government's Exhibits 311, 312, |
| 04:46:03 | 21 | and 313. |
| 04:46:17 | 22 | MR. EDDY:  And I just want to note these were |
| 04:46:19 | 23 | previously introduced in their entirety in electronic format to |
| 04:46:23 | 24 | the defense counsel. |
| 04:46:27 | 25 | THE COURT:  All right.  Any -- are you offering these |

04:46:29  1   now?

04:46:30  2            MR. EDDY:  I move 311 to 313, Your Honor.

04:46:34  3            THE COURT:  Any objection?

04:46:35  4            MR. GRIFFITH:  No, sir.

04:46:36  5            THE COURT:  They're admitted.

04:46:37  6            MR. EDDY:  Thank you, Your Honor.

04:46:38  7        *(GOVERNMENT EXHIBIT 311, 312, and 313:  Received in*

04:46:38  8   *evidence.)*

04:46:39  9            MR. GRIFFITH:  Those are the books -- the hard copies

04:46:40  10  of the books under that current column, right?

04:46:42  11           MR. EDDY:  Yes, that's right.

04:46:49  12  BY MR. EDDY:

04:46:49  13  Q.  Agent Ridgeway, if you could go back to what's marked for

04:46:53  14  identification in your binder as Government's Exhibit 106.  I'm

04:47:25  15  sorry.  I believe it's 306.

04:47:29  16           THE COURT:  306?

04:47:29  17           MR. EDDY:  Yes, Your Honor.

04:47:34  18  BY MR. EDDY:

04:47:34  19  Q.  Have you got it, Agent Ridgeway?

04:47:42  20  A.  Yes, sir, I do.

04:47:43  21  Q.  Have you seen this item before?

04:47:44  22  A.  I have.

04:47:45  23  Q.  What is it?

04:47:46  24  A.  A weighted collar.

04:47:50  25  Q.  Where were you when you previously saw this item?

RIDGEWAY - DIRECT

04:47:53  1   A.   At the secure location where the evidence was kept.

04:47:57  2   Q.   Was this item contained in a box or a bag labeled as having

04:48:00  3   been seized from the residence of Derek Golson?

04:48:06  4   A.   Yes.

04:48:06  5   Q.   Is Government's Exhibit 306 a fair and accurate

04:48:09  6   representation of an item seized from Derek Golson?

04:48:13  7   A.   It is.

04:48:13  8            MR. EDDY:  Your Honor, I move admission of

04:48:14  9   Government's Exhibit 306.

04:48:17  10            MR. GRIFFITH:  We would ask that the item be

04:48:19  11   introduced, not a photograph of the item.

04:48:21  12            THE COURT:  The item be substituted with the

04:48:22  13   photograph?  Is -- stand up.  I can't hear you, Mr. Griffith.

04:48:25  14            MR. GRIFFITH:  I'm sorry, Judge.  We would ask that

04:48:26  15   the item itself be introduced, not simply the photograph of the

04:48:30  16   item.

04:48:30  17            MR. EDDY:  I don't have a --

04:48:30  18            MR. GRIFFITH:  That would be the best evidence.

04:48:33  19   Excuse me.

04:48:34  20            MR. EDDY:  I don't have a problem with that in

04:48:36  21   concept, Your Honor, although it's not -- it's currently located

04:48:39  22   in an out-of-state facility; and in a prior exchange with

04:48:42  23   Mr. Griffith, he had asked us to bring with us certain physical

04:48:46  24   objects, not including that one.

04:48:48  25            THE COURT:  Objection's overruled.  The photograph

RIDGEWAY - DIRECT

| | | |
|---|---|---|
| 04:48:50 | 1 | should suffice to identify it. |
| 04:48:55 | 2 | MR. EDDY:  Thank you, Your Honor. |
| 04:48:55 | 3 | THE COURT:  It's admitted. |
| 04:48:56 | 4 | *(GOVERNMENT EXHIBIT 306:  Received in evidence.)* |
| 04:48:57 | 5 | BY MR. EDDY: |
| 04:48:58 | 6 | Q.  Did the search warrant for Mr. Golson's residence authorize |
| 04:49:01 | 7 | your agency to seize cell phones and other electronic devices? |
| 04:49:05 | 8 | THE COURT:  Before we leave 306, what kind of collar |
| 04:49:08 | 9 | is it? |
| 04:49:10 | 10 | THE WITNESS:  It's a weighted collar. |
| 04:49:13 | 11 | THE COURT:  Weighted.  Means it's got weight with it? |
| 04:49:16 | 12 | MR. EDDY:  That's right, Your Honor. |
| 04:49:20 | 13 | THE COURT:  Okay. |
| 04:49:21 | 14 | MR. GRIFFITH:  That was the reason we wanted it |
| 04:49:23 | 15 | introduced as whole, Your Honor, because of the weight to it. |
| 04:49:27 | 16 | THE COURT:  Well, let's establish how much weight it |
| 04:49:30 | 17 | has approximately.  Do you know? |
| 04:49:33 | 18 | THE WITNESS:  It would be an estimate, Your Honor. |
| 04:49:34 | 19 | THE COURT:  Well, as best you can. |
| 04:49:42 | 20 | THE WITNESS:  I would estimate approximately around |
| 04:49:46 | 21 | 5 pounds. |
| 04:49:49 | 22 | THE COURT:  All right.  Okay.  It's admitted. |
| 04:49:58 | 23 | MR. EDDY:  Thank you, Your Honor. |
| 04:50:00 | 24 | THE COURT:  Photograph. |
| 04:50:03 | 25 | MR. EDDY:  Thank you, Your Honor. |

RIDGEWAY - DIRECT

04:50:03  1   BY MR. EDDY:

04:50:04  2   Q.   Agent Ridgeway, did the request for Mr. Golson's residence

04:50:07  3   authorize the seizure of cell phones and other electronic

04:50:11  4   devices?

04:50:11  5   A.   Yes.

04:50:12  6   Q.   And did law enforcement, in fact, seize such devices that

04:50:17  7   day?

04:50:17  8   A.   Yes.

04:50:18  9   Q.   Did law enforcement obtain a second search warrant specific

04:50:21  10  just to Mr. Golson's cell phone?

04:50:23  11  A.   Yes.

04:50:23  12  Q.   And did agents obtain that cell phone?

04:50:26  13  A.   They did.

04:50:27  14  Q.   Did they give it to you?

04:50:28  15  A.   Yes.

04:50:29  16  Q.   Do you recall the name of the agent who gave it to you?

04:50:32  17  A.   Trent Glasshof.

04:50:34  18  Q.   What, if anything, did you do with that cell phone and

04:50:36  19  other electronic devices seized from Mr. Golson and his

04:50:40  20  residence?

04:50:41  21  A.   Secured those items as evidence and sent those items for

04:50:45  22  examination.

04:50:48  23  Q.   And do you recall to whom you sent those items?

04:50:51  24  A.   Chris Mashburn.

04:50:55  25  Q.   Did Mr. Golson's phone contain any reference to electronic

04:50:58   1   money transfers?

04:50:59   2   A.   Yes.

04:51:01   3   Q.   Did law enforcement serve a subpoena to PayPal for money

04:51:05   4   transfers to and from Derek Golson?

04:51:08   5   A.   Yes.

04:51:09   6   Q.   And I'd like you, if you would, please, to turn next to

04:51:13   7   what's been marked for identification as Government's Exhibit

04:51:15   8   144.

04:51:29   9        Do you recognize this?

04:51:30  10   A.   Yes.

04:51:30  11   Q.   What is it?

04:51:31  12   A.   A response to a subpoena.

04:51:32  13   Q.   Is this a true and correct copy of excerpts of records that

04:51:35  14   law enforcement received from PayPal in response to a subpoena?

04:51:40  15   A.   Yes.

04:51:41  16        MR. EDDY:  Your Honor, I move admission of

04:51:43  17   Government's Exhibit 144.

04:51:44  18        THE COURT:  Any objection?

04:51:45  19        MR. GRIFFITH:  No objection, Your Honor.

04:51:46  20        THE COURT:  It's admitted.

04:51:48  21        MR. EDDY:  Thank you, Your Honor.

04:51:49  22        (GOVERNMENT EXHIBIT 144:  Received in evidence.)

04:51:49  23        MR. EDDY:  And may we publish?

04:51:50  24        THE COURT:  Yes.

04:51:51  25   BY MR. EDDY:

04:51:51   1   Q.   And, Agent Ridgeway, we'll start here on page 1, and I'll

04:51:55   2   ask Ms. Backer to zoom us to about here.

04:52:07   3          THE COURT:  All right.  Again, this is from PayPal; is

04:52:09   4   that right?

04:52:10   5          THE WITNESS:  Yes, Your Honor.

04:52:17   6          THE COURT:  All right.

04:52:17   7   BY MR. EDDY:

04:52:17   8   Q.   Agent Ridgeway, what does each of the headings at the top

04:52:22   9   row signify here?  Just walk us through those.

04:52:26   10  A.   Date shows the date of each of the transactions.  The Time

04:52:32   11  reflects the time of the transactions.  Time Zone is the time

04:52:39   12  zone that it occurred in.  Name is the individual involved.  And

04:52:45   13  the Type, either request, received.

04:52:50   14  Q.   For the second row, what's listed under Date, Name, and

04:52:53   15  Type?

04:52:56   16  A.   I'm sorry?

04:52:56   17  Q.   For the second row, 6-9-19, can you give us the date, the

04:53:02   18  name, and the type for this transaction?

04:53:04   19  A.   Yes.  6-9-2019.  Anthony Wilburn.  Payment received.

04:53:12   20  Q.   How about the row under that?

04:53:15   21  A.   6-2-19, Anthony Wilburn, payment received.

04:53:23   22  Q.   And let's go now to the sixth row down.

04:53:34   23  A.   7-10-2017, Anthony Wilburn, payment received.

04:53:42   24  Q.   Let's go now to page 2, and we'll zoom in on these clusters

04:53:44   25  here.

04:53:44   1        Agent Ridgeway, what, if anything, is the relationship

04:53:59   2   between the entries on this page and the ones we were just

04:54:03   3   looking at on the last page?

04:54:05   4   A.   They're attached to them.   They're just a continuation of

04:54:07   5   them.

04:54:08   6   Q.   On the second row here, what's listed under Gross?

04:54:12   7   A.   200.

04:54:13   8   Q.   How about for the third row?

04:54:14   9   A.   300.

04:54:15   10   Q.   And the sixth?

04:54:19   11   A.   200.

04:54:21   12   Q.   Let's move now to page 3.   We'll zoom in on those fields

04:54:34   13   under the heading for To, e-mail address, what's listed there in

04:54:40   14   the rows?

04:54:40   15   A.   DerekJedidiah@gmail.com.

04:54:44   16   Q.   And now let's go to page 4.   For the transactions listed

04:54:54   17   here, following along with those same rows, what is seen under

04:54:59   18   shipping address for the second and third rows?

04:55:01   19   A.   Anthony Wilburn, 1029 Kale Adams Road, Leavittsburg, Ohio

04:55:10   20   44430, I'm sorry, United States.

04:55:13   21   Q.   For the Gmail account that was listed on page 3 of this

04:55:17   22   exhibit, did you apply to a judge for a warrant to search the

04:55:20   23   contents of that account for evidence of dogfighting?

04:55:23   24   A.   Yes.

04:55:23   25   Q.   Was that application granted?

RIDGEWAY - DIRECT

04:55:25   1   A.   Yes.

04:55:26   2   Q.   Did you provide that warrant to Gmail or Google?

04:55:30   3   A.   I did.

04:55:31   4   Q.   What, if anything, did they provide you in response?

04:55:32   5   A.   A response containing the contents of that account.

04:55:37   6   Q.   Was that in electronic format?

04:55:40   7   A.   It was.

04:55:40   8   Q.   Did you download those?

04:55:41   9   A.   I did.

04:55:42   10   Q.   Did you save an electronic copy of those materials?

04:55:45   11   A.   Yes, I did.

04:55:46   12   Q.   Did you keep them in a secure location?

04:55:48   13   A.   Yes.

04:55:49   14   Q.   And now, if I could, let's have you turn to what's been

04:55:52   15   marked for identification in your binder as Government's Exhibit

04:55:55   16   136.  And please take a look at that and also 138 to 143.  Just

04:56:13   17   familiarize yourself briefly with those documents and look up to

04:56:15   18   let me know when you've done that.

04:57:06   19           Have you seen these before?

04:57:07   20   A.   Yes.

04:57:07   21   Q.   In preparation for your testimony today, did you compare

04:57:10   22   those exhibits to material that you received from Google in

04:57:12   23   response to the search warrant that we just mentioned?

04:57:15   24   A.   Yes.

04:57:17   25   Q.   Are these fair and accurate copies of records that law

| | | |
|---|---|---|
| 04:57:20 | 1 | enforcement received from Google in response to that warrant? |
| 04:57:23 | 2 | A.   Yes. |
| 04:57:24 | 3 | MR. EDDY:  Your Honor, I move admission of |
| 04:57:28 | 4 | Government's Exhibits 136 and 138 through 143. |
| 04:57:33 | 5 | THE COURT:  Any objection? |
| 04:57:34 | 6 | MR. GRIFFITH:  No, sir. |
| 04:57:34 | 7 | THE COURT:  They are all admitted. |
| 04:57:36 | 8 | MR. EDDY:  Thank you, Your Honor. |
| 04:57:36 | 9 | *(GOVERNMENT EXHIBIT 136 and 138 through 143:  Received in* |
| 04:57:36 | 10 | *evidence.)* |
| 04:57:37 | 11 | MR. EDDY:  And may we publish -- |
| 04:57:39 | 12 | THE COURT:  Yes. |
| 04:57:39 | 13 | MR. EDDY:  -- 136. |
| 04:57:40 | 14 | BY MR. EDDY: |
| 04:57:40 | 15 | Q.   And I'll have you turn to that tab as well, Agent Ridgeway, |
| 04:57:43 | 16 | and then we'll zoom in right about there.  Was this in the |
| 04:57:49 | 17 | materials that Google provided in response to the search |
| 04:57:51 | 18 | warrant? |
| 04:57:53 | 19 | A.   Yes. |
| 04:57:54 | 20 | Q.   Do you see a line in all caps near the top? |
| 04:57:56 | 21 | A.   Yes. |
| 04:57:57 | 22 | Q.   What does it say? |
| 04:57:58 | 23 | A.   Google Subscriber Information. |
| 04:58:01 | 24 | Q.   Do you see a field over there for Name? |
| 04:58:03 | 25 | A.   Yes. |

04:58:04  1    Q.   What's that?

04:58:05  2    A.   Derek G.

04:58:07  3    Q.   How about under there, right underneath, for e-mail?

04:58:10  4    A.   DerekJedidiah@gmail.com.

04:58:15  5    Q.   Going down a few rows from there, do you see a line Created

04:58:18  6    On?

04:58:18  7    A.   Yes.

04:58:19  8    Q.   What's it say there?

04:58:21  9    A.   5-17-2006.

04:58:25  10   Q.   Do you see a field under there for SMS a couple of rows

04:58:29  11   down?

04:58:30  12   A.   Yes.

04:58:31  13   Q.   And can we zoom in on that a little bit more, Ms. Backer?

04:58:40  14   Do you recognize that?

04:58:41  15   A.   Yes.

04:58:44  16   Q.   As what?

04:58:47  17   A.   Derek Golson's phone number.

04:58:48  18   Q.   And now let's turn in your binder to what was just admitted

04:58:52  19   as Government's Exhibit 140.

04:58:53  20        MR. EDDY:  And I realize we're coming close to

04:58:59  21   5:00 o'clock here, Your Honor, but we're very close to being

04:59:02  22   finished with Agent Ridgeway's direct.  I anticipate another,

04:59:04  23   perhaps, another five or six minutes.

04:59:08  24        THE COURT:  Let's finish him up.

04:59:11  25        MR. EDDY:  And may we publish page 1 of Government's

RIDGEWAY - DIRECT

04:59:13  1   Exhibit 140?

04:59:14  2            THE COURT:  140?  You may.

04:59:19  3   BY MR. EDDY:

04:59:19  4   Q.   And let's zoom in on that header there.  Agent Ridgeway, is

04:59:22  5   this one of the e-mails from that account?

04:59:24  6   A.   Yes.

04:59:25  7   Q.   Who's it from and to?

04:59:27  8   A.   From DerekGolson or DGolson@cowin.com to

04:59:33  9   DerekJedidiah@gmail.com.

04:59:37 10   Q.   What's the subject?

04:59:38 11   A.   Derek Kennel logo.

04:59:41 12   Q.   And the date?

04:59:44 13   A.   3-10-2017.

04:59:45 14   Q.   Any attachments?

04:59:48 15   A.   Yes.

04:59:50 16   Q.   Let's move to page 2.  Is this the attachment?

04:59:57 17   A.   Yes.

05:00:00 18   Q.   And if we could -- well, let me just ask you,

05:00:03 19   Agent Ridgeway, can you make out what's in the cursive there?

05:00:12 20   A.   C Wood Kennels established -- or EST 2009.

05:00:15 21   Q.   Let's move from there to Government's Exhibit 138.  Is this

05:00:25 22   another e-mail from that account?

05:00:27 23   A.   Yes.

05:00:28 24   Q.   And we'll zoom in on that top part, please.  If you would,

05:00:30 25   who's it from and to?

05:00:33   1    A.   DerekG or DerekJedidiah@gmail.com.

05:00:37   2    Q.   What's the date?

05:00:38   3    A.   12-23-2014.

05:00:41   4    Q.   Any attachments?

05:00:42   5    A.   Yes.

05:00:42   6    Q.   Now let's move to page 2.  Is this the attachment?

05:00:47   7    A.   Yes.

05:00:48   8    Q.   Do you see the -- wooden item in this photograph?

05:00:52   9    A.   Yes.

05:00:53   10   Q.   Do you recognize it from somewhere else?

05:00:55   11   A.   I do.

05:00:56   12   Q.   That item was seized at James Tommy Peek's residence.

05:01:02   13        Did you physically handle the item resembling the item

05:01:06   14   in this photograph that was seized from Tommy Peek?

05:01:09   15   A.   Yes.

05:01:09   16   Q.   Did you previously compare this exhibit to that physical

05:01:11   17   item?

05:01:12   18   A.   Yes.

05:01:13   19   Q.   And what, if anything, did you notice when you did that?

05:01:16   20   A.   It's the same.

05:01:18   21   Q.   Did you notice any particular similarities?

05:01:23   22   A.   Yes.  The way this is built, with the long nail-like pieces

05:01:31   23   which hold the top of that guillotine-type structure in and the

05:01:35   24   rope pieces on there as well.

05:01:38   25   Q.   Agent Ridgeway, did you bring that item down here with you

05:01:40   1   from Alabama?

05:01:41   2   A.   I did.

05:01:43   3   Q.   And last one here, could you please --

05:01:48   4        MR. EDDY:   May we publish, Your Honor?

05:01:49   5   BY MR. EDDY:

05:01:49   6   Q.   -- and can you please turn in your binder to what's been

05:01:52   7   admitted as Government's Exhibit 139.  And we'll zoom in on that

05:02:01   8   header again, please.  Is this another e-mail from that account?

05:02:04   9   A.   Yes.

05:02:04   10   Q.   Who is it from and to?

05:02:06   11   A.   DerekJedidiah@gmail.com.

05:02:10   12   Q.   What's the date?

05:02:10   13   A.   12-23-2014.

05:02:14   14   Q.   Any attachments?

05:02:15   15   A.   Yes.

05:02:17   16   Q.   Let's go to page 2, and we'll zoom in a little bit more.

05:02:17   17   Is this the attachment?

05:02:20   18   A.   Yes.

05:02:20   19   Q.   Does the background in this photo resemble to you any place

05:02:24   20   that you have previously been?

05:02:27   21   A.   Yes.  James Tommy Peek's front porch.

05:02:33   22   Q.   Can you please flip back and forth in your binder and

05:02:36   23   compare the dates and the times of the e-mail with this

05:02:39   24   attachment and the e-mail in Government's Exhibit 138?

05:03:01   25   A.   The date is the same.  The time is about 12 seconds off,

05:03:08   1    different.

05:03:11   2            MR. EDDY:  Your Honor, that concludes our direct of

05:03:13   3    Agent Ridgeway.

05:03:16   4            THE COURT:  All right.  Ladies and gentlemen, we're

05:03:19   5    going to break.  We're a little bit late, but we'll break now

05:03:23   6    until the morning at 9:00 o'clock, and at that time we will have

05:03:26   7    cross-examination of Agent Ridgeway.

05:03:30   8            How many of you live more than 75 miles away.  One?

05:03:36   9    How far?

05:03:38   10           THE JUROR:  About a hundred.

05:03:40   11           THE COURT:  Hundred miles?  You've got a long drive.

05:03:42   12   Drive carefully.

05:03:43   13           All right.  Please be back in the morning at

05:03:46   14   9:00 o'clock, ready to go.  And don't talk about the case with

05:03:51   15   anyone at home.  Avoid anything that may be in the news about

05:03:55   16   this case or this trial.  Stay off your electronic devices.  And

05:04:00   17   we'll see you in the morning.  Good night.

05:04:12   18       *(Jury excused.)*

05:04:35   19           THE COURT:  Be seated.

05:04:41   20           Agent Ridgeway, you may step down and have a seat.

05:04:43   21           Let's see.  Mr. Griffith, you had some scheduling

05:04:47   22   issues you wanted to take up, I think.

05:04:49   23           MR. GRIFFITH:  Yes, Judge.  I've got a witness from

05:04:51   24   out of state and a veterinarian that we're going to call; and I

05:04:54   25   was wondering if, based upon where we are with the case, if we

05:04:59   1   could start the defense case Monday because it looks like we

05:05:03   2   probably won't wrap the Government's case up till Friday

05:05:07   3   sometime, and rather than have people potentially come here and

05:05:10   4   then have to spend the weekend as opposed to just coming in on

05:05:14   5   Sunday night and being able to start the defense case on Monday.

05:05:18   6           I would defer to the Government to see how much longer

05:05:22   7   they think their case will be; but I would think, based on the

05:05:25   8   pace we've kept today, that we'll be sometime Friday before the

05:05:29   9   Government would rest.

05:05:33   10          THE COURT:  Mr. Johnson, you've got some out of town

05:05:35   11  witnesses coming in too.  What's your problem that way?

05:05:40   12          MR. JOHNSON:  I don't know.  I mean, he's not on a

05:05:41   13  schedule yet.  I was kind of waiting to see what the Court's

05:05:45   14  schedule is.  At this point I can still kind of shuffle my

05:05:52   15  witness.

05:05:52   16          THE COURT:  The Government has sort of indicated it's

05:05:54   17  going to take four to five days, Mr. Eddy, and we're already in

05:06:00   18  day one, finished.  Where are we?

05:06:05   19          MR. EDDY:  It's so hard to say, Your Honor, because

05:06:07   20  we -- we're not sure what to expect in the way of

05:06:10   21  cross-examination.  But I think, based on previous trials that

05:06:13   22  I've had in a similar subject matter, I think it's -- there's a

05:06:22   23  decent chance that we could finish by the close of business

05:06:25   24  Friday.  I don't want to hold myself to that in case we've got

05:06:29   25  days on end of cross-examination.  But I think, given a

| | | |
|---|---|---|
| 05:06:31 | 1 | reasonable amount of cross-examination, end of this week would |
| 05:06:34 | 2 | be a good ballpark estimate for the Government's case in chief. |
| 05:06:37 | 3 | THE COURT:  Well, that would be a good dividing point. |
| 05:06:39 | 4 | You want to bring your witness in Monday morning?  Is that what |
| 05:06:41 | 5 | you want to do? |
| 05:06:41 | 6 | MR. GRIFFITH:  Yes, sir.  That's what I was hoping, |
| 05:06:42 | 7 | Judge.  If we could at least get started with the defense case |
| 05:06:46 | 8 | no sooner than Monday, that way I can get my witnesses here on |
| 05:06:49 | 9 | Monday. |
| 05:06:51 | 10 | THE COURT:  Well, just from my perspective, I think |
| 05:06:56 | 11 | there's little likelihood that we're going to finish any sooner |
| 05:07:01 | 12 | than Friday.  Is that a fair assessments, Mr. Eddy? |
| 05:07:03 | 13 | MR. EDDY:  I think late Friday would be, you know, an |
| 05:07:05 | 14 | aggressive but not totally unrealistic estimate.  And again, |
| 05:07:08 | 15 | it's, I think, driven more in my mind by the length of their |
| 05:07:12 | 16 | cross-examination than by -- we've already kind of timed out |
| 05:07:15 | 17 | what we think we have. |
| 05:07:18 | 18 | THE COURT:  All right.  Well, Mr. Johnson, how does |
| 05:07:24 | 19 | that fit with what you're thinking? |
| 05:07:27 | 20 | MR. JOHNSON:  Well, I can be prepared to start Monday, |
| 05:07:29 | 21 | or do you have a witness that has to be in here and out of here |
| 05:07:32 | 22 | by Monday? |
| 05:07:33 | 23 | MR. GRIFFITH:  No.  I just -- if you can start on |
| 05:07:35 | 24 | Monday, then I can get my people here Monday afternoon. |
| 05:07:39 | 25 | THE COURT:  Well, I know both of you have local |

05:07:41   1   witnesses.  You don't have to wait for somebody from out of

05:07:46   2   town, I presume.

05:07:48   3           MR. GRIFFITH:  That's correct, Judge.

05:07:49   4           THE COURT:  So you could start earlier if we

05:07:50   5   absolutely had to, but you would like to start with your

05:07:54   6   out-of-town witness on Monday morning.

05:07:58   7           MR. GRIFFITH:  Well, I'd like to start with all my

05:07:59   8   witnesses.  I don't want to tell them to take off work and sit

05:08:02   9   here and then lose a day's pay.  A couple of them are hourly

05:08:07  10   workers, Judge.

05:08:08  11           THE COURT:  Well, it's hard to predict now.  But,

05:08:11  12   Mr. Eddy, I hear you saying that sounds like a realistic

05:08:16  13   estimate.

05:08:16  14           MR. EDDY:  I think that's realistic, Your Honor.  And

05:08:18  15   if what the defendants are concerned about is that the

05:08:21  16   Government will rest its case in chief prior to the close of

05:08:26  17   business on Friday, if they have local witnesses that can fill

05:08:31  18   that time, that's great.  But I think we also -- I've been stuck

05:08:34  19   in that position before too; and we won't oppose, you know,

05:08:38  20   recessing prior to that if the Court's amenable to it.  I'm not

05:08:44  21   asking for that, though, Your Honor.

05:08:46  22           THE COURT:  Well, I'm not -- I'm not sure I'm going to

05:08:49  23   recess early.  But for your purposes, Mr. Griffith, you can

05:08:54  24   bring your out-of-town witness in Monday morning and not before.

05:08:58  25           MR. GRIFFITH:  Thank you, Judge.

05:08:59   1            THE COURT:  You may have to put some other witnesses

05:09:00   2    on before that, but that's where I am.

05:09:06   3            All right.  With that, anything else?

05:09:08   4            MR. GRIFFITH:  No, sir.  That would also be, if I

05:09:10   5    could, Judge -- I don't mean to interrupt.  But my veterinarian,

05:09:13   6    I can get him Monday rather than taking Friday off and maybe

05:09:17   7    sitting here on Friday.  So I can have both of those scheduled

05:09:20   8    for Monday.

05:09:20   9            THE COURT:  He's a paid expert, I presume.

05:09:24  10            MR. GRIFFITH:  Not paid the way a lot of experts are,

05:09:25  11    but...

05:09:27  12            THE COURT:  Well, we'll try to work it around as best

05:09:30  13    we can, yes.

05:09:31  14            MR. GRIFFITH:  Thank you, Judge, I appreciate your

05:09:33  15    courtesy.

05:09:33  16            THE COURT:  All right.  Anything else?  If not, we're

05:09:35  17    adjourned till 9:00 in the morning.

05:09:37  18            MR. EDDY:  Thank you, Your Honor.

05:09:38  19        *(Proceedings adjourned at 5:09 p.m.)*

05:09:38  20

          21                    * * * * * * * *

          22

          23

          24

          25

1        I hereby certify that the foregoing is a true and correct
transcript of the stenographically reported proceedings held in
2   the above-entitled matter, pursuant to the provisions of Section
753, Title 28, United States Code.

3

4   *Julie A. Wycoff*                        12/15/20

5   _____        _____
    Julie A. Wycoff, RMR, CRR              Date
    Official U.S. Court Reporter

6

7

8                          **I N D E X**

9                                                        Page

10  Court's Preliminary Statement ..............................3

11  Opening Statements by the Government ......................18

12  Opening Statements - Shane Sprague ........................27

13  Opening Statements - Derek Golson .........................35

14  Court Reporter's Certification ...........................214

15

16  Government Witnesses                Direct   Cross   Redirect

17  **ANDREW RIDGEWAY** .........................52

18

19                    **GOVERNMENT EXHIBITS**

20  Exhibit    Description                    Marked  Admitted

21  1          Report of Call System            63      63

22  3          Recorded call                    73      73

23  4          Excerpt of call on Ex. 3         73      73

24  5          Recorded call                    73      73

25  6          Excerpt of call on Ex. 5         73      73

| | | | | |
|---|---|---|---|---|
| 7 | Recorded call | 73 | 73 |
| 8 | Excerpt of call on Ex. 7 | 73 | 73 |
| 9 | Recorded call | 73 | 73 |
| 10 | Excerpt of call on Ex. 9 | 73 | 73 |
| 11 | AT&T response to subpoena | 65 | 65 |
| 13 | Info from Shane Sprague Facebook account | 84 | 84 |
| 16 | Call log report | 87 | 87 |
| 17, 18 | Copies of documents from Facebook | 90 | 90 |
| 21-27 | Copies of documents from Facebook | 90 | 90 |
| 38-47 | Copies of documents from Facebook | 90 | 90 |
| 55-57,59 | Copies of documents from Facebook | 90 | 90 |
| 58 | Copy of video | 102 | 102 |
| 60 | Copy of video | 104 | 104 |
| 61-63 | Copies of documents from Facebook | 90 | 90 |
| 64-68 | Pedigrees from Peds Online | 126 | 126 |
| 70-72 | Pedigrees from Peds Online | 126 | 126 |
| 75 | Pedigree | 122 | 122 |
| 76,80,81 | Pedigrees from Peds Online | 126 | 126 |
| 97 | Book: My Life and Times with the American Pit Bull Terrier, James Crenshaw | 133 | 133 |
| 98 | Delta Airlines response to subpoena | 158 | 158 |
| 100 | Ria Financial response to subpoena | 162 | 162 |
| 110,111 | Search and seizure warrants | 170 | 170 |
| 115-119 | Evidence receipts and search warrant inventories | 176 | 176 |

| | | | | |
|---|---|---|---|---|
| 1 | 136 | Google response to subpoena | 205 | 205 |
| 2 | 138-143 | Google response to subpoena | 205 | 205 |
| 3 | 144 | PayPal response to subpoena | 201 | 201 |
| 4 | 146 | Search and seizure warrant | 192 | 192 |
| 5 | 306 | Photograph of weighted collar | 199 | 199 |
| 6 | 311-313 | Books | 197 | 197 |
| 7 | 317-350 | Books and documents seized from Golson residence | 196 | 196 |
| 8 | | | | |
| 9 | 396 | Registration paperwork | 132 | 132 |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |